RICHARD LEWIS, in *PROPRIA PERSONA*
and *EX REL* as a Private Attorney General
For the Citizens of Tennessee and the
People of the United States of America
P. O. Box 365
Maynardville, TN 37807

# FILED

FEB 2 0 2013

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| RICHARD LEWIS, an individual in *propria persona* and *ex rel*; Private Attorney General; NELLE PAEGEL, Esq. a licensed California attorney and an individual; THOMAS W. PAEGEL, an individual; THOMAS W.V. PAEGEL, an individual; LORRAINE LEWIS, an individual; RICHARD L. LEWIS III, an individual; MINOR CHILD 1, age 6 an individual; MINOR CHILD 2, age 8 an individual; MINOR CHILD 3, age 3 an individual; MINORCHILD 4, age 7 an individual; THE BODY COMPANY SPORTS, INC. a Nevada corporation; and DOES 1-300 INCLUSIVE, Plaintiffs v. LYDIA KORNILOFF aka LYDIA CORNELL, an individual; LYDIA CORNELL ENTERPRISES, a non-entity business; GODSHOTS ("TM, L.L.C."), a non-organized internet website claiming to be an L.L.C., a charitable organization with a trademark; PAUL HAYELAND, aka PAUL HAYLAND, aka PAUL AYELAND, aka PAUL AYLAND, aka PAUL CORNELL, an individual; SPORTS | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) CASE NO: 3:13-CV-93 DATE OF FILING: COURT DATE OF TRIAL; Bertelsman/Guilton PLAINTIFFS' DEMAND FOR JURY TRIAL; UNLIMITED CIVIL CASE; REQUEST FOR GAG ORDER JUDGE: HON. HRG. DATE: TIME: **COMPLAINT FOR DAMAGES FOR:** **1) OBSTRUCTION OF JUSTICE (INCLUDING, BUT NOT LIMITED TO: COLLUSION, CONSPIRACY, PERJURY, BRIBERY DEFAMATION, FALSE REPORTING, ASSAULT& TECHNOLOGY HACKING)** **2) GRAND THEFT BY FALSE PRETENSES** **3) FEDERAL CONSPIRACY** **4) FEDERAL EXTORTION/ATTEMPTED EXTORTION AND BLACKMAIL** **5) CREDIT/DEBIT CARD FRAUD AND PHISHING** |

ICON ENTERTAINMENT, a non-entity business; GSAXE, a non-entity internet retail business owned by Gene Simmons of the band known as "KISS"; AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., a New York corporation and their agents and affiliates; WILLIAM BEATY, an individual; GEORGE DEL JUNCO, an individual, ELIDA DEL TORO, an individual; DAVID FLEMING, a individual; THE GREEN NETWORK, an entity of unknown derivation; eSTARHD.TV, an internet business of unknown derivation; HITMAN PR, an internet website; STEPHANIE M. KING, an individual; MERITUS PAYMENT SOLUTIONS, a credit card processor of unknown registration; ALLEN S. MILLER, an individual; THE MILNER GROUP, LLC, a California limited liability company; DAVID M. ROBINSON, an individual; STAROPOLY, LLC, a revoked Nevada limited liability company; TSOFTNET, INC, a Nevada corporation; IVAN JACKSON, director, treasurer, and secretary of TSOFTNET, INC; PHILLIP MULLIGAN, president and director of TSOFTNET, INC.; TODHD, a subsidiary of TSOFTNET, INC, or other company VIEWPARTNER CORPORATION, a Nevada corporation; ALEX VARONOS, aka ALEX VARONAS, aka ALEX ZARONOS, aka ALEX ZAMBONI, (aka UNKNOWN) an individual; WELLS FARGO N.A., a California corporation and their agents and Affiliates; CRAIG T. WORMLEY, an individual; (ALLEN) KELSEY GRAMMER, an individual; GRAMMNET, INC., a California corporation; GRAMMNET PRODUCTIONS, a California corporation; GRAMMNET NH PRODUCTIONS, a California corporation; GRAMMNET NH PRODUCTIONS, California corporation; GRAMNET GLOBAL, LLC, a California limited liability company; INNOVATIONS SUPPORT, a California limited liability company; SOLSTICE PROPERTIES, a California limited liability company; WORLD CUP COMEDY, LLC, a California limited liability company; ASTERISK, LLC, a California

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

6) **CHILD ENDANGERMENT AND CHILD ABUSE**
7) **FEDERAL ILLEGAL PRACTICE OF BUSINESS AND FALSE ADVERTISING**
8) **FRAUD BY INTENTIONAL OR FRAUDULENT MISREPRESENTATION**
9) **FRAUD BY NEGLIGENT MISREPRESENTATION**
10) **FRAUD BY FRAUDULENT INDUCEMENT TO ENTER INTO CONTRACT**
11) **INDUCEMENT TO COMMIT FRAUD**
12) **CONVERSION**
13) **GRAND LARCENY THEFT OF PERSONAL PROPERTY**
14) **GRAND THEFT OF MATERIAL**
15) **UNFAIR COMPETITION BY TORTIOUS INTERFERENCE WITH EXISTING BUSINESS RELATIONSHIP; PROCUREMENT OF BREACH OF CONTRACT**
16) **UNAUTHORIZED PRACTICE OF LAW**
17) **BREACH OF CONTRACT**
18) **BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**
19) **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS**
20) **FRAUD VIA INTERNET, COMPUTER FRAUD AND ABUSE**
21) **INTERNET PIRACY, PHISHING**
22) **NEGLIGENCE/GROSS NEGLIGENCE**
23) **GRAND THEFT BY EMBEZZLEMENT**
24) **INVASION OF PRIVACY, PHISHING**
25) **COMPUTER FRAUD AND ABUSE, INTERNET HACKING, PHISHING AND CYBER-CRIMES**
26) **VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
27) **HARASSMENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
28) **FILING FALSE REPORTS WITH GOVERNMENT AGENCIES**

| | |
|---|---|
| limited liability company; C2 CHANNEL CHANNEL, LLC, a California limited liability company; G3 MEDIA, LLC, a California limited liability; L A THEATRE SPORTS, a California corporation; NELSON PAGE ENTERTAINMENT, INC., a California corporation; SOLSTICE, LTD, a California limited liability company (suspended); KELSEY GRAMMER CHARITABLE FOUNDATION a California corporation GRAMMNET NH, INC. A California corporation; MARTHA KEHOE, an individual; JAN A. PLUIM, an individual; KEITH G. WILEMAN, an individual; XIAOYI YAO, an individual; ROBERT NEWELL, JR., an individual; LYRIX ENTERPRISES, a non-organized consulting and marketing internet business; MEKI COX, an individual aka (Meki L. Cox, Meki Lynn Cox, Meri Lynn Cox, Meki Cox, Meki C. Jaklitsch, Meki Jaklitsch, Meki L. Coxjaklitsch, Meki Selman, (aka UNKNOWN other identities); eSTARHD.TV, an online operation of unknown origin; ZURICH INSURANCE, N.A., an insurance company; FARMER'S INSURANCE GROUP, an insurance company; MASTERCARD WORLDWIDE, a New York corporation; CINDY THOMAS, an individual; PETE E. ALMEIDA, an individual; S. MARTIN KELETI, and individual; EDWARD WALSH, an individual; JAMES HILLIS FORD, an individual MARTHA KEHOE, an individual; ARTHUR HADDOCK, an individual; BARBARA NIVEN, an individual; CORBIN BLEU, an individual; AV COMPUTER DOCTOR/CASEY KEITH a non-organized business; JAMES D. ROBERTS, an individual and DOES 1-300 INCLUSIVE, Defendants | **29) INSURANCE BAD FAITH** **30) BUSINESS INTERFERENCE** **31) DEFAMATION** **32) VIOLATIONS OF THE FEDERAL RULES OF DISCOVERY** **33) FEDERAL AND STATE INCOME TAX EVASION AND FRAUD** **EXHIBITS** REQUEST FOR DECLARATORY RELIEF—CONSTRUCTIVE TRUST, RESTITUTION, PERMANENT INJUNCTION, SUMMARY POSSESSION, PUNITIVE DAMAGES, ATTORNEY FEES AND COSTS 18 U.S.C. CH. §§1961-1968, *et seq.*; HOBBS Act 18 U.S.C. §1951; 18 U.S.C. § 201, 202-209; The Federal Extortion and/or Blackmail Act, 18 U.S.C. §§ 872, 875-877; Grand Larceny; Stalking 18 U.S.C. 2261A et seq.; Mail Fraud 18 U.S.C. § 1341; Wire Fraud 18 U.S.C. § 1343; Extortion 18 U.S.C. § 875; Full Faith and Credit §§ 1738-1739; Americans with Disabilities Act of 1990, 42 U.S.C. § 12131; U.S.A. Patriot Act of 2001, 42 U.S.C § 5195; Homeland Security Act of 2002 6 U.S.C. 101; 12 U.S.C. § 2605(e) (2)(A) and (e)(3), ABA Model Code of Judicial Conduct (CANONS); Racketeer Influenced and Corrupt Organizations Act of 1970; Tennessee Civil RICO Act of 1968; Tennessee RICO act 1968; Tennessee GANG BILL; the Tennessee Terrorism Prevention Act, and common law of the United States (collectively, "The ACTS") and Tennessee, California, and Florida statutes and common law; The Adam Walsh Child Protection and Safety Act of 2006. |

# PARTIES

RICHARD LEWIS ("LEWIS"), P.O. Box 365, Maynardville, TN 37807.

NELLE PAEGEL ("NELLE"), 231 S. Glendora Ave, Glendora, CA 91741.

| | |
|---|---|
| 1 | THOMAS W. PAEGEL("TOM"), 231 S. Glendora Ave, Glendora, CA 91741. |
| 2 | THOMAS W. V. PAEGEL ("TOMMY"), 231 S. Glendora Ave, Glendora, CA 91741. |
| 3 | THE BODY COMPANY SPORTS, INC ("TBCS"), 231 S. Glendora Ave, Glendora, CA 91741. |
| 4 | LORRAINE LEWIS ("LORRAINE"), address placed under seal, contact RICHARD LEWIS at P.O. |
| 5 | Box 365, Maynardville, TN 37807. |
| 6 | RICHARD L. LEWIS III ("LEWIS III"), address placed under seal, contact RICHARD LEWIS at |
| 7 | P.O. Box 365, Maynardville, TN 37807. |
| 8 | MINOR CHILD 1 ("MINOR"), address placed under seal, contact RICHARD LEWIS at P.O. Box |
| 9 | 365, Maynardville, TN 37807. |
| 10 | MINOR CHILD 2 ("MINOR"), address placed under seal, contact RICHARD LEWIS at P.O. Box |
| 11 | 365, Maynardville, TN 37807. |
| 12 | MINOR CHILD 3 ("MINOR3"), address placed under seal, contact RICHARD LEWIS at P.O. Box |
| 13 | 365, Maynardville, TN 37807. |
| 14 | MINORCHILD 4("MINOR") , address placed under seal, contact RICHARD LEWIS at P.O. Box |
| 15 | 365, Maynardville, TN 37807. |
| 16 | LYDIA KORNILOFF aka LYDIA CORNELL ("CORNELL"), 300 S. Crescent St. Beverly Hills |
| 17 | CA, 90212 and P.O. Box Address 269 S. Beverly Drive, #1024, Beverly Hills, CA 90212. |
| 18 | GODSHOTS ("TM, L.L.C.")("CORNELL") 269 S. Beverly Drive #1204, Beverly Hills, CA 90212. |
| 19 | PAUL HAYELAND ("HAYELAND"), and aliases, 269 S. Beverly Dr., # 608, Beverly Hills, CA |
| 20 | 90212 and PCH.1111@YAHOO.COM. |
| 21 | SPORTS ICON ENTERTAINMENT ("SIE"), c/o PAUL HAYELAND and GSAXE.com. |
| 22 | GENE SIMMONS ("SIMMONS"), 2650 Benedict Canyon Drive, Los Angeles, CA. |
| 23 | AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC. ("EXP"), c/o CT |
| 24 | Corporation System, 111 Eighth Avenue, New York, New York 10011. |
| 25 | WILLIAM BEATY ("BEATY"), 81 Newport Ave., Santa Ana, CA 92705. |
| 26 | GEORGE DEL JUNCO ("JUNCO"), 1643 Larkvane Road, Rowland Heights, CA 91748. |
| 27 | ELIDA DEL TORO ("TORO"), 1643 Larkvane Road, Rowland Heights, CA 91748. |
| 28 | THE GREEN NETWORK ("GREEN"), 1643 Larkvane Road, Rowland Heights, CA 91748. |

1  DAVID FLEMING ("FLEMING"), 5016 Kester, Apt. 211, Sherman Oaks, CA 91703.

2  HITMAN PR/HITMAN PR.COM ("HITMAN"), 411 E. Huntington Dr., STE 107 PMB 285,

3  Arcadia, CA 91006.

4  STEPHANIE M. KING ("KING"), 375 Huntington Drive, Ste. B, San Marino, CA 91106 or 541

5  Linwood Avenue, Unit "C," Monrovia, CA 91016.

6  MERITUS PAYMENT SOLUTIONS ("MERITUS"), 1901 E. Alton Parkway, Ste. 220, Santa Ana,

7  CA 92705-5849.

8  ALLEN S. MILLER ("MILLER"), 541 Linwood Avenue, Unit "C," Monrovia, CA 91016.

9  THE MILNER GROUP, LLC (MILNER"), c/o DAVID ROBINSON agent for service of process,

10  715 S. Barrington Ave., Apt. D, Los Angeles, CA 90049.

11  DAVID M. ROBINSON ("ROBINSON"), 715 S. Barrington Ave., Apt. D, Los Angeles, CA 90049.

12  STAROPOLY, LLC ("STAROPOLY" also included as "VARONOS"). c/o Laughlin Associates,

13  Inc., 2533 N. Carson Street, Carson City, NV 89706.

14  TSOFTNET, INC. ("TSOFTNET" also included as "VARONOS"). c/o Davine Henderson, LLC,

15  2533 N. Carson St., Carson City, NV 89076.

16  IVAN JACKSON ("JACKSON" also "VARONOS" and "STAROPOLY"). Director, Treasurer, and

17  Secretary of TSOFTNET, INC. c/o Davine Henderson, LLC, 2533 N. Carson St., Carson City, NV

18  89076.

19  PHILLIP MULLIGAN ("MULLIGAN" also "VARONOS" and "STAROPOLY"), President and

20  Director of TSOFTNET, INC. c/o Davine Henderson, LLC, 2533 N. Carson St., Carson City, NV

21  89076.

22  TODHD ("TODHD" also included as "VARONOS"). TSOFTNET, INC., manager, c/o Davine

23  Henderson, LLC, 2533 N. Carson St., Carson City, NV 89076.

24  VIEWPARTNER CORP. ("VIEWPARTNER" also included as "VARONOS"), c/o Laughlin

25  Associates, Inc., 9120 Double Diamond Pkwy., Reno, NV, 89521.

26  ALEX VARONOS, President, Director, Secretary, Treasurer of VIEWPARTNER CORPORATION,

27  c/o Laughlin Associates, Inc., 9120 Double Diamond Pkwy., Reno, NV, 89521.

28

1 ALEX VARONOS (aka ALEX ZARONOS, aka ALEX ZAMBONI) ("VARONOS"), 11182
2 Lexington Dr., Los Alamitos, CA 90720; 1772 J. East Avenida de Los Arboles #114, Thousand
3 Oaks, CA 91362; or by publication L.A. Times.
4 WELLS FARGO N.A. ("FARGO"), 1200 Montego Way, Walnut Creek, CA 94598.
5 CRAIG T. WORMLEY ("WORMLEY"), 1109 Englewild Dr., Glendora, CA 91741.
6 KELSEY GRAMMER (included as "GRAMMER"), 11 E. Walton St., Apt. 3002, Chicago, Ill.
7 60611-5405.
8 GRAMMNET, INC. (included as "GRAMMER"), c/o Jeff W. Lane, 11400 W. Olympic Blvd., Ste.
9 200, Los Angeles, CA 90064.
10 GRAMMNET NH, INC. PRODUCTIONS, (included as "GRAMMER") c/o Jeff W. Lane, 11400 W.
11 Olympic Blvd., Ste. 200, Los Angeles, CA 90064.
12 GRAMMNET NH PRODUCTIONS (included as "GRAMMER"), c/o Jeff W. Lane, 11400 W.
13 Olympic Blvd., Ste. 200, Los Angeles, CA 90064.
14 GRAMMNET PRODUCTIONS (included as "GRAMMER"), c/o Jeff W. Lane, 11400 W. Olympic
15 Blvd., Ste. 200, Los Angeles, CA 90064.
16 SOLSTICE, LTD (included as "GRAMMER"), c/o Jeff W. Lane, 11400 W. Olympic Blvd., Ste. 200,
17 Los Angeles, CA 90064.
18 GRAMNET GLOBAL, LLC (included as "GRAMMER"), c/o Jeff W. Lane, 11400 W. Olympic
19 Blvd., Ste. 200, Los Angeles, CA 90064.
20 INNOVATIONS SUPPORT, LLC (included as "GRAMMER") , c/o Jeff W. Lane, 11400 W.
21 Olympic Blvd., Ste. 200, Los Angeles, CA 90064.
22 SOLSTICE PROPERTIES, LLC included as ("GRAMMER"), c/o Jeff W. Lane, 11400 W. Olympic
23 Blvd., Ste. 200, Los Angeles, CA 90064.
24 WORLD CUP COMEDY, LLC (included as "GRAMMER") , c/o Wayne Page, 1066 Charles St.,
25 Pasadena, CA 91103
26 ASTERISK, LLC (included as "GRAMMER"), c/o Jeff W. Lane, 11400 W. Olympic Blvd., Ste. 200,
27 Los Angeles, CA 90064.
28

C2 CHANNEL CHANNEL, LLC (included as "GRAMMER") , c/o Jeff W. Lane, 11400 W. Olympic Blvd., Ste. 200, Los Angeles, CA 90064.

G3 MEDIA, LLC (included as "GRAMMER"), c/o Jeff W. Lane, 11400 W. Olympic Blvd., Ste. 200, Los Angeles, CA 90064.

LA THEATRE SPORTS (included as "GRAMMER") , c/o Dan O'Connor, 2145 N. Gower St., Los Angeles, CA 90068.

NELSON PAGE ENTERTAINMENT, INC. (included as "GRAMMER") , c/o Wayne Page, 1066 Charles St., Pasadena, CA 91103.

GRAMNET NH, INC. (included as "GRAMMER") c/o Jeff W. Lane, 11400 W. Olympic Blvd., Ste. 200, Los Angeles, CA 90064.

KELSEY GRAMMER CHARITABLE FOUNDATION included as ("GRAMMER") , c/o Jeff W. Lane, 11400 W. Olympic Blvd., Ste. 200, Los Angeles, CA 90064.

JAN A. PLUIM, ("PLUIM") Judge of the California Superior Court, Pasadena Superior Court, department "P," 300 E. Walnut, Pasadena, CA 91101.

KEITH G. WILEMAN ("WILEMAN"), 3226 Mills Ave. La Cresenta, Ca. 91214.

XIAOYI YAO ("YAO"), 49 Sycamore Lane, Buena Park, CA 90621.

S. MARTIN KELETI ("KELETI"), 8340 Melrose Avenue Los Angeles, CA, US 90069-5420

ROBERT NEWELL, JR.. ("NEWELL"), Biltmore Court, 520 S. Grand Avenue, Suite 390, Los Angeles, CA 90071.

MEKI COX SELMAN and all aka's ("COX"), 44519 10TH STREET, WEST LANCASTER, CA 93534.

LYRIX ENTERPRISES, (included as "COX") 44519 10TH STREET, WEST LANCASTER, CA 93534.

eSTARHD.TV, c/o David Fleming, 5016 Kester, Apt. 211, Sherman Oaks, CA 91703.

ZURICH INSURANCE, N.A. ("ZURICH" included as "INS"), 1400 American Lane, Schaumburg, IL 60196.

FARMERS INSURANCE GROUP ("FARMERS" included as "INS"), Farmers National Document Center, P.O. Box 268994, Oklahoma City, OK 73126-1389 FAX 877-217-1389.

1  MASTERCARD WORLDWIDE ("MC" included as "FIN. INST."), 2000 Purchase Street, Purchase,
2  NY 10577 U.S.A.

3  CINDY THOMAS ("THOMAS"), clerk of the California Pasadena Superior Court, Dept. "P," 300 E.
4  Walnut, Pasadena, CA 91101.

5  BARBARA VARGAS ("VARGAS"), clerk of the California Pasadena Superior Court, Dept. "P,"
6  300 E. Walnut, Pasadena, CA 91101.

7  PETE E. ALMEIDA, ("ALMEIDA") 700 S. Flower St., 22nd Fl., Los Angeles, CA 90017-4209.

8  EDWARD WALSH, ("WALSH") 717 17th Street, Suite 1520, Denver, CO 80202.

9  JAMES HILLIS FORD ("FORD") through publication Boston Globe 135 Morrissey Blvd. Boston,
10  MA 02125.

11  MARTHA KEHOE ("KEHOE") 6238 Berkeley St., Englewood, Florida, 34224

12  ARTHUR HADDOCK ("HADDOCK") dedicated due to MINORS

13  BARBARA NIVEN AKA Barbara Lee Buholz. ("NIVEN") c/o LEGALZOOM.COM, INC. 100
14  WEST BROADWAY SUITE 100 GLENDALE CA 91210.

15  CORBIN BLEU ("BLEU") C/O Neil E. Meyer, Stone Meyer, & Genow 9665 Wilshire Boulevard
16  Suite 510 Beverly Hills, CA 90212.

17  JAMES D. ROBERTS, Esq. ("ROBERTS"), 20301 Ventura Blvd., Ste. 351, Woodland Hills, CA
18  91364.

19  CASEY KEITH/AV COMPUTER DOCTOR 44519 10th St West Lancaster, CA 93534

20  All defendants that cannot be reached through normal service will be served through publication in
21  accordance to the rules.

22

23                                  PLAINTIFFS

24        Plaintiffs, RICHARD LEWIS in *pro per* and *ex rel*, LORRAINE K. LEWIS,

25  RICHARD L. LEWIS III, NELLE PAEGEL, THOMAS W. PAEGEL, THOMAS W.V. PAEGEL,

26  ALL PAEGELS COLLECTIVELY ("PAEGELS"), THE BODY COMPANY SPORTS, INC.

27  ("TBCS"), MINOR CHILD 1, MINOR CHILD  2, MINOR CHILD 3, and MINOR CHILD 4

28  (collectively "MINORS") file this Complaint and alleges against Defendants as follows:

DEFENDANTS

Defendants, LYDIA CORNELL KORNILOFF; GODSHOTS,; WILLIAM BEATY, GEORGE DEL JUNCO, ELIDA DEL TORO, DAVID FLEMING, THE GREEN NETWORK, HITMAN PR/HITMAN PR.COM ("HITMAN"), STEPHANIE M. KING ("KING"), MERITUS PAYMENT SOLUTIONS ("MERITUS"), ALLEN S. MILLER ("MILLER"), THE MILNER GROUP LLC ("MILNER"), DAVID M. ROBINSON ("ROBINSON"), STAROPOLY LLC ("STAROPOLY"), TSOFTNET, INC ("TSOFTNET"), TODHD ("TODHD"), a subsidiary of TSOFTNET, INC, STAROPOLY AND/OR VIEWPARTNER CORPORATION, VIEWPARTNER CORPORATION ("VIEWPARTNER"), ALEX VARONOS, aka ALEX ZARONOS, aka ALEX ZAMBONI ("VARONOS"), IVAN JACKSON, an individual, PHILLIP MULLIGAN, an individual, WELLS FARGO N.A. ("FARGO" or "FIN. INST."), CRAIG T.WORMLEY ("WORMLEY"), KELSEY GRAMMER, an individual and his known companies organized in California: GRAMMNET, INC., GRAMMNET NH, INC. PRODUCTIONS, GRAMMNET NH PRODUCTIONS, GRAMMNET PRODUCTIONS, SOLSTICE, LTD, GRAMNET GLOBAL, LLC, INNOVATIONS SUPPORT, LLC, SOLSTICE PROPERTIES, WORLD CUP COMEDY, LLC, ASTERISK, LLC, C2 CHANNEL CHANNEL, LLC, G3 MEDIA, LLC, LA THEATRE SPORTS, NELSON PAGE ENTERTAINMENT, INC., GRAMMNET NH, INC., KELSEY GRAMMER CHARITABLE FOUNDATION, COLLECTIVELY ("GRAMMER"),. AMERICAN EXPRESS TRAVEL RELATED SERVICES, INC ("EXP" and "FIN. INST."), HON. JAN A. PLUIM, an individual; KEITH G. WILEMAN, ESQ., an individual; S. MARTIN KELETI, ESQ., an individual; XIAOYI YAO, ESQ., an individual; ROBERT NEWELL, JR., ESQ., an individual; MEKI COX, an individual aka (Meki L Cox, Meki Lynn Cox, Meri Lynn Cox, Meki Cox, Meki L Coxjaklitsch, Meki C Jaklitsch, Meki Jaklitsch, Meki L Coxjaklitsch, and Meki Selman); ALEX VARONOS, an individual; ALLEN S. MILLER, an individual; DAVID FLEMING, an individual; eSTARHD.TV, an online internet operation of unknown origin; ZURICH INSURANCE, N.A. ("ZURICH" or "INS."), an insurance company; FARMERS INSURANCE GROUP ("FARMERS" or "INS."), an insurance company; MASTERCARD credit card company, CINDY THOMAS, an individual; PETE E. ALMEIDA, an individual; EDWARD WALSH, an individual; JAMES HILLIS FORD an

individual; MARTHA KEHOE an individual; and ARTHUR HADDOCK, an individual, BARBARA NIVEN, an individual and CORBIN BLEU, an individual. CASEY KEITH an individual, AV COMPUTER DOCTOR fraudulent business LYRIX ENTERPRISES, a fraudulent non-organized consulting and marketing internet business; BARBARA VARGAS, an individual; JAMES D. ROBERTS, Esq., an individual.

**LEWIS REQUESTS AN ORDER OF THE FEDERAL COURT** to have all Defendant individuals AND their counsel present themselves in person no later than one week before "answering" this complaint for the purpose of being fingerprinted by United States Marshals. This case involves individuals who have committed child endangerment (as required by The Adam Walsh Child Protection and Safety Act of 2006), internet fraud and other frauds, including identity theft. The Court and the plaintiffs need to be assured of defendants' and counsel true identities. Each individual must bring a valid State or Federal form of photo identification.

**LEWIS FEARS for the safety of all PLAINTIFFS,** and does so for the forgoing reasons. As soon as this Federal complaint is filed, and the defendants are notified and aware that they are being brought to the Tennessee Federal court under the Federal CIVIL RICO ACT, and knowing that information has been collected and continuing to be collected about their activities, LEWIS FEARS that retribution reprisal and possible injury to and against the PLAINTIFFS including the MINORS. For instance, MILLER has a pattern of threating people and also threating people with a firearm; MILLER has been known to keep a pistol in his belt. MILLER does not have a "carry permit" and has admitted to having unregistered firearms. See **EXHIBIT No. 9, Pg 60.** MILLER is known to have a personal friend who owns a firing range. MILLER has a webpage called HITMAN which is tongue in cheek for his duties in the GANG.

VARONOS has already has made death threats upon LEWIS'S life in open court; WILEMAN has bragged about owning a $4,000.00 shotgun; WALSH, FORD and COX have made open threats to LEWIS and his family. LEWIS speaks for all the Plaintiffs in notifying and pleading to this court and law enforcement to offer protection. Defendants and any of them are the most likely

candidates for further crime. LEWIS knows that a piece of paper will not stop a bullet and as such places this plea for protection for all PLAINTIFFS.

LEWIS'S complaint and allegations against Defendants are as follows:

## STATEMENT OF ACTION

The Federal Rule of Civil Procedure for complex litigation requires that the court hearing a complex litigation case initiates and implements efficient supervision and control of the litigation proceedings from the beginning of the process to ensure a fair resolution of the complex litigation issue before it. The procedure expects all parties and representing counsel to collaborate in a professional manner and work together for the free exchange of basic and essential information within the allotted time to allow for proper initial pre-discovery and planning as well as case preparation. The rule presumes the court and all representing counsel will cooperate for the evolution of the case and the progression of settlement negotiations in a fair manner. The Federal Rule of Civil Procedure grants the presiding judge special procedures for managing potentially difficult or protracted actions that may involve complex matters, multiple parties, difficult legal situations, or extraordinary proof issues.

The complex litigation handbook addresses certain types of cases including:

Antitrust, Securities, Employment Discrimination, Intellectual Property, CERCLA (Superfund) and **Civil RICO**.

Complex litigation regularly involves two or more separate cases that have some relation or link between them. This may include all pending associated cases or cases that may filed later in the same court even if the cases are filed in separate division of the court. All related cases should be assigned to the same judge even if the judge divides them up later. The Federal Rule of Civil Procedure permits the consolidation of related case for the purpose of coordination and planning.

Consolidation of related cases and pretrial proceedings is possible even when related cases are filed in different courts by having the related cases transferred to the consolidation court if

personal jurisdiction and venue lie in the transferee forum. The Judicial Panel on Multidistrict Litigation may also consolidate the related cases under a single district court.

In cases of complex litigation, it is important to assess if there are clear and acceptable guidelines for compensation and reimbursement as well as whether the arrangements for coordination among participating counsel are fair, reasonable, and efficient.

## THE BURDEN OF PROOF

A series of United States Supreme Court decisions in diversity cases leaves no doubt of the relevance of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), to questions of burden of proof. These decisions are: *Cities Service Oil Co. v. Dunlap*, 308 U.S. 208, 60 S.Ct. 201, 84 L.Ed. 196 (1939), *Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), and *Dick v. New York Life Ins. Co.*, 359 U.S. 437, 79 S.Ct. 921, 3 L.Ed.2d 935 (1959). (Involving burden of proof, respectively, as to status as bona fide purchasers, contributory negligence, and non-accidental death (suicide) of an insured.) In each instance the state rule was held to be applicable. It does not follow, however, that all presumptions in diversity cases are governed by state law. In each case cited, the burden of proof question had to do with a substantive element of the claim or defense. Application of the state law is called for only when the presumption operates upon such an element. Accordingly the rule does not apply state law when the presumption operates upon a lesser aspect of the case, i.e. "tactical" presumptions. The situations in which the state law is applied have been tagged for convenience in the preceding discussion as "diversity cases." The designation is not a completely accurate one since *Erie* applies to any claim or issue having its source in state law, regardless of the basis of federal jurisdiction, and does not apply to a federal claim or issue, even though jurisdiction is based on diversity. Vestal, Erie R.R. v. Tompkins: A Projection, 48 Iowa L.Rev. 248, 257 (1963); Hart and Wechsler, The Federal Courts and the Federal System, 697 (1953); 1A Moore, Federal Practice 0.305[3] (2d ed. 1965); Wright, Federal Courts, 217–218 (1963). Hence the rule employs, as appropriately descriptive, the phrase "as to which state law supplies the rule of decision." See A.L.I. Study of the Division of Jurisdiction Between State and Federal Courts.

One critical aspect of litigation is the threshold one has to establish in order to prove a case, otherwise known as the burden of proof. There is a major distinction between *criminal and civil*

*burdens of proof.* In criminal courts, the **beyond a reasonable doubt** burden of proof is a very high burden, which is often described as having to prove your case to a very high degree of moral certainty. If a member of the jury has any reasonable doubt, which essentially means doubt that is formulated well enough that it can be expressed and supported by reason, that person should vote for acquittal of the defendant.

The burden of proof is much lower in a *civil trial.* The civil justice system uses the **mere preponderance of the evidence burden**, which is sometimes expressed as 51 percent level of proof. Civil jury instructions, which are given to jurors by the judge prior to their deliberations on a case, often describe this as the "scales of justice tipping ever so slightly in the direction of one party versus another," meaning that the jury must find for the party who is supported by the weight of the evidence, even if this is only slightly so.

This difference in burdens of proof can often result in a defendant being acquitted (found not guilty) of criminal charges, yet having a judgment rendered against him or her in a corresponding civil action.

Here, Plaintiffs will show that there is not only a "preponderance" of evidence, but often evidence "beyond a reasonable doubt" as well. The criminal aspects will be handled by the other agencies such as the United States and District Attorneys; the civil and civil RICO ACT matter of showing the mere preponderance of the evidence burden shall be shown in this jurisdiction and court.

**TO THE HONORABLE COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**: Now comes Richard Lewis, in *propria persona* and *ex rel.,* Private Attorney General for the people of the United States of America and the Citizens of Tennessee under the Civil RICO Act 18 USC Ch. 96 §§1961-1968 *et seq.*; HOBBS Act §1951; Bribery, Graft, and Conflicts of Interest 18 USC Chapter 11 §§ 201, 202-209; U.S.A. Patriot Act 2001 42 U.S.C § 5195; Homeland Security Act of 2002 6 U.S.C. 101; The Federal Extortion and/or Blackmail Act, 18 U.S.C. §§ 872, 875-877; Grand Larceny; Stalking 18 U.S.C. 2261A et seq.; Mail Fraud 18 U.S.C. § 1341; Wire Fraud 18 U.S.C. § 1343; Extortion 18 U.S.C. § 875; Full Faith and Credit §§ 1738-1739; Americans with

Disabilities Act of 1990, 42 U.S.C. § 12102; ABA Model Code of Judicial Conduct (CANONS); Racketeer Influenced and Corrupt Organizations Act of 1970; Tennessee Civil RICO Act of 1968; Tennessee RICO act 1968; Tennessee GANG BILL; The Adam Walsh Child Protection and Safety Act of 2006; the Tennessee Terrorism Prevention Act, and common law of the United States (collectively, "The ACTS") and Tennessee, California, and Florida statutes and common law.

## ORIGINAL JURISDICTION

This case properly falls under the jurisdiction of the Eastern District of Tennessee of the United States District Court and supported by the federal statutes, state statutes and common law. This Court shall have original jurisdiction to prevent and restrain violations of The ACTS by issuing appropriate orders, including, but not limited to: 1) Ordering any person to divest himself of any interest, direct or indirect, in any enterprise, 2) Imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce, and/or 3) Ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

## CIVIL RICO (Racketeering and Organized Crime)

UNDER THE CIVIL RICO ACT, THE STATUTE OF LIMITATIONS IS EXTENDED TO 10 YEARS; LEWIS FULLY INTENDS TO INVESTIGATE GANG ACTIVITIES FOR THAT PERIOD OF TIME. THE STATUTES REQUIRE LEWIS TO ENGAGE IN AGGRESSIVE DISCOVERY AND REPORT TO VARIOUS AUTHORITIES ENDOWED WITH THE RESPONSIBILITY OF FILING CRIMINAL CHARGES WHERE JUSTIFIED.

AT THE OUTSET, THE EVIDENCE AGAINST EVERY DEFENDANT, BEING SUBMITTED HEREIN, WARRANTS THAT EACH DEFENDANT COULD EASILY BE

CHARGED WITH PERJURY AND/OR FRAUD THIS CASE IS A PERFICT EXAMPLE OF HOW ORIGINAZED CRIME WORKS.

**The Private Attorney General** is authorized under the Civil RICO Act to investigate under this section and report his findings to the proper authorities for any and all criminal actions they may take. Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court or the State of Tennessee— the State of Tennessee which has original jurisdiction thereof—and **shall recover threefold the damages** he/she sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final. Tennessee RICO Statute 1989; Applied to TN "Gangs Act" Jan. 23, 2012; Ch. 3917, 1981; 18 U.S.C.1962 *et seq*.

A final judgment or decree rendered in favor of the United States and the State of Tennessee in any criminal or civil proceeding brought by the Private Attorney General **shall estop the defendant from denying the essential allegations of the criminal or civil offense in any subsequent proceeding brought by the United States.**

Civil RICO statutes are supplemented by 2 Human Rights Treaties—the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights—both of which are rendered supreme law by virtue of the Supremacy Clause (just like the Bill of Rights).

The latter Covenant's Reservations enacted by Congress expressly reserve original jurisdiction to State and local governments, to the end that their competent authorities may take appropriate measures for the fulfillment of the Covenant.

**Under 18 USC § 1964(C), a Private Attorney General may appear in court without the license to practice law that is required of all State Bar members**.

Civil RICO specifically has a further purpose of encouraging potential private **plaintiffs to investigate diligently**. *Rotella v. Wood*, 528 U.S. 549 (2000).

RICO, 18 U. S. C. §§1961-1968 (1994 ed. and Supp. III), makes it criminal "to conduct" an "enterprise's affairs through a pattern of **racketeering activity**," 18 U. S. C. §1962(c), defined as behavior that violates certain other laws, either enumerated federal statutes or state laws addressing specified topics and bearing specified penalties, 18 U. S. C. §1961(1) (Supp. III). "Pattern" is also a defined term requiring "**at least two acts of racketeering activity** . . .', the last of which occurred **within ten years** ... after the commission of a prior act of racketeering activity." 18 U. S. C. §1961(5). Given Civil RICO's want of any express limitations provision for civil enforcement actions, Clayton Act analogy, §4b, as added, 69 Stat. 283, 15 U. S. C. §15b. See, e.g., *Grimmett v. Brown* , 75 F. 3d 506, 511 (CA9 1996); *McCool v. Strata Oil Co.* , 972 F. 2d 1452, 1464-1465 (CA7 1992); *Rodriguez v. Banco Central Corp.* , 917 F. 2d 664, 665-666 (CA1 1990); *Bankers Trust Co. v. Rhoades* , 859 F. 2d 1096, 1102 (CA2 1988); *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.* , 828 F. 2d 211, 220 (CA4 1987). The administrative director of the courts is authorized to establish any policies and procedures that may be necessary to assist courts with compliance with the Americans with Disabilities Act, 42 U.S.C. 12131 et. seq. The Supreme Court shall approve any such policies and procedures prior to implementation. Participants in the judicial system shall comply with any policies and procedures that may be implemented. This rule shall apply to all courts in this state, including without limitation, municipal courts, general sessions courts, juvenile courts, circuit courts, chancery courts, criminal courts, and the respective appellate courts. 18 USC § 195, Interference with commerce by threats or violence. 18 U.S.C. Sec. 1951, a provision commonly known as the Hobbs Act, and described in RICO itself, Sec. 1961(1)(A).

## FEDERAL EXTORTION AND OR BLACKMAIL 18 U.S.C. § 871

Black's Law Dictionary defines "blackmail" as follows: "Unlawful demand of money or property under threat to do bodily harm, to injure property, to accuse of crime, or to expose disgraceful defects. This crime is commonly included under extortion statutes." Black's defines "extortion" as follows: "The obtaining of property from another induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." FEDERAL EXTORTION AND OR BLACKMAIL 18 U.S.C. § 871 both fall under the Tennessee and Federal Civil RICO ACT.

Extortion by an officer or employee of the United States includes: Threatening to inform (or not to inform) on the violation of a federal law coupled with a demand for money or anything of value (blackmail). Using the mails to extort money or anything of value.is when the offender threatens to reveal information about a victim or his family members that is potentially embarrassing, socially damaging, or incriminating unless a demand for money, property, or services is met. Even if the information is true or actually incriminating, you can still be charged with blackmail if you threaten to reveal it unless the victim meets your demand.

In this case, the Defendants demanded money, threatened, and revealed personal information about the Plaintiff LEWIS, LEWIS III, LORRAINE the MINORS and other family members.

## The USA PATRIOT Act

Congress enacted the Patriot Act by overwhelming, bipartisan margins, arming law enforcement with new tools to detect and prevent terrorism: The USA Patriot Act was passed nearly unanimously by the Senate 98-1, and 357-66 in the House, with the support of members from across the political spectrum.

The Act Improves Our Counter-Terrorism Efforts in Several Significant Ways:

a. The Patriot Act allows investigators to use the tools that were already available to investigate organized crime and drug trafficking.

b. Allows law enforcement to use surveillance against more crimes of terror. Before the Patriot Act, courts could permit law enforcement to conduct electronic surveillance to investigate many ordinary, non-terrorism crimes, such as drug crimes, mail fraud, and passport fraud.

Agents also could obtain wiretaps to investigate some, but not all, of the crimes that terrorists often commit. The Act enabled investigators to gather information when looking into the full range of terrorism-related crimes, including: chemical-weapons offenses, the use of weapons of mass destruction, killing Americans abroad, and terrorism financing.

c. Allows federal agents to follow sophisticated terrorists trained to evade detection.

d. Allows law enforcement to conduct investigations without tipping off terrorists. Allows federal agents to ask a court for an order to obtain business records in national security terrorism cases.

e. Prosecutors and investigators used information shared pursuant to section 218 in investigating the defendants in the so-called "Virginia Jihad" case.

The Patriot Act updated the law to reflect new technologies and new threats. It allows law enforcement officials to obtain a search warrant anywhere a terrorist-related activity occurred **Allows victims of computer hacking to request law enforcement assistance in monitoring the "trespassers" on their computers.** This change made the law technology-neutral; it placed electronic trespassers on the same footing as physical trespassers. Now, hacking victims can seek law enforcement assistance to combat hackers, just as burglary victims have been able to invite officers into their homes to catch burglars.

The Patriot Act increased the penalties for those who commit terrorist crimes. Americans are threatened as much by the terrorist who pays for a bomb as by the one who pushes the button. That's why the Patriot Act imposed tough new penalties on those who commit and support terrorist operations, both at home and abroad.

## BRIBERY

The Civil RICO Act - 18 U.S.C. 1961-1968 Racketeer Influenced and Corrupt Organizations (RICO) Legislation (US Criminal Code, Chapter 96) provides support for legal actions against individuals or organizations involved in systematic illegal activities. The Office of Government Ethics (OGE), a small agency within the executive branch, was established by the Ethics

in Government Act of 1978. Originally part of the Office of Personnel Management, OGE became a separate agency on October 1, 1989 as part of the Office of Government Ethics Reauthorization Act of 1988. **18 U.S.C. § 201 - Bribery of Public Officials and Witnesses Bribery** – Definition: The offering, giving, receiving, or soliciting of something of value for the purpose of influencing the action of an official in the discharge of his or her public or legal duties. Bribery - Modern Law Modern statutes, state and federal, have four common characteristics. (1) They apply equally to receivers and givers. (2) They are comprehensive, including as officials all employees of government and those acting in a government capacity, such as jurors and legislators. More recent statutes include party officials and even party employees. (3) They treat bribery as a crime that can be committed by the briber even though the bribee is not influenced. (4) They treat bribery as a felony. Bribery is a criminal act, classified as white collar crime. It refers to the improper acceptance, offering, giving, receiving or solicitation of a gain or advantage for the Beneficiary, with the intent of influencing the actions, views, opinions, or decisions of a public official, juror, someone in a position of trust, or someone bound by a duty to act impartially.

The gain or advantage may be a promise, money, property, goods, services, information, commercial interests or anything else of value. In most cases, both the person offering the bribe and the person accepting the bribe can be charged with bribery. Bribery is usually charged as a felony, punishable by a fine, imprisonment, or both. In order to be considered bribery, there must be corrupt purpose, either implied or proven. A gift is not a bribe unless it is given with the intention of influencing the recipient's behavior. There are various types of bribery, which include: bribery by/of a public official; bribery by/of a witness; bribery of a foreign official; commercial bribery; bank bribery; and bribery in sporting contests. Bribery is closely associated with extortion.

18 U.S.C. § 201 proscribes bribery and the acceptance of certain gratuities. The U.S. Supreme Court in *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404-405 (1999), describes the two crimes as follows:

"The first crime, described in §201(b)(1) as to the giver, and §201(b)(2) as to
the recipient, is bribery, which requires a showing that something of value was
corruptly given, offered, or promised to a public official (as to the giver) or

corruptly demanded, sought, received, accepted, or agreed to be received or accepted by a public official (as to the recipient) with intent, inter alia, "to influence any official act" (giver) or in return for "being influenced in the performance of any official act" (recipient). The second crime, defined in §201(c)(1)(A) as to the giver, and §201(c)(1)(B) as to the recipient, is illegal gratuity, which requires a showing that something of value was given, offered, or promised to a public official (as to the giver), or demanded, sought, received, accepted, or agreed to be received or accepted by a public official (as to the recipient), "for or because of any official act performed or to be performed by such public official." *Id.*

The distinguishing feature of each crime is its intent element. Bribery requires intent "to influence" an official act or "to be influenced" in an official act, while illegal gratuity requires only that the gratuity be given or accepted "for or because of" an official act. In other words, for bribery there must be a quid pro quo— a specific intent to give or receive something of value in exchange for an official act. An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken."

Due to the pervasiveness of bribery herein alleged during case nos. GC047909 and 11-cv-08810-GW, all transcripts from those case numbers are herein incorporated in part or full by reference.

## **RICO**

The predicate acts, of which at least two are required, to establish a pattern of racketeering activity for RICO purposes, are:

i.  Any violation of state statutes against gambling, murder, kidnapping, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in the Controlled Substances Act);

ii.    Any act of bribery, counterfeiting, theft, embezzlement, fraud, dealing in obscene matter, obstruction of justice, slavery, racketeering, gambling, money laundering, commission of murder-for-hire, and several other offenses covered under the Federal criminal code *Title 18);

iii.    Embezzlement of union funds;

iv.    Bankruptcy or securities fraud;

v.    Drug trafficking;

vi.    Money laundering and related offenses;

vii.    Bringing in, aiding or assisting aliens in illegally entering the country (if the action was for financial gain);

viii.    Acts of terrorism.

## **PRIVATE ATTORNEY GENERAL**

18 USC 1964(c), which was passed by Congress which enable **any person** who has been injured by a Civil RICO Act violation to sue. That person can request an order for damages and injunctions (such as a restraining order). Under his authority as the Private Attorney General, Plaintiff LEWIS in *propria persona* and as *ex rel* is also requesting a restraining order against all defendants at this time, to prevent future violations. **The ACTS provide that the plaintiff can recover treble damages, expenses, attorney fees, and costs.** Furthermore, The ACTS provide that the plaintiff must submit all findings of fact and discovery to the appropriate legal authority(ies) for prosecution. **This case is a perfect example of how obstruction of justice and other acts are perpetrated by and through organized crime and protected by corruption within the judiciary.** Appropriate local and federal agencies are actively investigating certain Defendants. The EXHIBITS include transcripts from a number of hearings by PLUIM and federal Judge George Wu ("Wu") in a similar, though different, California case involving many of the plaintiffs and defendants here.

**All statements are being made under penalty of perjury according to my information and belief.**

Dated: _____

By: _____
Richard Lewis, in *propria persona* and Private
Attorney General, *ex rel*

Plaintiffs herein named and DOES 1-300 inclusive allege as follows:

## GENERAL ALLEGATIONS

1.        LEWIS alleges:  all the Defendants have impeded in an ongoing investigation as LEWIS is the PAG.

2.        Plaintiff LEWIS is, and at all times mentioned herein, a resident of Union County, Tennessee.

3.        Plaintiff TBCS is, and at all times mentioned herein, a Nevada corporation with principle place of business in Los Angeles County, California.

4.        Plaintiffs, PAEGELS were, and at all times mentioned herein, residents of Los Angeles County, California, and incorporators of TBCS.

5.        NELLE PAEGEL ("NELLE") is a licensed California attorney at law and was the attorney for herself, Thomas W. Paegel, Thomas W.V. Paegel, The Body Company Sports, Inc., Lydia Cornell and Brian Williams in California Los Angeles Superior Court Case No. GC047909, known as case no. 11-cv-08810-GW, during the time of its removal to federal jurisdiction. References to that/those case numbers refers to that case, during the litigation of which, some of the herein causes of action arose.

6.        Plaintiff LORRAINE is, and at all times mentioned herein, a resident of Charlotte County, Florida and visits with her family Union county Tennessee.

7.        Plaintiff LEWIS III is, and at all times mentioned herein, a resident of Charlotte County, Florida and visits with her family Union county Tennessee.

8.        Plaintiffs MINORS, and at all times mentioned herein, reside in the United States, however their location is under protection due to the invasion of their privacy and child endangerment they have suffered. Contact can be made with them through LEWIS.

9.        The true names and capacities, whether individual, corporate, associate, representative or otherwise, of the Plaintiffs identified herein as DOES 1-300, inclusive, are unknown to Plaintiffs, who therefore represents these Plaintiffs by said fictitious names. LEWIS will amend this complaint to allege the true names and capacities of Defendant DOES 1-300 who will have same or similar complaints.

10.        LEWIS is informed and believes, and thereon allege, that at all times mentioned herein Defendant VARONOS is a principle of VIEWPARTNER CORP., TSOFTNET, STAROPOLY, TODHD, and eSTARHD.TV, all of which do business over the internet and or in multiple states of the U.S.

11.        LEWIS is informed and believes, and thereon allege, that at all times mentioned herein Defendants TORO and JUNCO portended to own and operate GREEN.

12.        LEWIS is informed and believe, and thereon allege, that at all times mentioned herein Defendant CORNELL is and at all times mentioned herein individual living at 300 S. Crescent St. Beverly Hills California 90212.

13.        CORNELL/GODSHOTS misrepresents on her Facebook site that GODSHOTS is a charity with a trademarked name and an L.L.C. The site solicits donations under false pretenses.

14.        CORNELL has endangered the MINORS and conspired and colluded with MILLER, KEHOE, HADDOCK, COX, WALSH, FORD, and WILEMAN to create a false persona of LEWIS in order to discourage him from his investigations.

15.        CORNELL gave false statements on the record in court, to the FBI to the Beverly Hills police, and the La. County Sheriffs about LEWIS. She personally created a defamatory police profile including a false mug shot and description of LEWIS and presented same to the court as if it were true, to others and placed such material on the internet.

16.        CORNELL filed a false petition for a restraining order against LEWIS containing the above self-created profile.

17.        CORNELL has harassed, threatened and stalked LEWIS and continues to do so, and has impeded an ongoing investigation to where LEWIS had to get a restraining oarder against CORNELL in Tennessee state court, Maynardville.

18.          CORNELL originally filed complaint GC047909 as one of the seven plaintiffs in order to obtain information about that case as an **"informant"** for those defendants. She regularly reported information obtained in the case to the rest of the GANG.    LEWIS joined case no. GC047909 in March, 2012.

19.          HAYELAND is CORNELL'S former husband and business partner.   He is also a member of the GANG; they both have a close connections and ties to FLEMING and SIMMONS. As such, he regularly commits fraud on the internet via the fraudulent businesses known as GSAXE and SPORTS ICON ENTERTAINMENT.

20.          HAYELAND and CORNELL are known to receive and "fence" stolen property such as jewelry and paintings.

21.          SIMMONS has/is allowing his likeness and image to be used by a fraudulent business entity to commit fraud.

22.          FINANCIAL INSTITUTIONS (EXP, FARGO, MERITUS) ("FIN. INST.") failed to self-report that they were named in Case No. GC047909, as required by regulators.

23.          FIN INST., including MC intentionally and/or negligently allowed the GANG to launder money by and through their respective banking institutions.

24.          FIN. INST. failed to adequately research the use the GANG was making of their bank services.

25.          BEATTY knowingly enabled the GANG to misuse FIN. INST. services.

26.          KEHOE is/has impeded in an ongoing investigation; she has stalked, harassed, and invaded the privacy of some of the Plaintiffs; hacked into Plaintiff's computers in order to commit fraud and endanger MINORS; she has violated LEWIS'S restraining order; and hacked into one or more Plaintiff's e-mail(s).

27.          FORD stalked, harassed, threatened, and interfered with an on-going investigation by PAG LEWIS, and used the telephone to threaten LEWIS.

28.          WALSH is a licensed attorney in Colorado who interfered with and impeded an on-going case in California, GC047909.

29. WALSH practiced law in the state of California without a license by giving legal advice to CORNELL in California, GC047909.

30. WALSH made bodily injury threats to LEWIS.

31. WALSH defamed LEWIS via the internet on his and LEWIS'S Facebook pages.

32. ROBERTS is a licensed California attorney at law who falsely told the court in GC047909 that VARONOS was not served with process. In fact, VARONOS was served several times including in that court.

33. HADDOCK has impeded an ongoing investigation; colluded and conspired to endanger the health and welfare and life of the MINORS; to defamed LORRAINE and MINORS by giving personal and private information about them to other Defendants, namely CORNELL, KEHOE, MILLER and COX who placed said information on the internet.

34. HADDOCK has threatened of bodily injury against LORRAINE, LEWIS, LEWIS III, and the MINORS.

35. MILLER, KING, CORNELL, KEHOE, COX, KEITH, SIMMONS, HAYELAND, AXE, ISE have/are committing income tax evasion, both state and federal, by engaging in fraudulent businesses.

36. NIVEN has impeded in an ongoing investigation and is a partner of MILLER and KING. She has defrauded Plaintiffs PAEGELS of $10,000.00 and 21 videotapes belonging to the PAEGELS and TBCS.

37. LEWIS is informed and believes MILLER poses as a public relations "firm" characterized as HITMAN/HITMANPR, which is a false depiction as a public relations "business"; its true purpose is to defraud businesses of money and property with false claims and promises of success and use of threats.

38. MILLER has impeded in an ongoing investigation.

39. LEWIS is informed and believes, and thereon alleges, that at all times mentioned herein Defendant MILLER was/is and at all times mentioned herein, a resident in Los Angeles County, California.

40.     LEWIS is informed and believes, and thereon alleges, that at all times mentioned herein Defendant KING was/is a resident in Los Angeles County, California; a practicing chiropractor in the city of San Marino; and she supports and collaborates with MILLER'S illegal activities; and has impeded in an ongoing investigation.

41.     LEWIS is informed and believes, and thereon alleges, that at all times mentioned herein Defendant CORNELL is a resident of Los Angeles, California, city of Beverly Hills.

42.     LEWIS is informed and believes, and thereon alleges, that at all times mentioned herein Defendant FLEMING was/is a resident of Los Angeles County, California and was/is a partner of VARONOS.

43.     LEWIS is informed and believes, and thereon alleges, that at all times mentioned herein Defendant ROBINSON was/is a resident of Los Angeles County, California, president of Defendant MILNER, a partner of WORMLEY, and was/is an agent of Defendants VARONOS and FLEMING.

44.     LEWIS is informed and believes, and thereon alleges, that at all times mentioned herein Defendant WORMLEY was/is a resident of Los Angeles County, California and a partner of Defendants MILNER and ROBINSON.

45.     LEWIS IS INFORMED AND BELIEVES, AND THEREON ALLEGES, THAT AT ALL TIMES MENTIONED HEREIN THAT DEFENDANTS VARONOS, GRAMMER, CORNELL, FLEMING, AND MILLLER ARE THE MASTERMINDS BEHIND THIS ORGANIZED GANG AND THAT THE REMAINING OTHER DEFENDANTS ARE WILLING AND ABLE PARTICIPANTS OF THE GANG AND THAT EACH GANG MEMBER POSSESSES UNIQUE QUALITIES ESSENTIAL TO FURTHERING THE GANGS' ACTIVITIES.

46.     LEWIS is informed and believes, and thereon alleges, that defendants initially target their victims through the internet via fake fraudulent companies and false identities, using FIN. INST.

47.     LEWIS is informed and believes, and thereon alleges, that all gang members are BEING/HAVE BEEN PROTECTED from liability by some court including, but not limited to, dept. "P" in the Pasadena Courthouse of the Los Angeles Superior Court.

48.     LEWIS'S allegations are the result of gang activities that occurred before and after filing of Los Angeles Superior Court Case No. GC047909 in Pasadena, California at 300 E. Walnut, Pasadena, CA 91101 on October 15, 2011. **LEWIS REQUESTS THAT THIS COURT TAKE JUDICIAL NOTICE OF ALL ENTRIES IN Los Angeles Superior Court File No. GC047909, transcripts and appeals thereto and in Central District of California Federal Court File No. 11-cv-08810-GW, transcripts and appeal thereto.**

49.     LEWIS is informed and believes, and thereon alleges, that defendants actively participate in on-going Ponzi schemes that continuously evolve as each becomes "exposed." THESE ACTS CONSTITUTE ORGANIZED CRIME GANG ACTIVITIES THAT INVOLVE, BUT ARE NOT LIMITED TO, BUSINESSES ON THE WORLD WIDE WEB ("INTERNET"), MEMBERS OF THE WORLD WIDE BANKING INDUSTRY, AND MEMBERS OF THE CALIFORNIA STATE COURT SYSTEM, IN LOS ANGELES COUNTY, AND IN VIOLATION OF STATE AND FEDERAL RULES and THE ACTS.

50.     LEWIS is informed and believes, and thereon alleges, that defendants actively participate in on-going schemes COORDINATED IN ORDER TO STEAL MONEY AND PROPERTY, USING THREATS, INTERNET PUBLICATIONS, FILING FALSE POLICE AND GOVERNMENT REPORTS, AND SYSTEMATICALLY WREAKING PERSONAL "TERROR" ON COMPLAINING VICTIMS THROUGH OUT THE UNITED STATES AND THE INTERNET.

51.     LEWIS is informed and believes that all Defendants are in some way members of the same gang whose "success" hinges on a variety of private sector "positions" of power AND authority.

52.     LEWIS is informed and believes, and thereon alleges, that at least some, if not all, defendants have "hacked" into government databases and Plaintiffs computers.

53.     LEWIS is informed and believes, and thereon alleges, that at all times mentioned herein Defendants CORNELL, COX, MILLER, HADDOCK, HAYELAND, KING, BLEU, FIN. INST., INS., PLUIM, THOMAS, VARGAS, WILEMAN, GRAMMER, ROBERTS, DEL TORO and DEL JUNCO have conspired to defame, interfere with, defraud, extort, blackmail, threaten,

harass, stalk, hack, and steal from one or more Plaintiffs and impede LEWIS' investigation as the PAG.

54.        LEWIS is informed and believes, and thereon alleges, that at all times mentioned herein Defendants JUNCO and TORO were agents and/or owners of GREEN.

55.        LEWIS is informed and believes, and thereon alleges, that at all times mentioned herein Defendant EXP was a FIN. INST. located in New York County, New York.

56.        LEWIS is informed and believes, and thereon alleges, that at all times mentioned herein Defendant BEATY was a resident of Orange County, California.

57.        LEWIS is informed and believes, and thereon alleges, that at all times mentioned herein Defendant MERITUS was a FIN. INST. located in Orange County, California.

58.        LEWIS is informed and believes, and thereon alleges, that at all times mentioned herein Defendant FARGO was a FIN. INST. located in Contra Costa County, California.

59.        LEWIS is informed and believes, and thereon alleges, that at all times mentioned herein Defendant EXP was a FIN. INST. located in New York, New York.

60.        LEWIS is informed and believes, and thereon alleges, that at all times mentioned herein Defendant MC was a FIN. INST. located in New York, New York.

61.        LEWIS is informed and believes, and thereon alleges, that at all times mentioned herein Defendant ZURICH was an INSURER located in Illinois.

62.        LEWIS is informed and believes and thereon alleges, that at all times mentioned herein Defendant FARMERS was an INSURER located in Oklahoma.

63.        LEWIS is informed and believes, and thereon alleges, that at all times mentioned herein Defendant GRAMMER was a resident of Los Angeles County, California and/or Chicago, Illinois and owner of all GRAMMER companies.

64.        LEWIS is informed and believes, and thereon allegse, that at all times mentioned herein Defendant NEWELL was a licensed California attorney and resident of Los Angeles.

65.        LEWIS is ignorant of the true names and capacities of the Plaintiffs herein identified as DOES 1-300.

66.     LEWIS is ignorant of the true names and capacities of the Defendants sued herein as DOES 1- 300.

67.     The true names and capacities, whether individual, corporate, associate, representative or otherwise, of the Defendants identified herein as DOES 1-300, inclusive, are unknown to Plaintiffs, who therefore sues these Defendants by said fictitious names. Plaintiffs will seek leave of Court to amend this Complaint to set forth their true names and capacities thereof, when the same has been ascertained. Defendant DOES 1- 300 will in some manner be legally responsible for the wrongs and injuries alleged herein.

68.     LEWIS is informed and believe, and based thereon alleges, Defendants, and each of them, were and are the agents, servants, representatives, and/or employees of one or more other Defendant(s) herein.

69.     LEWIS is informed and believes, and based thereon alleges, that at all times mentioned in this Complaint, each of the Defendants, including DOES 1-300 inclusive, were acting in concert with, and in conspiracy with, at least one other Defendant in doing the things alleged in this complaint.

70.     This Complaint arises, in part, from a series of Agreements, contracts between Plaintiffs and Defendants wherein Defendants defrauded Plaintiffs of money and/or property.

71.     This Complaint arises, in part, from incidents that occurred during the Los Angeles Superior Court case no. GC047909, which was removed to federal jurisdiction for a time as case no. 11-cv-08810-GW and remanded.

72.     The Plaintiffs LEWIS, TBCS and PAEGELS, LORRAINE, LEWIS III, and MINORS are joined by Plaintiff LEWIS as PAG, because the facts and parties are so intertwined that complete relief cannot otherwise be granted.

73.     LEWIS complains as to facts and parties as herein described:

74.     On or about March, 2009, BRIAN WILLIAMS was first introduced to MYEZTV/TODHD by an employee of VARONOS. BRIAN WILLIAMS was solicited to bring advertisers to the TODHD network and was told that Defendant GRAMMER and CORBIN BLEU

("BLEU"), both well-known entertainers, along with defendant CORNELL were channel holders, investors and promoters in the "company."

75.     BRIAN WILLIAMS established contact with Defendant VARONOS and on November 15, 2010, BRIAN WILLIAMS, as an independent contractor, brokered a one hundred thousand dollar ($100,000.00) sponsorship agreement between Defendant TODHD and Defendant VARONOS by and on behalf of the well-known "trade" publication Daily Variety ("Variety"), for sponsorship rights arising from the Variety Power of Comedy Event ("EVENT").

76.     The terms of said agreement gave Defendant TODHD a "Premier Level Sponsorship" package for the Event in exchange for a $100,000.00, tax-deductible donation, payable by Defendant TODHD/ VARONOS to BRIAN WILLIAMS and due by December 1, 2010, through an invoice from BRIAN WILLIAMS.

77.     Under the terms of the BRIAN WILLIAMS/VARONOS Agreement, VARONOS would pay BRIAN WILLIAMS, $100,000.00 in exchange for numerous and extensive advertising concessions by Variety.

78.     The sponsorship package included, inter alia, extensive advertising with the "TODHD" logo in a full page 4-color ad in Variety, guest passes at the EVENT, and an "Opportunity to have TODHD host, on the red carpet and backstage, to capture by videotape unique clips with the comedians/performers." Defendant TODHD was to be allowed to film the red carpet and backstage interviews by its host and have the TODHD logo included on the "Step and Repeat" and displayed on stage screens via overhead projection. TODHD also was to be allowed to live-stream the EVENT.

79.     Defendants VARONOS and FLEMING breached the contract by failing to pay the money for the EVENT'S advertising.

80.     Defendant GRAMMER promised to "take care of this," but failed to do so.

81.     GRAMMER and CORNELL reaped the benefit of the "free" advertising as their photos appeared on a full page ad listing TODHD in Variety Magazine distributed at the December 4, 2010 EVENT.

1   82.       Defendant STAROPOLY was advertised to be a "multi-level" marketing company,

2   but it TURNED OUT TO BE A PONZI SCHEME for the purpose of stealing credit card and other

3   personal property (phishing) and information from its victims.

4   83.       Defendants GRAMMER, BLEU and CORNELL'S names and likenesses were

5   prominent on the TODHD and STAROPOLY website and sales materials.

6   84.       Defendant GRAMMER, BLEU and CORNELL freely advertised(es) VARONOS'S

7   schemes.

8   85.       Defendant VARONOS advertised TODHD as "Kelsey's Network." STAROPOLY'S

9   site and sales power point marketing presentation featured numerous photographs of GRAMMER

10   with his name alongside the words "First Monetized Branded Social Network."

11   86.       TODHD was advertised as: "The world's first monetized social network of the Stars!"

12   featuring photos of GRAMMER, BLEU and CORNELL. In fact TODHD, STAROPOLY and

13   ESTARHD.TV are all "fronts" as the schemes for credit card fraud.

14   87.       Defendant CORNELL recruited LEWIS as a STAROPOLY associate, for which he

15   paid money.

16   88.       The STAROPOLY sales pitch was skillful and pressured. Defendants VARONOS

17   and FLEMING guaranteed that STAROPOLY "was going to unite small businesses across the

18   country and bring back the American economy."

19   89.       GRAMMER personally phoned LEWIS to encourage his enrollment saying that

20   "STAROPOLY was an excellent business opportunity."

21   90.       GRAMMER, BLEU and CORNELL knew or should have known that people and fans

22   would rely on their celebrity— hundreds if not thousands enrolled in one of the scams as a result.

23   91.       GRAMMER, BLEU and CORNELL enrolled and promoted STAROPOLY in notices

24   to millions of fans on TWITTER, Facebook and all over the World Wide Web ("WEB").

25   92.       STAROPOLY conference calls featured GRAMMER, who personally promoted

26   STAROPOLY.

27   93.       Coincidentally on or about September, 2009, Plaintiffs TBCS and its owners the

28   PAEGELS were approached by JUNCO and TORO with a business "opportunity" that would assist

said Plaintiffs in monetizing their venture. JUNCO and TORO were the owners of GREEN, which they promoted as their business, and so-called channel owners on MYEZTV/TODHD, which BLEU, CORNELL and GRAMMER freely advertised. TBCS and the PAEGELS were swindled by all of the foregoing as they were merely members of a very organized GANG of white collar criminals. None of the averments they made were true.

94.         JUNCO and TORO stole nearly $100,000.00 from Plaintiffs by selling them a "sub-channel" on the TODHD "network" under the name of a fraudulent business entity. Not only was GREEN fraudulent, but so was TODHD as neither fictitious name represented a "real" business.

95.         After TBCS and the PAEGELS discovered the swindle of JUNCO and TORO, they were persuaded by the owners and operators of TODHD, VIEWPARTNER, TSOFTNET, and STAROPOLY, VARONOS and FLEMING, to "ignore JUNCO and TORO and do business with the source." VARONOS and FLEMING continued the swindle by selling TBCS and the PAEGELS what appeared to be a better opportunity. In reality, the Plaintiffs were just being "passed around" to other members of the GANG.

96.         VARONOS and FLEMING stole another $23,000.00 from Plaintiffs when they sold Plaintiffs PAEGELS and TBCS their "own" channel on TODHD.

97.         Eventually, MILLER, NIVEN and KING were inserted to add their "marketing expertise." As there was never any expertise or marketing even remotely possible, it finally became clear that MILLER and KING were just the final stop in the chain in the swindle. MILLER, NIVEN and KING ultimately stole not only money, but invaluable property with virtually unlimited earning potential as the material they stole was new to the marketplace.

98.         MILLER and KING also ruined numerous pre-existing business relationships that TBCS owned as assets.

99.         MILLER, NIVEN and KING stole $43,000.00 in addition to Plaintiffs property and in addition to ruining TBCS'S assets—essentially, they stole everything TBCS had.

100.        When TBCS, the PAEGELS and others sued the aforementioned Defendants in California they were summarily dismissed by the judicial misconduct and corrupt members of the GANG there. California has a reputation for corruption within some members of its judiciary. This

case is intended to draw attention to those individuals and assist the people of California in "rooting them out" as well. The fact that they have knowingly reached into the state of Tennessee to fraudulently affect LEWIS with their corrupt scheme is fortuitous as the full circle of this GANG'S activities is complete. For any scheme to "work," there must be judicial "support" in order for the smooth operations of the GANG to continue undisturbed; such as in the case here. The GANG also includes certain banking institutions as conduits for money changing hands via wire and credit cards.

101.    Plaintiffs have named an additional 300 DOE Plaintiffs and 300 DOE Defendants in anticipation that, through discovery, at least that many more parties will be joined in the furtherance of justice.

102.    LEWIS alleges that this organized GANG is responsible for devastating numerous other individuals and businesses in much the same way. As the Private Attorney General, LEWIS intends to corral this GANG, get restitution for the harm they have caused, and put an end to their activities for the sake of the people of the United States, which includes the citizens of Tennessee, where he resided at the time he was personally defrauded.

## FIRST CAUSE OF ACTION

**OBSTRUCTION OF JUSTICE (INCLUDING, BUT NOT LIMITED TO: COLLUSION, CONSPIRACY, PERJURY, DEFAMATION, FALSE REPORTING, BRIBERY, ASSAULT & TECHNOLOGY HACKING) asserted by Plaintiffs LEWIS, LORRAINE, LEWIS III, PAEGELS, NELLE and DOE Plaintiffs 1-300 against INS., CORNELL, MILLER, KING, NEWELL, VARONOS, WILEMAN, YAO, PLUIM, VARGAS, THOMAS, WALSH, FORD, KEHOE, KELETI, COX, HADDOCK, ROBERTS, JUNCO, TORO and DOE Defendants 1-300 inclusive.**

**(The ACTS; CIVIL RICO; U.S. Const. amends. VIII and XIV)**

103.    By this reference, Plaintiffs herein incorporates each and every allegation of the foregoing paragraphs 1-102 inclusive of this Complaint as if the same were hereat set forth in full.

104.     WILEMAN has an established pattern for misleading the judiciary, by twisting and abjectly misstating law and facts as he did in GC047909 and appeals and 11-cv-08810-GW and appeal. Every pleading and hearing contain numerous false statements of law and fact.

105.     WILEMAN has a pattern of such actions.     In **FIRESTONE v. HOFFMAN No. B183184** where California's Second District Court of Appeals admonished WILEMANS malfeasance. *SEE* **the full case showing the pattern of WILEMAN'S corruption and collusion with a judicial officer** and that Court severely admonished WILEMAN in the unpublished portions of that case on   **EXHIBIT 2, pp. 2R-2T.**   Nearly half of the ruling centered about the Appellate Court's "concerns" about WILEMAN'S actions and statements in pleadings:

"We are concerned about the conduct of Firestones counsel in litigation. We understand the importance of zealous advocacy and of an attorney's duty of loyalty to the client. But we are also mindful that for every member of the bar, zealous advocacy must be constrained by the member's duty to "employ" for the purpose of maintaining the causes confided to the member such means only as consistent with truth, and by the duty not to " seek to mislead the judge, judicial officer, the jury by artifice or false statements of fact and law.  (Rules prof. Conduct, rule 5-200(A), (B).) At the same time, it is not improper to advocate a position that is "warranted by no frivolous argument for the extention, modification, or reversal of existing law or the establishment of new law" ( Code  civ. Proc. 128.7, subd. (b)(2).) All things considered, our review of the brief and record in this case leaves us concerned that Firestone's counsel failed in their duty [8] Our failure to express concern about Hoffman's oun conduct-both in discovery, and at trial, and on appeal- must not be construed as approval of that conduct. Rather, our silence reflects the facts that (1) Hoffman is not a member of the bar, and hence is not subject to the Rules of Professional conduct, and (2) although so of Hoffman's conduct does appear to have been improper, we do not find it nearly as troubling as the conduct of Firestone's counsel." **SEE EXHIBIT 2, 2R**

106.     LEWIS will investigate WILEMAN'S cases for the past 10 years to discover additional acts of corruption.

107.     LEWIS has found that the Colleges that WILEMAN states he attended have no record of him in the alumni searches. Therefore, LEWIS has a reasonable belief that WILEMAN may not be

who he says he is. On the record, WILEMAN has expressed special knowledge of diploma "mills."

108.     LEWIS believes that because of WILEMAN'S lack of knowledge of State and Federal rules, and law in every pleading and court appearance is replete with these errors. WILEMAN miss - stated law, rule and procedure, and WILEMAN corrupted the original complaint in GC047909 at the time he removed it to federal court by altering 206 pages of a 432 page document, including text and exhibits.

109.     WILEMAN failed to follow federal, state and/or local rules regarding substitution of attorney, offering further support that WILEMAN may not be who her says he is. **LEWIS requested this Court take judicial notice of files, transcripts and appeals stemming from case numbers GC047909 and 11-CV- 08810-GW.**

110.     Preliminarily, LEWIS believes that WILEMAN has been issued multiple different Social Security numbers.

111.     CORNELL, MILLER, WILEMAN, PLUIM, KING THOMAS, INS, ROBERTS, VERONOS, GRAMMER, FLEMING, and the rest of the GANGS plan was and is to so increase the costs of litigation so as to preclude further action.

112.     Using LEWIS'S stolen personal and private information, CORNELL created a false and degrading profile of LEWIS, which she and other Defendants distributed to thousands of sites on the internet.

113.     CORNELL and other Defendants placed LEWIS'S family including LEWIS III, LORRAINE and MINORS on the internet with addresses and maps to their residences. By doing so, CORNELL intended to place all of them in danger for their lives. LEWIS believes that CORNELL did so in an effort to pressure LEWIS into dropping his Civil Rico Supplement to case no. GC047909.

114.     CORNELL also gave false statements about Plaintiffs LEWIS, LEWIS III, and NELLE in transcript dated September 13, 2012. She singlehandedly caused LEWIS and PAEGEL to incur in excess of two million dollars in money, time, pleadings, travel, costs and more when GC047909 was dismissed. See transcripts dated December 14, 2012 and January 18, 2014. **The transcripts of this case that are attached will prove each and every statement made.**

115.    CORNELL along with the other GANG members including WILEMAN and MILLER used innocent people to further their corruption and fraud so that the GANG could turn around then blame the innocent people unknowingly for wrong doings.

116.    On December 14, 2012 PLUIM ADMITTED that he had been paid a "flat fee." **EXHIBIT 1, Pg. 1-MM, LINES 3-4.**

117.    On January 18, 2013 WILEMAN was in attendance—despite KING having been dismissed on December 14, 2012 to ensure that PLUIM finished the job he was paid for by dismissing GC047909 in *to to*. **See generally EXHIBIT 1, which shows that PLUIM, THOMAS and VARGAS were instrumental in furthering the GANG'S plan.** The transcript reflects that WILEMAN'S attendance was specifically brought to PLUIM'S attention.

118.    CORNELL is quoted by TMZ on November 5th, **"I WAS DISMISSED FROM THE CASE [GC047909] ON SEPTEMBER 13 AND HAVE BEEN IN CONTACT WITH KELSEY'S TEAM SINCE JULY." CORNELL was not withdrawn from NELLE'S representation until September 13, 2012.** CORNELL has admitted openly in a statement now found on TMZ.com that while she was the client of NELLE'S in the case CORNELL was working for GRAMMERS team (GANG); her admission to collusion, fraud, and corruption. **See EXHIBIT 4-E.**

119.    CORNELL wrote and *ex parte* e-mail to certain Defendants in this and GC047909 while being represented by NELLE.

120.    LEWIS believes that CORNELL and WILEMAN conspired and colluded to commit fraud. Before the January 16, 2012 meet and confer, Wileman stated, **"I saw LEWIS and CORNELL on T.V. they were doing some kind of show."** The problem with that statement was that LEWIS didn't do the U-STREAM show with CORNELL until March of 2012. This is further proof of GANG member conspiracy.

121.    CORNELL has also made statements in TMZ article as to her situation that she was threatened and stalked. This is a theme of CORNELLS dating back to 2005. Through LEWIS' investigation he found that CORNELL accused **ANNE COULTER** of stalking and threating her. **See EXHIBIT 4-A & B.**

122.     On September 13, 2012 ALL the Defendants that showed in court waved CORNELL'S liability in the case when she dropped out of the case. This clearly showed that CORNELL had colluded *ex-parte* with the other Defendants who knew before the hearing that CORNELL was going to drop out of the case.

123.     YAO and KELETI have done similar acts; PLUIM condoned all such acts of corruption as they were brought to his attention regularly by the plaintiffs, LEWIS and NELLE.

124.     CORNELL, WALSH, COX, MILLER, FORD, WILEMAN, PLUIM, and THOMAS have done everything in their power to obstruct justice by interfering and impeding LEWIS'S on-going investigation as the PAG.

125.     CORNELL, COX, MILLER, WILEMAN, PLUIM, THOMAS and FORD have used LEWIS'S private health condition to defame and harass LEWIS.

126.     One or more Plaintiffs have been pressured and subjected to harassment, threats, stalking, death threats, computer hacking, computer fraud, false blogging, social networking, online media attacks, grand theft, grand larceny, embezzlement, state copyright infringement, bribery, perjury, extortion, blackmail, impeding, defamation, obstruction of justice, child endangerment, and death threats, by Defendants CORNELL, MILLER, COX, WILEMAN, PLUIM, THOMAS, VARGAS, VARONOS, WALSH, FORD, KEHOE, INS., FIN. INST. directly in an attempt to stop LEWIS'S investigations as the PAG. **See EXHIBIT 1-RRR, Lines 16-22 where PLUIM struck LEWIS'S Civil RICO Supplement, which named PLUIM as a defendant.**

127.     Defendant PLUIM, stated on the record taken at hearing on December 14, 2012 in case no. GC047909, admits to having taken a "bribe" when—in response to WILEMAN'S statement that he had been paid a "flat fee" [by INS.] said "I was paid a flat fee too." **See EXHIBIT 1-MM, Lines 3-4.**

128.     PLUIM, VARGAS, and THOMAS destroyed evidence belonging to Plaintiffs in court—on the record—on January 18, 2013 by dismantling Plaintiff's conformed copy of their original complaint without permission. **EXHIBIT 1-J, lines 23 - 26.**

129.     LEWIS alleges that INS. bribed PLUIM, THOMAS and VARGAS to get said case against KING dismissed.

130.     PLUIM dismissed in its entirety case no. GC047909 against 31 Defendants despite irrefutable and uncontroverted proof that Defendants defrauded Plaintiffs and committed 33 other offenses against them. **See EXHIBIT 1-X, Line 28.**

131.     PLUIM, VARGAS and THOMAS conspired and colluded with the Defendants in furtherance of continuing and on-going illegal actions in—and out of—court.

132.     CORNELL, PLUIM, VARGAS, THOMAS, NEWELL, KING, INS., WILEMAN and YAO all conspired to protect WILEMAN, YAO, MILLER and KING from being exposed as the criminals that they are in order to further the corruption and illegal activities of the GANG in case no. GC047909. **See generally EXHIBIT 1.**

133.     As managing partner of VEATCH CARLSON, ALMEIDA harassed, stalked and invaded the privacy of LEWIS along with WILEMAN.   PLUIM interfered with an ongoing investigation and was non-responsive to demands for sanctions and that WILEMAN cease and desist. **See EXHIBIT 1-EEEE, Lines 26-28, 1-FFFF, Lines 1-23, and EXHIBIT 11-C, Pg. 3, Lines 13-21.** PLUIM ignored LEWIS'S motion and complaints for relief.

134.     ALMEIDA refused to corroborate that WILEMAN legitimately represented KING in case no. GC047909.

135.     PLUIM, VARGAS and THOMAS conspired and violated federal conflict of interest statutes by coordinating their efforts against LEWIS in a number of ways, including, but not limited to, dismissing LEWIS'S SUPPLEMENT in case no. GC047909 where PLUIM and THOMAS were named defendants. **EXHIBIT 1-RRR, Lines 21-22.**

136.     PLUIM ultimately dismissed—***without prejudice***—case no. GC047909 without cause, legal justification or proper hearings. **See EXHIBIT 1-X, Line 28.**

137.     Defendants  PLUIM, VARGAS and THOMAS continuously denied Plaintiffs LEWIS and PAEGEL their constitutional rights to due process.

138.     THOMAS and VARGAS regularly and habitually practiced law without a license by giving legal advice, drawing legal conclusions, making rulings, and conducting telephonic hearings with attorneys and other parties outside PLUIM'S hearing.

139. PLUIM habitually deferred to WILEMAN for information and "guidance" as to how PLUIM should rule on matters. Commensurately, WILEMAN regularly gave false facts and information about case no. GC047909 WITHOUT any offer of proof being demanded by PLUIM. PLUIM regularly ignored Plaintiff's objections or precluded Plaintiffs from correcting WILEMAN'S false statements of fact and/or law.

140. PLUIM condoned and encouraged WILEMAN'S UNJUSTIFIED harassment of LEWIS.

141. WILEMAN condoned and encouraged PLUIM'S UNJUSTIFIED harassment of LEWIS.

142. PLUIM condoned WILEMAN'S invasion of LEWIS'S privacy; WILEMAN habitually sent pleadings to LEWIS'S home address instead of LEWIS'S business address by denying LEWIS'S motions that the court order WILEMAN to cease and desist.

143. PLUIM took no action to preclude WILEMAN'S continued harassment and invasion of LEWIS'S privacy despite WILEMAN'S admission that he telephoned LEWIS'S home and questioned LEWIS'S disabled brother.

144. PLUIM allowed WILEMAN to falsely pose as attorney for KING despite WILEMAN and NEWELL never complying with mandatory rules governing substitution and withdrawal of representation. Appeals as to WILEMAN'S status are pending in the Ninth Circuit Court of Appeals and the California Supreme Court. **See EXHIBIT 1-M, Lines 22-28 and 1-N, Lines 1-13.**

145. NEWELL falsely testified on KING'S behalf in federal court.

146. NEWELL'S close personal friend was the clerk in federal court, Javier Gonzalez.

147. NEWELL conspired with KING, WILEMAN, INS., and the court to attempt to "transfer" his standing as the attorney for KING without complying with mandatory federal, state and local rules to do so legally. NEWELL is implicated and is herein considered an active participant in the GANG, AND PERSONALLY LIABLE FOR ALL OF THE ACTIONS OF WILEMAN, YAO, INS., PLUIM, THOMAS, VARGAS, ALMEIDA, INS., and KING.

148. PLUIM failed to take any action against WILEMAN when he was given evidence as to WILEMAN'S having filed a falsified version of the complaint in Case No. GC047909, in federal

court in Federal Case No. CV-11-8810-GW. A true and exact copy of the corrupted version was given to PLUIM whose only comment was to ask WILEMAN "what should I do about it." Said complaints are herein incorporated by reference as evidence of bribery and corruption of evidence. **See EXHIBIT 1-CCC, line 12 to 1-EEE, line 5. PLUIM never asked WILEMAN if he had done so; instead, PLUIM tried to shift the blame onto a phantom "mole in the clerk's office." WILEMAN has never refuted that he corrupted the complaint, despite it being discussed in several pleadings, in court, and in the courts of appeals briefs and petition.**

149.      Bribery regularly occurred between PLUIM and Defendants in case no. GC047909 where PLUIM openly instructed Defendants as to how to next proceed in order to achieve their respective purposes. PLUIM is recorded on transcripts as initiating acts of bribery. PLUIM systematically initiated actions so as to try to justify his purpose of ridding his docket of case no. GC047909 for corrupt purposes including, but not limited to, his desire to begin his retirement. Defendants also became bribee's by complying with PLUIM'S "instructions." **See Generally EXHIBIT 1.**

150.      WILEMAN—most particularly—but also other Defendants in case no. GC047909 are recorded in transcripts as initiating or receiving acts of bribery. WILEMAN bribed PLUIM, VARGAS, and THOMAS by falsely stating that he was listed as a "super lawyer." A review of the lists of "super lawyers" in Southern California for 2011, 2012 and 2013 reflects no such listing.

151.      During hearings and in pleadings in case no. GC047909, PLUIM regularly granted Defendants motions and denied Plaintiffs' motions without reading them or knowing the contents of same. When Plaintiffs asked "why" he granted Defendants' motion(s), PLUIM ALWAYS refused to articulate same. This "standard" of practice by this judicial officer is well-documented in the transcripts and record, constituting proof and implied evidence of bribery on a systematic and on-going basis. **See Generally EXHIBIT 1.**

152.      PLUIM, VARGAS, and THOMAS regularly and systematically engaged in bribery and corruption by ignoring federal, state and local laws by and through PLUIM'S rulings benefitting CORNELL, WILEMAN and Defendants MILLER, GRAMMER (and his related businesses) JUNCO, TORO, VARONOS, FLEMING, VIEWPARTNER, TODHD, STAROPOLY, TSOFTNET,

WELLS FARGO, AMERICAN EXPRESS TRAVEL RELATED SERVICES, ZURICH INSURANCE, FARMER'S INSURANCE, and KING. **See EXHIBIT 1 generally.**

153.     PLUIM and THOMAS denied Plaintiff's petition/motion for PLUIM'S DISQUALIFICATION for the "appearance of bias" in case no. GC047909, justified under the Judicial Cannons.  Said petition by LEWIS and motion by NELLE are herein incorporated by reference.

154.     Bribery regularly occurred between THOMAS and VARGAS and the numerous Defendants in case no. GC047909.  Often, bribery is evident by clerk THOMAS and VARGAS'S activities that include, but are not limited to, practicing law without a license, denying Plaintiffs their rights to due process, ordering sheriffs to intimidate LEWIS and NELLE during a hearing on October 19, 2012, granting and offering favors to Defendants, refraining from properly recording Plaintiffs pleadings, refraining from correcting false recordings on the Docket, having *ex parte* communications with Defendants, and contributing false or incomplete information during court hearings. **See generally EXHIBIT 1**

155.     On December 14, 2012 during hearing in case no. GC047909, PLUIM admitted to being paid "a flat fee" for his "services." **See EXHIBIT 1-MM, Lines 3-6.**

156.     WILEMAN and PLUIM knowingly served MILLER in court with said corrupted complaint in the presence of LEWIS and PAEGEL as though MILLER had not already been "served," which he had—by the sheriff. **See EXHIBIT 1-A-k, lines 3-28 and 1-A-l, lines1-17.  In particular, see EXHIBIT 1-A-l, lines 12-13 where PLUIM acknowledged that MILLER was served with the corrupted copy.**

157.     WILEMAN regularly misstated facts as to LEWIS'S involvement in the California case.  In court, WILEMAN presented a fabricated felony "profile" of LEWIS featuring a cropped photo and incorrect physical features claiming that it was a police mug shot of LEWIS'S arrest. Despite the information being false, PLUIM refused to accept Plaintiff's corrections in his own defense.  WILEMAN, CORNELL, MILLER, COX, KEITH and VARONOS conspired to create said false "identity" of LEWIS **See EXHIBIT 1-EEEE, lines 18-25.**

158. WILEMAN'S purpose in presenting said profile was in order to get a NO-BAIL WARRANT against LEWIS, claiming with NO PROOF that "**LEWIS practiced law in the state of California without a license**." **EXHIBIT 50.** PLUIM issued the warrant despite the complete absence of proof or evidence against LEWIS and despite his refusal to hear evidence in LEWIS'S defense. This act alone amounted to a "death sentence" owing to LEWIS'S medical condition at that time. It also constituted acts violating LEWIS'S constitutional rights to due process, harassment and stalking. PLUIM, VARGAS and THOMAS were fully aware of LEWIS'S medical conditions and have received letters from LEWIS'S Tennessee physicians which are in the GC047909 case.

159. VARONOS threatened LEWIS'S life on the record by stating that LEWIS was a "dead man." PLUIM said and did absolutely nothing about VARONOS'S threat.

160. YAO was hired by WILEMAN and therefore, also was not an attorney for KING in case nos. GC047909 and 11-cv-08810-GW. All pleadings filed by YAO are therefore void in that case.

161. In pleadings, YAO regularly misstated facts and laws to the state and federal courts. She CONTINUOUSLY criticized the "complaint" and called Plaintiffs' counsel names ("contumacious") for submitting a complaint in that condition to the court. The complaint she was referring to was the version that had been altered by WILEMAN. This was a fraudulent attempt to discredit Plaintiffs and their complaints against the Defendants and KING.

162. YAO refused to comply with Plaintiff's subpoena. PLUIM ignored PAEGEL'S motion to compel YAO to produce her working copy of the complaint.

163. YAO withdrew her representation via an e-mail to NELLE. She, too, failed to file proper withdrawal paperwork.

164. PLUIM regularly ignored the California Codes, Rules of Court, the civil RICO ACT and common law to always rule in favor of the defendants in case no. GC047909. All such rulings are in court transcripts included in **EXHIBIT 1 and the Tentative Rulings in EXHIBIT 24.**

165. The extent of PLUIM'S involvement in the conspiracy is so blatant that he completely ignored LEWIS'S numerous requests that WILEMAN be forced to cease and desist using LEWIS'S personal residence in the pleadings instead of his business address. **For example, see EXHIBIT 1-**

**EEEE, line 26 to FFFF, Lines 1-23.** Plaintiffs request the Court takes JUDICIAL NOTICE of ALL of the transcripts and pleadings with exhibits of said proceedings in case nos. GC047909 and 11-cv-08810-GW.

166.        PLUIM actively participated in *ex parte* communications with the Defendants and conspired with CORNELL (as a plaintiff) to sabotage case no. GC047909. **EXHIBIT 6-A-1.**

167.        PLUIM told LEWIS to "shut up, get out of my courtroom, and never come back" (witnessed by a courtroom full of attorneys and citizens) after LEWIS attempted to answer PLUIM'S question directed to LEWIS. There was NO PROVOCATION WHATSOEVER for this outburst; it marked PLUIM'S first attempt to get LEWIS off of that case. Failing that, PLUIM, THOMAS. VARGAS, WILEMAN, MILLER, CORNELL and VARONOS subsequently conspired to get rid of LEWIS via various means including, but not limited to, threatening LEWIS'S life and health, calling multiple sheriffs to intimidate LEWIS in court hearings, refusing to allow him to appear at hearings via Court Call, and threatening to lock him up by instructing him to "bring [his] toothbrush" with him to the hearing rescheduled from October 19, 2012. See **EXHIBIT 1-SSSS, Line 23 .**

168.        PLUIM and THOMAS regularly ignored LEWIS'S doctor's letters that he was not to travel from Tennessee to California for hearings by refusing to allow LEWIS to appear via Court Call. Despite that, PLUIM issued an order for LEWIS to appear in his court room on October 19, 2012, WHICH LEWIS DID in order to defend himself and prove that he had not practiced law in California without a license. Knowing that LEWIS had traveled more than 2200 miles against his doctor's orders, PLUIM refused to hear LEWIS'S DEFENSE, without excuse AFTER promising to give 1 hour for that hearing. Later, PLUIM issued the NO-BAIL WARRANT against LEWIS for failing to re-appear. PLUIM and THOMAS were fully aware that LEWIS had suffered a heart attack on July 6, 2012 while traveling to California from Tennessee for a hearing. They were also aware that LEWIS was in treatment for Leukemia—and that he was supposed to be in treatment in Florida on October 19, 2012 instead of in court. **SEE EXHIBIT 1-EEEE, Lines 14-16.**

169.        PLUIM, VARGAS and THOMAS conspired to deny LEWIS and NELLE their constitutional rights to due process by SINGLING THEM OUT by depriving them access to the December 14, 2012 hearing via Court Call; they all lied about it on the record. As a result, PLUIM

1  was actually able to get LEWIS out of his court, shut up, and never to come back or face immediate
2  arrest without bail despite being unwarranted and illegal. **See EXHIBIT 40-A through E and**
3  **EXHIBIT 1-R, Lines 1-20.**

4  170.        On December 14, 2012, PLUIM *sua sponte* dismissed all of the Defendants except for
5  MILLER and JUNCO and all of the Plaintiffs except NELLE. There had been no motion or other
6  pleading requesting same. By depriving LEWIS and PAEGEL an opportunity to appear via Court
7  Call at that hearing, PLUIM, THOMAS and VARGAS conspired to dismiss the case without
8  objection.

9  171.        On January 18, 2013 PLUIM dismissed the remaining three parties, refusing to justify
10  the dismissals of December 14, 2012 and denying Plaintiffs' motion to reconsider them.

11  172.        On October 19, 2012, PLUIM and VARGAS—at WILEMAN'S REQUEST—ordered
12  three members of the Pasadena Sheriff's department stand behind LEWIS to intimidate him if he had
13  not been ready to present evidence at that hearing. Knowing that LEWIS was sick and needed
14  treatment, PLUIM "continued" the hearing for two weeks because PLUIM said he had no time
15  (despite his prior promise to reserve 1 hour for the hearing—see ¶168 herein). The real reason is on
16  record. As further evidence of conspiracy and collusion between PLUIM and WILEMAN, the
17  continuance was ordered to give WILEMAN time as he came to court unprepared that day and to
18  prevent LEWIS from receiving the treatment he badly needed.

19  173.        WILEMAN urged PLUIM to immediately incarcerate LEWIS without any evidence
20  against him. **EXHIBIT 1-UUUU, Lines 4-5.**

21  174.        Except the MILLER and WILEMAN *ex parte* hearing with PLUIM on February 6,
22  2012, all of the hearings in PLUIM'S court are on the record. Despite the termination of most LASC
23  court reporters, LEWIS and PAEGEL hired court-approved reporters at their expense.

24  175.        THOMAS regularly practices law without a license by conducting ALL Court Call
25  hearings instead of PLUIM. PLUIM is on the Court Call list of JUDGES that have agreed to
26  PARTICIPATE in Court Calls from attorneys and parties. THOMAS is a clerk, not a judge, yet she
27  handled all hearings via Court Call 100% of the time. In fact, the callers regularly refer to her as
28  "your honor," which THOMAS often failed to correct.

176.     Numerous times, THOMAS has been heard to make "deals" with certain attorneys. At times, Plaintiffs overheard THOMAS negotiate for special favors that contravened the LASC "fast track" system.

177.     One or more of Plaintiffs LEWIS, LORRAINE, LEWIS III and NELLE suffered knowingly defamatory statements by Defendants MILLER, CORNELL, VARONOS, WILEMAN, ZAO, PLUIM, THOMAS, WALSH, FORD, KEHOE, COX, and HADDOCK, who conspired to defame and damage them in numerous various ways.

178.     In addition to ignoring the California codes, rules and common law, PLUIM, VARGAS and THOMAS violated Plaintiffs rights to due process under the California and United States Constitutions and the Canons of Judicial conduct by denying LEWIS and PAEGEL ANY opportunity to be heard via Court Call. **The EXHIBIT 1 Transcripts, tentative rulings and motions filed by LEWIS and PAEGEL that were never heard or even calendared clearly prove this allegation. Furthermore, when said Defendants dismissed LEWIS'S Supplement, they violated The ACTS by Congress expressly for LEWIS'S protection and rights of all the Plaintiffs and DOE Plaintiffs.**

179.     WILEMAN, YAO and KELETI perjured themselves and made no fewer than 50 false statements of fact and law in pleadings and in court.

180.     MILLER perjured himself in pleadings, in court, and committed fraud no fewer than 50 times.

181.     MILLER assaulted a process server with a hand gun which he carries—without a permit—on his person.

182.     MILLER, WILEMAN, TORO and JUNCO refused to comply with any and all discovery requests by the Plaintiffs in Case nos. GC047909 and 11-cv-08810-GW.

183.     At a "meet and confer" on January 16, 2012, MILLER—in WILEMAN and JUNCO'S presence—verbally assaulted and abused NELLE, as Plaintiffs' counsel. See **EXHIBIT No. 9, Pages 31-68**, a true transcription of that meeting that was videotaped on a security camera and audio recorded on a cell phone with their knowledge. Conspiratorially and as a direct conflict of interests, WILEMAN defended MILLER by suggesting NELLE'S witness must leave the meeting for asking

MILLER to "Please be respectful" in an attempt to get MILLER to stop his vile and offensive conduct.

184.     MILLER filed false sheriff and police department complaints against Plaintiff NELLE in September, 2011 and July, 2012. No action was taken against NELLE by either agency.

185.     MILLER filed two false California State Bar complaints against Plaintiff NELLE. No action was taken against NELLE.

186.     MILLER admits to spreading lies and filth about Plaintiffs NELLE and LEWIS on at least 5,000 sites on the internet. See **EXHIBIT No. 9, pp. 32-33.**

187.     CORNELL stole from LEWIS'S wallet his social security and V.A. Medical cards. She used this information to help create the false felony profile of LEWIS referred to herein at ¶¶ 157 & 158.

188.     MILLER and CORNELL conspired to create a Google "Wikipedia listing" of LEWIS giving all of his personal information in such a way as to make it appear to have been put there by LEWIS. CORNELL drew attention to the site on her Facebook page.

189.     MILLER, KEHOE, COX, and CORNELL have exposed the identities and addresses of all of the Plaintiffs MINORS on their various internet sites. See discussion under "EXTORTION, BLACKMAIL and the U.S. PATRIOT ACT" supra, page 17-19. Said Defendants refused to immediately remove the material about the MINORS as demanded by LEWIS and LORRAINE exposing the MINORS to predators. **EXHIBITS 10-A through E and 19 B & H.**

190.     MILLER put a map to Plaintiff LORRAINE'S workplace on his HITMAN internet site and blog exposing her to predators.

191.     MILLER put a map to Plaintiff LEWIS III'S workplace on his HITMAN internet site and blog.

192.     Defendants CORNELL and COX had falsely reported to LEWIS III'S employer which resulted in LEWIS III'S suspension from FEMA. FEMA is investigating CORNELL and COX.

193.	WILEMAN, VARONOS, MILLER and CORNELL perjured themselves every time they spoke in court in LASC. MILLER made false statements of facts in every pleading filed in that case.

194.	KING submitted verifications of false statements in pleadings submitted by WILEMAN and in conspiracy with MILLER during and after the LASC suit was filed.

195.	MILLER brags to having defamed Plaintiff NELLE on 5,000 internet sites and has invited her to sue him for it. See **EXHIBIT No. 9, page 34.**

196.	As a member of the "GANG," Defendant ROBERTS committed MORE THAN TWO ACTS of perjury in court about service of process on VARONOS. **EXHIBITS 1-E, Lines 7-9, 1-F, Lines 17-24, 26 AND 1-II through 1-LL.**

197.	As in Case No. GC047909, VARONOS has a well-established pattern and history of committing perjury. In a different California LASC suit, PAYUPSUCKER PRODUCTIONS, INC. and (noted celebrity) JESSE JAMES v. ALEX VARONOS, case no. BC439356, there are multiple pleadings about serving VARONOS with process.

198.	VARONOS and ROBERTS perjured himself in court in case no. GC047909 by denying service and devising a lie about the service being on some stranger with his name; MILLER testified on October 14, 2011 that VARONOS'S cousin was in fact served (substituted service at VARONOS'S residence).

199.	ROBERTS served as counsel to the GANG at large by representing more than one defendant in case no. GC047909 at the same time.

200.	ROBERTS perjured himself on December 14, 2012 and January 18, 2013 by telling PLUIM that VARONOS had not been served and then weaving an elaborate "story" about some stranger "with the same name having been served instead." NELLE proved the lies in court on January 18, 2013 by using MILLER'S in-court statement of October 14, 2011 against VARONOS and ROBERTS. This charade is a perfect example of how members of the GANG "cover" for each other. The problem this time is that MILLER forgot his original lie that VARONOS had not been served when he stated that VARONOS'S COUSIN had been served. All three statements were made to PLUIM who dismissed the case despite proof of the lying by MILLER, ROBERTS and

VARONOS. Obviously, the GANG conspires regularly and on an on-going basis to get their "story" straight. The record is replete with numerous such incidences of lying by all of the GANG members. PLUIM did his best to preclude the Plaintiffs in case no. GC047909 from disputing all of the lies on the record; but the record reflects that as well.

201. On October 19, 2012 PLUIM, VARGAS, THOMAS, and WILEMAN conspired to and brought three sheriffs into the courtroom to intimidate LEWIS and NELLE and to ensure that they would refrain from refuting Defendants "wild" and untrue statements to the court. All three sheriffs stood behind LEWIS and NELLE; one of them even tapped NELLE on the shoulder and cautioned her to "be quiet" under threat of arrest. Denial of Due Process is one of the bases for that appeal, which is currently before the California Supreme Court.

202. The transcripts from each hearing in GC047909 clearly show that this is a GANG who do their best to confuse through lies in court and in pleadings. PLUIM regularly prevented GANG member falsities from being refuted on the record by interrupting them and changing the subject. Unfortunately for PLUIM, the transcripts clearly indicate his complicity as a GANG member. Clearly, the GANG has a highly developed strategy for committing fraud in the first place and subsequent defenses after being sued. All aspects of criminal activity have been well planned—until now.

203. Defendants PLUIM, VARGAS and THOMAS actively participated in the GANG by giving legal "protection" from liability to GANG members through the Los Angeles Superior Court System.

204. In retaliation and in anticipation of this litigation, CORNELL, MILLER and other members of the GANG filed false police and government agency reports.

205. CORNELL petitioned the Santa Monica, CA court for a restraining order against LEWIS for alleged "stalking and harassment." In so doing, CORNELL submitted false evidence to that court. Apparently, CORNELL acted from her belief that she could stop LEWIS from his investigations as PAG. In granting CORNELL and LEWIS each a 6 mo. restraining order, the judge made clear that same did not apply to any legal action.

206.          Numerous times. CORNELL violated the restraining order in her attempts to impede LEWIS'S investigation as the PAG.

207.          Defendant MILLER assaulted a LICENSED process server with a firearm (pistol) this pistol was in MILLERS belt, when the LICENSED process server STEVE DAUBENSPECK ("DAUBENSPECK") tried to serve MILLER at his home, MILLER chased DAUBENSPECK down the street waiving the pistol at him. As evidence of collusion. KING signed a declaration refuting the event.

## SECOND CAUSE OF ACTION

**GRAND THEFT BY FALSE PRETENSES** asserted by Plaintiffs LEWIS, TBCS, LEWIS III, PAEGELS and DOES 1-300 against Defendants VARONOS. GRAMMER, BLEU, KING, MILLER, FLEMING, TORO, JUNCO, NIVEN, CORNELL, COX, BEATY, PLUIM, VARGAS, THOMAS, WILEMAN. YAO, FIN. INST., ROBINSON, ROBERTS, WORMLEY, KEHOE and DOES 1-300.

## (The ACTS; CIVIL RICO)

208.          By this reference. LEWIS herein incorporates each and every allegation of the foregoing paragraphs1-207 inclusive of this Complaint as if the same were hereat set forth in full.

209.          Said Defendants stole money and/or property from said Plaintiffs by making false statements and misrepresentations to or about said Plaintiffs, either directly or indirectly.

210.          GRAMMER took no legal action against his partners; instead two different stories from GRAMMER were given to the press. First. GRAMMER stated that he was first cheated out of $200,000.00, later GRAMMER said he was cheated out of $1,000.000.00. His entertainment attorney, Marty Singer, threatened to sue the Plaintiffs. See **EXHIBIT 21-C**.

211.          GRAMMER is the "face" on TODHD, STAROPOLY and ESTARHD.TV—all of which are internet schemes to defraud the public. GRAMMER has taken no action to prevent further so-called "mis-use" of his identity by the GANG.

212.          Each Defendant is liable DIRECTLY OR INDIRECTLY for the entire fraudulent scheme as a member of an organized GANG, which began as theft of money and/or property by CORNELL, VARONOS, FLEMING, JUNCO. TORO, MILLER, FIN. INST., ROBINSON, WILEMAN. PLUIM, THOMAS. KEHOE, COX, NIVEN, BEATY, GRAMMER, INS., BLEU,

1  ZAO, WORMLEY and KING and ended in the court systems of California and Tennessee with the
2  collusive and coordinated efforts of CORNELL, WILEMAN, ZAO, ROBERTS, INS., JUNCO,
3  VARONES, TORO, MILLER, GRAMMER, PLUIM, VARGAS and THOMAS.

4  213.        Agreements were initiated by GANG members CORNELL, GRAMMER, JUNCO,
5  TORO, VARONOS, FLEMING, KING and MILLER with said Plaintiffs and NUMEROUS other
6  "victims" under false pretenses to take and permanently deprive all of them of their money and/or
7  property as part of an on-going and evolving series of illegal schemes. See **EXHIBITS 4-C & E; 12-**
8  **A-O; 20-M though U; 37 A & B; 42-H through L; 9, pp. 35-36; and Generally, see all EXHIITS.**
9  214.        GRAMMER, BLEU and CORNELL all falsely advertised and solicited said schemes
10 on TODHD, ESTARHD and STAROPOLY on the internet and in paper with the specific intent of
11 taking money under false pretenses. See **EXHIBITS 4-C & E; 12; 20-M though U; 42-H through**
12 **L;**

13 215.        Said Defendants specifically intended that Plaintiffs and others would rely on the
14 perceived integrity and tacit protections against fraud of the FIN. INST. and GRAMMER, BLEU,
15 CORNELL, NIVEN and KING; the collection of these Defendants was material to the investment.
16 216.        None of said Defendants took any action to cease their illegal advertising and support
17 from TODHD and STAROPOLY despite their having direct knowledge that they were involved with
18 illegal schemes.  As such, it must be understood that said Defendants are members of the same
19 organized GANG OF CRIMINALS.  **Generally, see all EXHIBITS**.

20 217.        Through trickery and false promises, CORNELL, VARONOS, KING, FLEMING,
21 and MILLER stole TBCS/PAEGEL'S property—videotapes of the EVENT. A constructive trust had
22 been created between TBCS and the PAEGELS with said Defendants that they violated.

23 218.        CORNELL, VARONOS, KING, FLEMING, and MILLER stole TBCS/PAEGEL'S
24 services by tricking TBCS/PAEGELS into supplying the labor, supplies, and equipment to film the
25 "step and repeat," the EVENT itself, and the back-stage interviews, which said Defendants took
26 under false pretenses and kept them permanently.

27 219.        TBCS and the PAEGELS videotaped said activities described in ¶218; at the end of
28 the evening, MILLER and KING, at CORNELL'S insistence, took the tapes promising to "digitize"

1  and return them the following week. They took the tapes with the intent of keeping them
2  permanently and they have done so.

3  220.    Defendants TODHD/VARONOS committed fraud against the Noreen Fraser Cancer
4  Foundation when it breached its agreement with Variety Magazine for the sponsorship fee of
5  $100,000.00. TODHD/VARONOS received the benefit of the bargain.

6  221.    On December 30, 2009, Defendants JUNCO and TORO falsely pretended to sell
7  TBCS a TODHD sub-channel under false pretenses. TBCS/PAEGELS paid said Defendants
8  seventy-seven thousand five hundred forty-six dollars and sixty-two cents dollars ($77,546.62)
9  toward a two hundred and fifty thousand dollar ($250,000) before finding out the truth.

10  222.    Unbeknownst to TBCS, the sub-channel capability did not exist at the time of said
11  Agreement and all Defendants committed grand theft under false pretenses for fraudulently selling
12  something that did not exist. In fact, TODHD itself was a scheme to defraud under false pretenses.

13  223.    TBCS was induced by GRAMMER, who was the "face" of the TODHD "network of
14  channels" to invest in obtaining a channel to operate on the network for the purpose of offering
15  programming, advertising, and specialized subscriptions to an exercise regimen. The so-called
16  network, however, consisted of nothing more than artwork; there was no technology capability to
17  support the ads that BLEU, CORNELL and GRAMMER made. See **EXHIBITS 20-M through U.**

18  224.    CORBIN BLEU was featured on the **promotional video** demonstrating the alleged
19  "technological wonders of TODHD" (then MYEZTV).

20  225.    Defendants, VARONOS and FLEMING further induced Plaintiffs to invest in
21  TODHD by falsely listing the well-known television networks: ABC, CBS, NBC, CNN, BBC, ESPN
22  and others on the TODHD channel guide. These representations were completely untrue as none of
23  the major networks were ever affiliated with TODHD.

24  226.    In June, 2010, Defendants VARONOS and FLEMING scheduled a meeting to meet
25  with TBCS owners at D.G. Entertainment, a well-known film and recording studio in Los Angeles,
26  California, to discuss terms of the new channel for them.

27

28

227.     Defendant FLEMING represented TODHD at the June 2010 meeting and introduced himself and Defendant MILLER to Plaintiff TBCS/PAEGELS. FLEMING referred to MILLER as a "public relations expert" and fellow TODHD channel holder.

228.     Defendant MILLER showed numerous photos of notable industry professionals who he claimed were his clients. These representations were false.

229.     Soon thereafter, Plaintiff TBCS reached an agreement to pay Defendant VARONOS a one-time channel fee of ten thousand dollars ($10,000.00) plus monthly fees of one thousand dollars ($1,000.00) per month plus "bandwidth use" for their channel. The money was directly deposited to VARONOS'S FARGO account.

230.     FLEMING did artwork for TBCS'S "channel." FARGO received those payments.

231.     Payments amounting to $23,000.00 were made into FARGO accounts belonging to VARONOS and FLEMING.

232.     Defendant MILLER pursued an agreement with Plaintiff TBCS to act as its public relations specialist "for the purpose of getting programming for, and aired, on their TODHD channel."

233.     MILLER falsely promised that TBCS would have a return on their investment of seventy thousand dollars ($70,000.00) by the third month. He also guaranteed that he obtained prior commitments from several of his "contacts" to place programming on the TBCS channel exclusively, in anticipation of a HITMAN PR/TBCS Agreement. Based upon MILLER'S false pretenses, the Agreement was signed on September 21, 2010. **EXHIBITS 24**. All of MILLER'S assertions were false and made solely to defraud Plaintiffs TBCS and the PAEGELS.

234.     Defendant MILLER had no such commitments nor did he ever produce any. MILLER ignored and failed to perform according to his marketing proposal and under the terms of the Agreement. MILLER knew that it was on the strength of those promises that Plaintiff TBCS finally entered into an agreement with Defendant MILLER, which was doomed to fail because MILLER had lied about everything, including that HITMAN/MILLER was a real business organized in Nevada and MILLER was a public relations expert.

235.     MILLER believed that although he stole Plaintiffs valuable property, breached his agreement, and never performed any part of his promises that Plaintiffs should continue paying him on a contract that was void *ab initio*. MILLER retaliated for refusing to pay his extortion was child endangerment, character assassination, threats, hacking and defamation.

236.     MILLER conspired with other GANG members to hack into Plaintiffs' e-mails, government databases, and social media networking sites Facebook, Linked-In, Twitter and unknown others.

237.     MILLER told TBCS/PAEGELS that his office was located in San Marino, California, which is an up-scale location. In reality, MILLER merely rented the address, not the office at the address, in order to defraud businesses into thinking that he was legitimate. The Agreement was based upon false pretenses as there was NEVER any public relations "firm;" MILLER and KING admitted same to J. Wu. **See EXHIBIT 44,** Transcript of hearing where KING admits MILLER rented the address.

238.     MILLER has no marketable public relations skills; his sole purpose is to cheat people. The Agreement he made with TBCS was based upon the false pretense of advertising and improving public relations. His true purpose is to pilfer assets and leave a business decimated.

239.     The material taped at the Variety EVENT was done exclusively by the Plaintiff PAEGELS; there is no question as to ownership. The issue is possession and the theft of that property, which was taken under false pretenses.

240.     Later, CORNELL, claiming to have been defrauded by MILLER, VARONOS, and FLEMING was included as a plaintiff in the GC047909 LASC suit. In actuality, **CORNELL is a GANG MEMBER AND INFORMANT and is in breach of trust from that suit**.

241.     On or about November 15, 2010, VARONOS had already planned to give copies of the EVENT videos to the skin-care company, Pure Chemistry, in exchange for satisfying the "gift bag" term of the BRIAN WILLIAMS Agreement showing that his intent to put the material on TBCS'S channel was made under false pretenses.

242. Defendants MILLER, KING, FLEMING and VARONOS have ignored TBCS/ PAEGEL demands to return their videotapes and money paid under false pretenses. See **EXHIBITS 13-D & E; 45 and 46.**

243. Defendant CORNELL persuaded Plaintiffs PAEGELS to give MILLER and KING the Variety EVENT tapes under false pretenses. CORNELL frightened them into believing that MILLER had a handgun that he would use on the PAEGELS if they did not cooperate by giving him their videotapes. CORNELL has never reported this threat; she caused the PAEGELS to give MILLER and KING their property under false pretenses.

244. Defendant MILLER attempted to extort money in exchange for returning PAEGEL'S videotapes.

245. GRAMMER phoned LEWIS to sell LEWIS on STAROPOLY membership; after LEWIS became suspicious about the efficacy of STAROPOLY, GRAMMER refused to speak with him. Clearly, GRAMMER conspired to enroll membership in this Ponzi scheme under false pretenses; he avoided contacts with them later.

246. MILLER asserted that TBCS would receive special endorsements of their programs by reputable firms; these assertions were all false and designed merely to take money under false pretenses.

247. Plaintiffs LEWIS and PAEGELS entered into agreements with Defendants VARONOS, FLEMING, TODHD, STAROPOLY, TODHD, MILLER, JUNCO, TORO and KING in good faith and in reliance on the celebrity of GRAMMER. CORNELL and BLEU under false pretenses.

248. CORNELL stole $3,666.00 from LEWIS under false pretenses that it was a "loan" to be paid back within three (3) months.

249. All said Defendants have either entered into agreements in bad faith, by *inter alia*, intending to breach the agreements from the outset or to defraud Plaintiffs by selling Plaintiffs something that did not exist or services it had no intention or the capability of performing.

250.     All of the Plaintiffs have demanded appropriate restitution and monetary damages and specific performance of property from Defendants. As of the date of filing, none of the Defendants have responded in any positive way to, or complied with, any of Plaintiffs' demands.

## THIRD CAUSE OF ACTION

**FEDERAL CONSPIRACY** asserted by ALL PLAINTIFFS and DOE Plaintiffs 1-300 against ALL DEFENDANTS and DOE Defendants 1-300 Inclusive.

### (The ACTS; 18 USC 1961- 1968 Civil RICO Act, Hobbs Act)

251.     By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-250 inclusive of this Complaint as if the same were hereat set forth in full.

252.     Plaintiffs LEWIS, TBCS, PAEGELS, LEWIS III, LORRAINE, and MINORS were conspired against by ALL DEFENDANTS IN THIS ACTION WORKING TOGETHER AS AN ORGANIZED GANG to endanger children and defraud, misrepresent, collude, infringe, defame, extort, blackmail, embezzle, pirate, stalk, harass, threaten, corrupt, divert justice, breach contracts, conduct illegal businesses, commit perjury, and destroy and corrupt evidence directly or indirectly, via all of the included causes of action.

253.     On November 5, 2012, CORNELL stated on TMZ's website: **" I WAS DISMISSED FROM THE CASE [GC047909] ON SEPTEMBER 13 AND HAVE BEEN IN CONTACT WITH KELSEY'S TEAM SINCE JULY"** See **EXHIBIT 4-E.**

254.     WILEMAN has a well-established pattern for misleading the judiciary, by twisting and abjectly misstating law and facts as seen in transcripts of case no. GC047909. In so doing, WILEMAN conspired with PLUIM, MILLER, KING, INS, and all other Defendants in that case.

255.     Similarly, YAO and KELETI have followed WILEMAN'S example.

256.     PLUIM participated actively in the conspiracy by condoning all such acts of corrupting the California judicial system as evidenced by LEWIS and NELLE'S numerous attempts to bring it to PLUIM'S attention.

257. PLUIM, THOMAS, VARGAS, MILLER, KING, WILEMAN, YAO, KELETI, ALMEIDA, NEWELL and INS. conspired to have KING dismissed as a Defendant despite that she was already in default. **See generally, EXHIBIT 1.**

258. CORNELL, MILLER, COX, KEITH, KEHOE, WILEMAN, INS., KING, PLUIM, THOMAS, VARGAS, VARONOS, HADDOCK and KELETI conspired against LEWIS to have him removed as a plaintiff, arrested without bail, and his Supplement dismissed without cause.

259. VARONOS, FLEMING, GRAMMER, COX, MILLER, FIN. INST., BLEU, ROBINSON, WORMLEY, JUNCO, TORO, HAYELAND, SIMMONS and CORNELL conspired to defraud the public at large and Plaintiffs LEWIS, PAEGELS, and TBCS by initiating business dealings and "opportunities" that were wholly fraudulent. **EXHIBITS 5; 13-A; 18-A, C, D, and K; 18-Aa – Ad; 19-A; 22-A through C; 25-A through E; 26; 36; 37; 39-A; and 42.**

260. GRAMMER, BLEU, JUNCO, MILLER, KING, TORO, ROBINSON, WORMLEY, VARONOS, FIN. INST., CORNELL, HAYELAND, SIMMONS and FLEMING, conspired to defraud the public at large and Plaintiffs PAEGELS, TBCS, and LEWIS by engaging in illegal business practices while vouching for each other AND their fraudulent "businesses." **See generally EXHIBITS 1; 8; 9; 12; 13; 15; 16; 17; 20; 23; 25; 29; 30; 32; 36; 37; 39; and 42.**

261. MILLER, VARONOS, HADDOCK, CORNELL, COX, WILEMAN, KEHOE, and KEITH conspired to endanger the lives of Plaintiffs MINORS, LEWIS, LEWIS III, and LORRAINE by posting personal and private information about them on the internet and in person.

262. MILLER, VARONOS, WILEMAN, PLUIM, CORNELL, COX, KEHOE, KEITH, HADDOCK, THOMAS, YAO, KELETI, VARGAS and ROBERTS conspired to harass, intimidate, defame, commit perjury and cause severe emotional and physical distress to LEWIS, LEWIS III, LORRAINE, and the PAEGELS. **EXHIBITS 1, 5, 6, 9, 10, 11, 19, 27, 28, 33, 34, 35, 38, and 41.**

263. MILLER, VARONOS, JUNCO, WILEMAN, PLUIM, CORNELL, COX, KEITH, YAO, KELETI and ROBERTS conspired to defame, issue a no-bail warrant against LEWIS and endanger MINORS, LEWIS III, LORRAINE, NELLE and LEWIS by committing perjury, fraud, collusion and making personal threats against said Plaintiffs.

264.     GRAMMER, BLEU, CORNELL, VARONOS, ROBINSON, NIVEN, JUNCO, TORO, MILLER, PLUIM, THOMAS, VARGAS. INS., FIN. INST. and FLEMING conspired to defraud the public at large and Plaintiffs LEWIS, PAEGELS, and TBCS by initiating business "opportunities" that did not exist.

## FOURTH CAUSE OF ACTION

**FEDERAL EXTORTION/ATTEMPTED EXTORTION & BLACKMAIL** asserted by Plaintiffs LEWIS, LEWIS III, LORRAINE, MINORS, TBCS, PAEGELS, and DOE Plaintiffs 1-300 against Defendants MILLER, CORNELL, COX, KEHOE, GRAMMER, PLUIM, WILEMAN, KING, INS., THOMAS, VARGAS and DOE Defendants 1-300 Inclusive

### (The ACTS; CIVIL RICO)

265.     By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-264 inclusive of this Complaint as if the same were hereat set forth in full.

266.     Defendant MILLER attempted to extort money from the PAEGELS in exchange for getting their own property back.

267.     Defendant CORNELL attempted to extort money from LEWIS by engaging in on-line, in-court, and telephonic attacks on LEWIS'S character and reputation. CORNELL presented a "contract" to LEWIS in which she wanted him to agree to pay her 50% of his litigation proceeds in exchange for no stated benefit to him. **EXHIBIT 3-C.**

268.     In retaliation to LEWIS'S refusal to sign said "agreement," CORNELL endangered the lives of all MINORS, who are LEWIS'S grandchildren, by putting their names, home addresses and maps to same on the internet. CORNELL knew that MINORS visit LEWIS at his home.

269.     Also in retaliation, CORNELL, COX and MILLER falsely told LEWIS III'S employer that which caused LEWIS III to lose his FEMA card until such time as LEWIS and LEWIS III could clear up the matter.

270.     In retaliation and in anticipation of this litigation, CORNELL and MILLER filed false numerous police and government agency reports against LEWIS and NELLE.

271.     In retaliation, CORNELL filed a false petition in Santa Monica, California court against LEWIS for stalking and harassment in order to get a restraining order against him.

CORNELL mistakenly believed that the restraining order would preclude LEWIS from investigating to learn of her involvement in the GANG activities. The court informed CORNELL that legal action was exempt from the restraining order, which was granted to both LEWIS and CORNELL. **EXHIBIT No. 6-C and D.**

272.	Similarly, MILLER filed numerous false reports with the California State Bar, the Walnut Sheriff and the Glendora Police Dept. against NELLE. None of MILLER'S reports resulted in any investigation against NELLE.

273.	CORNELL has a history of filing unjustified complaints of harassment and stalking; well-known author, publisher and radio celebrity **ANNE COULTER** was targeted by CORNELL in the past as she has done to others. **See EXHIBIT 4-A and B.**

274.	In retaliation, CORNELL stole LEWIS'S **Social Security Card, HIS Veterans Administration Medical Card, two cell phones and his PURPLE HEART** in order to blackmail LEWIS into quitting case no. GC047909. CORNELL perjured herself in court on September 13, 2012 by *inter alia* refuting that LEWIS is a disabled veteran.

275.	LEWIS suspected that CORNELL was impeding his Civil RICO investigations in case no. GC047909 by giving strategy and evidence to the GANG. As a result, CORNELL tried to blackmail him into quitting his investigations by fraudulently stating on the internet and in courts that LEWIS threatened to kill her and her son on July 29th 2012. **THIS WAS AT THE TIME CORNELL ADMITTED TO WORKING FOR GRAMMERS TEAM (GANG) and before being released by her own counsel, NELLE.**

276.	Acting in his capacity as the PAG, LEWIS requested correspondence paperwork from CORNELL with others because CORNELL was instructed by NELLE not to contact anyone about the case, but NELLE had been contacted by others and now she needed to know what CORNELL had been saying. At that time, LEWIS was unaware that CORNELL was actually a "ringleader" and was working with KELSEY'S TEAM. After that, CORNELL, MILLER, COX, KEHOE, WALSH, and FORD posted numerous false, defamatory, and/or endangering items on the internet about LEWIS, LEWIS III, LORRAINE, and the MINORS in an attempt to intimidate and stall LEWIS'S investigation. In fact, FORD filed a false police report with the Arlington, Massachusetts police

department alleging that LEWIS threatened him. The only threat made between LEWIS and FORD was initiated by FORD and CORNELL at 4:30 a.m. when they left a threatening voicemail message and FORD spoke about his affiliation with organized crime.

## FIFTH CAUSE OF ACTION

**CREDIT/DEBIT CARD FRAUD and PHISHING** asserted by Plaintiffs LEWIS, TBCS, PAEGELS, and DOE Plaintiffs 1-300 against Defendants VARONOS, GRAMMER, BLEU, KING, MILLER, FLEMING, CORNELL, BEATY, FIN. INST., STAROPOLY, TSOFTNET, PLUIM and DOE Defendants 1-300 Inclusive

### (The ACTS; CIVIL RICO; 18 U.S.C. § 1341; 18 U.S.C. § 1343)

277.    By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-276 inclusive of this Complaint as if the same were hereat set forth in full.

278.    Said Defendants conspired with each other and FIN. INST. to defraud hundreds, if not thousands, of "victims" of their money and/or property through the fraudulent use of credit/debit cards.

279.    Becoming an associate of STAROPOLY involved giving certain private information and payment via credit or debit card. **EXHIBIT 47**.

280.    Members could not disassociate with STAROPOLY and cease monthly credit card charges without having to void the credit or debit card used in the "sign up."

281.    FIN. INST. failed to disclose the terms of their charges in connection with STAROPOLY and ESTARHDTV or any other scheme by the GANG.

282.    FIN. INST. failed to properly supervise the GANG'S use of their client's credit or debit cards.

283.    FIN. INST. actively participated in charging credit debit cards, in furtherance of GANG activities, without permission.

284.    FIN. INST. received stolen money for the purpose of embezzlement by the GANG.

285.    MILLER tried to force PAEGELS to pay him money via credit card through the processor located at KING'S office; he did so by becoming belligerent and abusive. MILLER also tried to get NELLE to order artwork from a RUSSIAN NATIONAL, NICKOLAY ZDANEVICH, through a European credit card processor, moneybookers.com. This was another scam. MILLER resigned shortly after this attempt at getting TBCS/NELLE'S credit card failed. The artwork was paid for via western union, however TBCS/PAEGELS never received their artwork from either the RUSSIAN or from MILLER. **EXHIBITS 13-B, and 15 A-C.**

286.    PLUIM used his position in the LASC court system to protect those who committed the credit card fraud by dismissing GC047909 against all of the Defendants without any legal justification.

## SIXTH CAUSE OF ACTION

**CHILD ENDANGERMENT AND CHILD ABUSE** asserted by Plaintiffs LEWIS, LORRAINE, LEWIS III, MINORS and DOE Plaintiffs 1-300 against CORNELL, COX, KEHOE, MILLER, HADDOCK, KEITH and DOE Defendants 1-300 Inclusive.

### (42 U.S.C.A. § 5106g; The Child Safety Act of 2005, HR3132; The Adam Walsh Child Protection and Safety Act of 2006 HR 4472 (109th, 2005-2006) (Mandated by federal authorities))

287.    By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-286 inclusive of this Complaint as if the same were hereat set forth in full.

288.    The health, safety, and welfare of MINORS were endangered by Defendants CORNELL, MILLER, COX, KEITH, KEHOE, and HADDOCK who conspired to and placed all MINORS' personal information on the internet in numerous sites. Said personal information included MINORS' names, addresses, and maps to their addresses.

289.    CORNELL, HADDOCK, and KEHOE supplied their co-conspirators, MILLER, COX, and KEITH, with all of the particular personal information that appeared.

290.    As MINOR'S grandfather, LEWIS'S name, address and map to his address was also placed on the internet on numerous sites in order to punish LEWIS for retaining his interest in case no. GC047909 by discouraging visits to LEWIS by MINORS due to fear of predators.

291.     CORNELL, COX, MILLER and WILEMAN hacked into LEWIS'S computer in order to access his "family-only" Facebook page in order for them to obtain photographs of LEWIS, LEWIS III, LORRAINE and MINORS.

292.     Photographs were taken by family members at one of the MINOR'S birthday parties in Florida, while LEWIS was in Florida for medical treatment. Neither MILLER nor WILEMAN are "friends" on LEWIS'S family page, yet they told the court that they had pictures of LEWIS partying in Florida at the December 14th 2012 hearing. **EXHIBIT 1-TT, Lines 3-12.**

293.     CORNELL and the GANG recklessly endangered the lives of MINORS in their assault on LEWIS'S credibility by exposing them to predators on numerous internet sites including, but not limited to Wikipedia, Facebook, and personal web pages. **EXHIBITS 4-F; 19-B, F, G; and H (redacted content to protect the MINORS).**

294.     **Following unconscionable postings by CORNELL, MILLER, KEHOE, and COX about MINORS,** LEWIS Texted CORNELL that he would file complaints against them and seek legal action. CORNELL persisted despite LORRAINE'S pleas that she cease and desist.

## SEVENTH CAUSE OF ACTION

**FEDERAL ILLEGAL PRACTICE OF BUSINESS & FALSE ADVERTISING** asserted by Plaintiffs LEWIS, TBCS, PAEGELS, and DOE Plaintiffs 1-300 against Defendants VARONOS, KING, MILLER, BLEU, FLEMING, TORO, JUNCO, NIVEN, CORNELL, HAYELAND, COX, BEATY, FIN. INST., INS., KEITH, FLEMING, AV COMPUTER DOCTOR; ALMEIDA, ZAO, WILEMAN, ROBINSON, MILNER, KEHOE, WORMLEY, and DOE Defendants 1-300 Inclusive.

### (Federal Trade Commission Act, the Clayton Act; The ACTS; CIVIL RICO; Fl. Civ. Proc. § 400.506 Florida Dept. of Elderly Services)

295.     By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-294 inclusive of this Complaint as if the same were hereat set forth in full.

296.     Defendants are/were all involved in businesses that by definition are false representations made for the purpose of committing fraud. **EXHIBITS 5, 12, 13-A, B, D, E. F, H through Y, BB, DD, EE, 15, 17, 18-AA, 18A-b, 18A-c, 18A-d, 18-A, 18-B, 18-C, 18-D, 18-E, 18-H, 18-I, 18-J, 18-K, 20, 22, 23, 25, 26-A, 26-B, 26-C, 26-D, 26-E, 26-G, 36-A through E, 39, 42-A**

**through HH, 45, 46, and 47.** For example, FLEMING sent Plaintiffs The PAEGELS numerous e-mails under a business name "SparkyProd," in order to try to claim ownership or affiliation with Sparky Productions, which is a false representation. In fact, Sparky Productions is a legitimate 501(c)(3) corporation organized in Colorado.

297.     TODHD is not a business, as it was represented; it never had any of the technological capabilities it was advertised to possess by CORNELL, COX, VARONOS, FLEMING, BLEU, GRAMMER, ROBINSON, JUNCO, TORO, MILLER, KING, and NIVEN. All of said Defendants worked in concert and individually to maximize the overall fraudulent scheme.

298.     STAROPOLY was never a multi-level marketing company, as it was so advertised by its representatives CORNELL, VARONOS, FLEMING, BLEU, GRAMMER, BEATY, and FIN. INST.

299.     COX represents that LYRIX as a bona fide business being advertised to promote and sell skills in internet marketing and publishing. COX and KEITH advertise this non-entity business on AV COMPUTER DOCTOR in Lancaster, CA where COX resides.

300.     CORNELL advertises GODSHOTS as a charity(ies) in order to specifically and fraudulently solicit donations from the public.

301.     SIMMONS and HAYELAND represent SPORTS ICON ENTERTAINMENT and GSAXE as organized companies, which they are not, as a platform to sell SIMMON'S products.

302.     KEHOE runs "house maker" and/or "companion" services in the state of Florida without a license.

303.     KING and MILLER advertise and operate HITMAN as a legitimate public relations business from KING'S "chiropractic" office without a license from the City of San Marino and contra the Chiropractic Rules of Ethics.

304.     KING and MILLER know that neither of them possesses any public relations skills.

305.     CORNELL, MILLER, VARONOS, FLEMING, GRAMMER, BLEU, ROBINSON, KING, TORO, JUNCO, and NIVEN advertised and/or made false representations to Plaintiffs TBCS and PAEGELS that TODHD was "the first branded social media entertainment network" having "revolutionary technology" and offering programming and merchandising opportunities.

306.     CORNELL and HAYELAND operate an unlicensed, illegal—unlicensed and unorganized—business known as SPORTS ICON ENTERTAINMENT (SIE).

307.     CORNELL falsely portends to own Lydia Cornell, Inc., which is also unlicensed and unorganized.

308.     CORNELL advertises GODSHOTS on Facebook, Twitter, LydiaCornell.com, U-stream, and LinkedIn.

309.     COX advertises LYRIX on at least Facebook, LinkedIn, Twitter, Google and on AV COMPUTER DOCTOR at 44519 10th St West Lancaster CA 93534, 661-729-2823 owned by Defendant KEITH. See **EXHIBIT 5**.

310.     HAYELAND advertises GSAXE and SIE over the internet. GSAXE is owned by Defendant SIMMONS and has no license or organization.

311.     JUNCO and TORO advertised GREEN as a legitimate business to TBCS/PAEGELS and others. GREEN was never a real company; JUNCO admitted same. **EXHIBIT No. 9, pg. 11.**

312.     MILLER and KING drafted contracts fraudulently stating that HITMAN/MILLER was a "company" organized in Nevada. HITMANPR has never been organized by any secretary of state or licensed anywhere else.

313.     MILLER falsely advertises(ed) himself as a "public relations professional."

314.     Defendants KING and MILLER advertised the chiropractic office address as a public relations firm for deceptive purposes. Such advertisements were made via business cards, KING and MILLER'S electronic press kits ("EPK") over the internet at HitmanPR.com, Dedicated to Health and on 5,000 other sites.

315.     Defendants KING and MILLER did so conspire to defraud TBCS/PAEGELS by stating that the office, located at 375 Huntington Drive, Suite B, San Marino, California was/is a legitimate public relations business.

316.     KING also illegally practices businesses that are not licensed or organized known as Advanced Health Concepts and Dedicated to Health without licenses from her office.

317. Defendant KING allowed her chiropractic office to be used illegally, which clearly demonstrates Defendant KING'S intent to deceive the public—as she did Plaintiff's TBCS, and PAEGELS—into concluding that a legitimate public relations business was being conducted there.

318. The California Board of Chiropractic Examiners ("Board") requires that all licensees register their related licenses, registrations and permits. To date, only the "Stephanie King Chiropractic Corporation" has been registered with the Board.

319. KING also advertises "massage therapy" at Advanced Health Concepts, which requires that she get a city permit for same and registers her services with the police chief of San Marino. KING has obtained no permit.

320. KING misuses her chiropractor's license to ascribe credibility to MILLER, VARONOS, TODHD and FLEMING.

321. KING'S website, dedicatedtohealth.com, is also not registered with the Chiropractic Board.

322. KING and MILLER testified under oath that MILLER was only renting the San Marino address from KING, however they both deny having proof that their statements were valid.

323. INS. suborned KING'S continuing illegal acts by hiring ALMEIDA, WILEMAN, KELETI AND YAO to defend her past practices instead of paying her claim for "business fraud." In so doing INS., ALMEIDA, WILEMAN, KELETI and YAO became KING'S on-going and knowing accomplices to her frauds.

324. ROBINSON and WORMLEY were partners in a supposed law firm MILNER. WORMLEY was fully aware that ROBINSON was on suspension at the time he engaged in legal representation of TBCS. ROBINSON has now been permanently disbarred by the California State Bar.

325. Defendant ROBINSON took money ($5,000.00) from Plaintiffs TBCS/PAEGELS to assist them with legal work against fellow GANG members, JUNCO and TORO. At that time ROBINSON was on suspension pending permanent disbarment.

326. VARONOS referred ROBINSON to the PAEGELS knowing that ROBINSON was on suspension. He conspired with ROBINSON to protect JUNCO and TORO from suit.

327.     Clearly, EACH MEMBER OF THIS GANG developed their separate and unified means of defrauding members of the public.

### EIGHTH CAUSE OF ACTION

**FRAUD BY INTENTIONAL OR FRAUDULENT MISREPRESENTATION asserted by Plaintiffs LEWIS, TBCS, PAEGELS, LEWIS III, LORRAINE, MINORS and DOE Plaintiffs 1-300 against Defendants GRAMMER, VARONOS, KING, MILLER, BLEU, FLEMING, TORO, JUNCO, NIVEN, CORNELL, HAYELAND, COX, FIN. INST., INS., ALMEIDA, YAO, WALSH, WILEMAN, ROBINSON, KEHOE, WORMLEY, PLUIM, VARGAS, THOMAS, ICON, AXE, HAYELAND, SIMMONS and DOE Defendants 1-300 Inclusive.**

### (The ACTS; CIVIL RICO; 18 U.S.C. § 1341; 18 U.S.C. § 1343)

328.     By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-327 inclusive of this Complaint as if the same were hereat set forth in full.

329.     GRAMMER, BLEU, CORNELL, VARONOS, FLEMING, TORO, JUNCO, MILLER, and NIVEN misrepresented TODHD as a legitimate business in order to victimize the public at large and Plaintiffs TBCS and PAEGELS.

330.     FIN. INST. conspired and colluded with said Defendants VARONOS, BLEU, FLEMING, CORNELL, GRAMMER, TORO, JUNCO, MILLER, TODHD, STAROPOLY and ESTARHD to enable said Defendants to intentionally defraud the public at large and Plaintiffs LEWIS, TBCS, and the PAEGELS in particular.

330.     INS. conspired and colluded with MILLER, KING, WILEMAN, KELETI and YAO to defraud Plaintiffs LEWIS, TBCS, PAEGELS and NELLE by suborning non-compliant representation of KING.

331.     HAYELAND and SIMMONS conspired and colluded to defraud the public at large and the internal revenue service by misrepresenting ICON and AXE as legitimate businesses.

332.     GRAMMER, BLEU, CORNELL used their celebrity status to unduly influence members of the public at large, including Plaintiffs LEWIS, TBCS, and PAEGELS, to advertise for and solicit fraudulent" agreements" with TODHD and STAROPOLY.

333.     GRAMMER is currently seen on ESTARHD.

334.	GRAMMER, BLEU, CORNELL, VARONOS, FLEMING, MILLER, KING, JUNCO, TORO, and ROBINSON, all knew that they were making misrepresentations of fact to Plaintiffs at the time they entered into agreements or attempted to enter into agreements either directly, or indirectly. At times, Defendants exercised undue influence on one or more Plaintiffs.

335.	On January 18, 2013, in case no. GC047909, PLUIM, VARGAS and THOMAS destroyed evidence by dismantling Plaintiff's "CONFORMED" copy of the original complaint so as to "retain a document for the file." Said Defendants misrepresented that the document was needed for the record when, in fact, PLUIM failed to make any ruling as to the document, it's validity or necessity, before entirely dismissing the case. When it became clear that PLUIM'S ruling was IN SPITE OF the evidence, he refused to return NELLE'S document to her.

336.	PLUIM withheld information as to the bases upon which he accused LEWIS of practicing law without a license, which he had a duty to disclose to LEWIS at the time of the accusations. LEWIS denied unequivocally having practiced law in the state of California without a license. PLUIM used undue influence and made false statements of fact as to Plaintiffs LEWIS and the PAEGELS at every hearing and knew that he was making misrepresentations and making false statements at the time. **See EXHIBIT 1, generally.**

337.	On December 14, 2012, THOMAS deliberately withheld information that LEWIS and NELLE were precluded from the hearing that day owing to PLUIM'S refusal to allow them to attend via Court Call. She had a duty to disclose that information for the record instead of allowing PLUIM and the Defendants to falsely and prejudicially comment that LEWIS and NELLE were just absent without any justification. **EXHIBIT 1-BB, Lines 26-28 is the only portion of that transcript that addresses the contact with the clerks about LEWIS and NELLE being unable to appear. THOMAS had a conversation with LEWIS on December 13, 2012, but THOMAS remained silent during the hearing about LEWIS and NELLE attempting to appear via court call.**

338.	THOMAS told LEWIS that PLUIM could not hear the Court Call box from his place at the bench.

339.	VARGAS told NELLE that PLUIM flatly refused to allow either LEWIS or NELLE to participate in any hearings via Court Call at any time. Doing so is contra the California Rules.

340.     INS. withheld information requested to confirm its employment "hiring date" of WILEMAN. This information was required in order to assist Plaintiffs in determining WILEMAN'S status. WILEMAN and INS. conspired to defraud Plaintiffs LEWIS and PAEGELS by making false statements of fact to the Plaintiffs in case no. GC047909.

341.     FIN. INST. knowingly made false statements of fact to Plaintiff LEWIS by misrepresenting STAROPOLY as a legitimate business opportunity.

342.     KING and MILLER made knowingly false statements of fact as to the Plaintiff LEWIS'S personal service on KING on August 15, 2011 to the federal court on December 8, 2011.

343.     MC committed both mail and wire fraud by issuing credit cards to members of STAROPOLY on which they would ostensibly issue credits based upon the member's sales and recruiting performance.

344.     MILLER made false statements of fact to the court [GC047909] about Plaintiffs LEWIS, TBCS, and the PAEGELS and knew that he was making misrepresentations and making false statements at the time, and continues tö do so as of this filling as to his qualifications as a chiropractor and alleged public relations "expert." **EXHIBIT 48.**

345.     MILLER has misrepresented actions and concealed facts as to his business relationship and relationship in general with KING**.**

346.     MILLER misrepresented his address to the court for service.

347.     MILLER misrepresented facts about the PAEGELS to:  the Glendora police department, the Walnut Sheriff, the California State Bar (twice), the courts at hearings and in pleadings in both state and federal courts.

348.     WILEMAN submitted said false Glendora police report by MILLER to Los Angeles Superior Court in case no. BC495150 against Plaintiffs NELLE and TOMMY.

349.     WILEMAN misrepresented himself as KING'S attorney of record in case nos. GC047909 and 11-cv-08810-GW.

350.     WILEMAN misrepresented himself as a "super lawyer" in southern California's list.

351.     WILEMAN misrepresented his corrupted version of NELLE'S original complaint in GC047909 to federal court as "true and exact."

1 352. WILEMAN misrepresented numerous laws and facts to state and federal courts in case
2 nos. GC047909 and 11-cv-08810-GW.

3 353. PLUIM took no punitive action against WILEMAN for his illegal and unethical acts
4 as described in ¶¶349-352.

5 354. CORNELL contacted the F.B.I. in Los Angeles, The Beverly Hills Police, Los
6 Angeles Sheriff, PLUIM, WILEMAN, MILLER and THOMAS by e-mail and in person along with
7 other persons and made false statements to them about and against PAEGEL, LEWIS, LEWIS III,
8 LORRAINE and MINORS.

9 355. CORNELL stole LEWIS'S **Social Security Card and his V.A. Medical Card** from his
10 wallet while LEWIS was CORNELL'S invited guest in her rented home at 300 S. Crescent St
11 Beverly Hills Ca. 90212. CORNELL also stole from LEWIS his PURPLE HEART from his
12 overnight bag; LEWIS caught CORNELL leaving his room carrying an article of LEWIS'S clothing
13 that was handing in the closet. LEWIS alleges that his identification cards were wrapped in the
14 clothing in order to conceal the theft. CORNELL had gone into the room LEWIS was occupying
15 while LEWIS was outside working on CORNELL'S swimming pool for the sole purpose of stealing
16 from him. CORNELL used the information from her theft to create a false felony profile in order to
17 misrepresent LEWIS'S background to the court. **See EXHIBIT 1-A-s Lines 4-28 and 1-A-t Lines**
18 **1-28.**

19 356. CORNELL contrived illnesses and ascribed them to LEWIS by using said stolen
20 medical and social security cards. CORNELL then spread the falsities about LEWIS to internet e-
21 mails, blogs, U-Stream and social networking sites such as Facebook and Twitter. CORNELL
22 repeated these lies in courts of law in California and to other members of the GANG. All of these
23 misrepresentations about LEWIS began after LEWIS refused to "loan" CORNELL more money.

24 357. CORNELL, COX, KEHOE, WALSH and FORD posted false, insulting and
25 demeaning information of a personal nature about plaintiff LEWIS on the internet.

26 358. CORNELL continued to post such information despite plaintiff LEWIS'S demands
27 that she stop.

28

359.     CORNELL'S self-created false identity profile of LEWIS showed a cropped half picture of someone who resembles LEWIS along with a description that LEWIS was 5` 10" tall, with black hair and brown eyes. In fact, LEWIS is 6 feet tall, with light brown hair and blue eyes.

360.     CORNELL also claimed that LEWIS was not retired/disabled from the U. S. Army and that LEWIS had stolen the identity of another military person. CORNELL posted all of her false statements about LEWIS over the internet. **See EXHIBITS 4-E, 6, 10-A to C, E, and 19-G.**

361.     LEWIS loaned CORNELL his laptop computer in 2010, because CORNELL complained to him that she didn't have a working laptop. Using LEWIS'S laptop, CORNELL hacked into LEWIS'S Facebook account, his AT&T site, e-mail account, and she reopened a twitter account that LEWIS'S had closed. CORNELL also tried to hack into LEWIS' Bank account.

362.     LEWIS demanded that CORNELL return his laptop computer. CORNELL lied and stated that her mother had the Laptop and would give it to LEWIS the following day. Meanwhile, CORNELL tried to hide her activities by deleting LEWIS'S information and traces of her hacking activities. Proof of CORNELL'S illegal hacking activities has been professionally retrieved.

363.     COX and KEITH, two of CORNELL'S accomplices, own a computer repair store known as AV COMPUTER DOCTOR, an unlicensed operation located in southern California.

364.     CORNELL habitually accuses others of "stalking," 'harassing," and "threating" her. She has filed numerous false police reports with the Beverly Hills police department.

365.     CORNELL has admitted to committing fraud on the internet on her Facebook account. CORNELL and COX invented a fictitious person and Facebook page for one JASON MEADOWS; CORNELL and COX and others have used this phony Facebook page as a forum to defame LEWIS and post private and personal information about MINORS, LORRAINE, LEWIS and LEWIS III.

366.     LORRAINE, daughter of LEWIS, confronted CORNELL on her Facebook page, about CORNELL'S defamatory remarks and postings of LEWIS, and the private personal information about LORRAINE and the family. CORNELL needed to steal LEWIS'S items to deprive LEWIS of an immediate defense to CORNELL'S in-court testimony that LEWIS had never been in the military. See **EXHIBIT 19-B and C, 19-H and I, and 35-A.**

1  367.          Instead of taking the defamatory and private material down, CORNELL responded to
2  LORRAINE'S pleas by blocking her from the page.

3  368.*          Hacking into LEWIS'S Facebook account and using LEWIS'S name as though
4  information was coming from LEWIS, CORNELL, COX and MILLER SPREAD FALSE AND
5  PRIVATE INFORMATION ABOUT LEWIS TO ALL OF LEWIS'S FRIENDS. CORNELL then
6  posted a link to Wikipedia and Linked-In on CORNELL'S Facebook that gave family information
7  about LEWIS, LEWIS III, LORRAINE, and MINORS GIVING THE PRIVATE INFORMATION
8  ABOUT MINORS'S RESIDENCES AND OTHER INFORMATION FOR THE PUBLIC AT
9  LARGE TO FIND. She had taken said information off of LEWS'S cell phones, social security card
10 and veterans administration medical card that she stole from LEWIS in May of 2012. COX,
11 MILLER, WILEMAN, KEHOE and FORD all placed that information about LEWIS'S family,
12 addresses and where they lived on various sites on the internet, including their own. **EXHIBITS 19-**
13 **H & L, 33-Aa and 34-A &B.**

14 369.          MILLER freely admits to having posted untrue information about Plaintiff NELLE on
15 the internet after she refused to pay his extortion.

16 370.          WALSH wrote "you can run but you can't hide" on LEWIS'S public Facebook page.
17 LEWIS took WALSH'S statement to be a threat on his life. WALSH is a longtime friend of
18 CORNELL'S. Shortly after the threat was made, LEWIS'S name and address with a Google map to
19 LEWIS'S home was placed on the internet by CORNELL. Also, MINORS names, addresses with a
20 map to their homes, a map to where LORRAINE worked, and a map to LEWIS III's house, were also
21 posted by CORNELL. **These postings exposed all of them to predators**. Within one day,
22 MILLER, FORD, KEHOE, and COX also posted that information. These Defendants colluded to
23 post this private, personal information directly on numerous sites including the Huffington Post and
24 TMZ. MILLER has bragged about distributing defamatory information about NELLE to 5,000
25 websites; LEWIS alleges that MILLER placed his family's private information on 5,000 sites as well.
26 371.          CORNELL devised a phony Facebook account under the name of "Jason Meadows."
27 She used that account to post defamatory and false information about LEWIS, MINORS, LEWIS III,
28 and LORRAINE. **See EXHIBITS 19A-C.**

372. CORNELL has a site page on Facebook called MILITARY GODSHOTS, ™ LLC. CORNELL urged LEWIS to be a part of and run said site, knowing that the page was fraudulent. The modus operandi of members of the GANG is to engage innocent victims to unwittingly commit illegal acts in order to preclude said victims' from taking legal action. **MILITARY GODSHOTS TARGETS MILITARY PERSONNEL AND THEIR FAMILIES**. Essentially, CORNELL tried to induce LEWIS to actively defraud the armed forces for HER benefit. There is no LLC registered as MILITARY GODSHOTS nor is there a trademark with that name. NOT ONLY DID LEWIS REFUSE TO PARTICIPATE IN THIS ACTIVITY, HE ALSO REFUSED TO ALLOW CORNELL TO IN ANY WAY USE HIS NAME ON THAT SITE.

373. CORNELL actively engages in this same sort of activity on her "Christian" site, GODSHOTS ™, LLC, IN ORDER TO DEFRAUD CHRISTIANS. GODSHOTS IS ALSO NEITHER AN LLC NOR A TRADEMARKED NAME.

374. ALMEIDA, KELETI and YAO misrepresented that WILEMAN represented KING in case no. GC047909.

375. WILEMAN, KELETI and YAO misrepresented numerous laws and facts in case nos. GC047909 and 11-cv-08810-GW.

376. ROBINSON misrepresented himself as an attorney. At that time, ROBINSON had been suspended and subsequently disbarred.

377. WORMLEY misrepresented himself as ROBINSON, knowing that ROBINSON had been disbarred.

378. Together, ROBINSON and WORMLEY both participated in illegal activities under many pseudonyms relating to financial services and immigration. Such pseudonyms are advertised, inter alia, via the internet.

## NINTH CAUSE OF ACTION

**FRAUD BY NEGLIGENT MISREPRESENTATION asserted by Plaintiffs LEWIS, TBCS, PAEGELS, and DOE Plaintiffs 1-300 against ALL Defendants and DOE Defendants 1-300 Inclusive.**

**(The ACTS; CIVIL RICO; 2010 Tennessee Code, Title 47, Uniform Deceptive Trade Practices Act No. §47-18-101 et seq.; Tennessee Consumer Protection Act of 1977 § 47-18-104)**

379.    By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-378 inclusive of this Complaint as if the same were hereat set forth in full

379a.    All of said Defendants misrepresented numerous phony businesses in order to receive tax free money by defrauding the public. These activities have been employed for decades. As the PAG, LEWIS is authorized to reach back in time for ten years during discovery and will be undoubtedly bringing significantly more charges against these and additional Defendants. **Ref: EXHIBITS 1-50.**

380.    CORNELL, COX, KEHOE, FORD, WALSH, WILEMAN and MILLER posted fraudulent misrepresentation online over 5000 sites, about plaintiffs LEWIS and the PAEGELS. This information was false. When LEWIS the PAEGELS refused to give any more money to Defendants MILLER and CORNELL in their attempted extortions, they and other GANG members conducted a smear campaign.

381.    Said smear campaign was brought to the courts attention, however PLUIM, THOMAS and VARGAS supported their smearing; in fact, they even REPEATED said smearing in court!

382.    CORNELL intentionally or negligently misrepresented that she worked for the benefit of the Noreen Fraser Cancer Foundation at the EVENT. In fact, her only purpose for being there was to benefit TODHD, FLEMING and VARONOS.

383.    CORNELL, MILLER, COX, FORD, and KEHOE posted personal information about LEWIS on Ripoff.com, on their blogs, on u-stream feeds, other social networks and media groups such as the Huffington Post where FORD claims to work without LEWIS'S knowledge or consent.

384.    CORNELL, COX, KEHOE, FORD and MILLER also created phony Facebook accounts to use as their "hate forum." There, said Defendants hacked into LEWIS'S various accounts for additional smearing.

385.    CORNELL, COX, KEHOE, FORD and MILLER also placed MapQuest maps to the homes of MINORS and LEWIS III, to LORRAINE'S place of employment and to LEWIS'S home.

Said maps were made public on blogs, twitter, and Facebook without permission. The material remained despite demands to remove it.

## TENTH CAUSE OF ACTION

**FRAUD BY FRAUDULENT INDUCEMENT TO ENTER INTO CONTRACT** asserted by Plaintiffs LEWIS, TBCS, PAEGELS, NELLE and DOE Plaintiffs 1-300 against Defendants VARONOS, STAROPOLY, VIEWPARTNER, TODHD, TSOFTNET, KING, MILLER, BLEU, FLEMING, TORO, JUNCO, NIVEN, CORNELL, BEATY, FIN. INST., ROBINSON, WORMLEY, and DOE Defendants 1-300 Inclusive.

### (The ACTS; CIVIL RICO; FL statute for caregiving §39.5085(2)(f))

386. By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-385 inclusive of this Complaint as if the same were hereat set forth in full.

387. Said Plaintiffs were induced to enter into fraudulent contracts/agreements by ALL said Defendants, directly or indirectly. **EXHIBITS 8-A-b, 8-B through K, 13-A, 13-P through R, 13-II through OO, 16-A through I, 25-A through E, 32 A through D, 43 A & B, and 47.**

388. GRAMMER, BLEU and CORNELL knew or should have known that neither TODHD nor STAROPOLY was legitimate.

389. KING and MILLER knew that MILLER/HITMAN was not legitimate.

390. JUNCO, TORO, MILLER, KING, VARONOS, FLEMING, GRAMMER and CORNELL falsely stated material information to induce Plaintiffs LEWIS, TBCS, and PAEGELS to enter into the respective contracts for services by HITMANPR/MILLER, STAROPOLY, GREEN and TODHD.

391. Defendants BLEU, JUNCO and TORO showed a promotional video for MYEZTV featuring celebrity BLEU with the specific intent to fraudulently induce Plaintiff TBC/TBCS to enter into contracts with GREEN, TORO, VARONOS, FLEMING, VIEWPARTNER, TSOFTNET, TODHD, MILLER and KING.

392. Plaintiff TBCS were induced to pay $77,546.62 due to JUNCO and TORO'S fraud.

393. VARONOS and FLEMING knew that TODHD had no technological advancement, as they represented to induce Plaintiffs TBCS/PAEGELS to invest.

394. FLEMING and VARONOS induced TBCS/PAEGELS stating that TODHD was suitable for their particular uses—live streaming sporting events, subscription-based exercise programs, cooking programs, health-based programs and the like. In truth, TODHD DID NOT EXIST except as artwork created by FLEMING. **Singlehandedly, FLEMING created** displays for the express purpose of tricking others into believing that TODHD could do and was something it was not.

395. Defendants FLEMING and VARONOS induced TBCS/PAEGELS into paying them directly by trickery directly to their FARGO accounts sums totaling $23,000.00 for a "channel" and logos on the "TODHD network" that was nothing more than a scam created by FLEMING.

396. GRAMMER induced hundreds if not thousands to invest in the TODHD, STAROPOLY and ESTARHD fraudulent schemes.

397. At the time the representations were made and at the time the Agreement was entered into, Plaintiffs TBCS/PAEGELS were ignorant of Defendants FLEMING and VARONOS'S secret intention not to perform. Said Plaintiffs could not have, in the exercise of reasonable diligence, discovered Defendants' secret intentions. Plaintiffs entered into agreements in reasonable reliance on Defendants' promises and representations. If Plaintiff TBCS had known the truth of these matters, it would never have entered into any of the Agreements.

398. Plaintiff LEWIS would never have invested in STAROPOLY as an associate had he known it to be a Ponzi scheme.

399. MILLER induced the contract with TBCS by making untrue statements about his affiliations and abilities to improve their marking through their TODHD channel; MILLER knew at the time that TODHD was a scam.

400. Among MILLER'S false statements were "guaranteed" programming agreements with third parties: World Series of Golf (WSOG), Marie Diamond, Christian Wilde, Julie Kicke, and Stephanie King, and in so doing presented materials by the third parties and put on a display of

"phoning" some of them in the presence of TBCS members. MILLER was well aware that TODHD had no programming capabilities and that his so-called programming agreements were a lie.

401.     Defendants MILLER and KING made said representations with the intent to induce Plaintiff TBCS to enter into the Agreement and pay to Defendant MILLER a \$25,000.00, non-refundable, initial fee plus \$4,500.00 per month until the Agreement ended. Defendant MILLER'S inducements and misrepresentations about the third-party commitments went to the heart of the contract with Plaintiff TBCS, which would not have otherwise entered into the Agreement. The contract is void based on fraud.

402.     At the time of the contract, TBCS was ignorant of the fraud nor could they have discovered the truth.

403.     The true purpose for the contract was to steal TBCS/PAEGELS money and property.

404.     MILLER also induced NELLE to agree to let him market her children's book. MILLER'S sole purpose was to steal her intellectual property.

405.     ROBINSON induced TBCS to retain him and his firm for legal work by misrepresenting himself as an attorney, licensed in California.

## ELEVENTH CAUSE OF ACTION

**INDUCEMENT TO COMMIT FRAUD asserted by Plaintiffs LEWIS, TBCS, PAEGELS, and DOE Plaintiffs 1-300 against Defendants CORNELL,VARONOS, KING, MILLER, BLEU, GRAMMER, FLEMING, TORO, JUNCO, NIVEN, BEATY, FIN. INST., and DOE Defendants 1-300 Inclusive.**

### (The ACTS; CIVIL RICO)

406.     By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-405 inclusive of this Complaint as if the same were hereat set forth in full.

407.     CORNELL, MILLER, VARONOS, FLEMING, GRAMMER, BEATY, FIN. INST, BLEU, JUNCO, TORO, KING, and NIVEN actively engaged Plaintiffs to try to get them to "market" or promote said Defendants fake and/or illegal "businesses": TODHD, STAROPOLY, TNT

FAMILY FINANCE, DEDICATED TO HEALTH, HITMANPR, GODSHOTS™, LC MEDIA ENTERPRISES, and GREEN NETWORK.

408.    MILLER attempted to induce fraudulent representations by TBCS/PAEGELS by putting them in the position to unwittingly do so via a "marketing brochure" of MILLER'S creation.

409.    MILLER scripted an interview with a talk show host that included statements that GRAMMER was supposed to have made, but MILLER later accused Plaintiffs of "lying on the show."

410.    MILLER created an advertising brochure that showed on its face the business logos and names of businesses that he told said Plaintiffs were "on board with our programming." Plaintiffs refused to use the brochure unless contracts were signed first for the reason that unless there were contracts, Plaintiffs would open themselves to suit for "fraud in the inducement to contract." This TRICK AGAINST HIS OWN "CLIENT" is a perfect example of how the GANG keeps their victims under "control." MILLER resigned his "contract" soon thereafter when his trick did not work with TBCS/PAEGELS.

411.    Plaintiffs repeatedly instructed MILLER on the prerequisites for advertising their financial services business; despite that MILLER secured a domain name—TNT FAMILY FINANCE—trade name and organized advertising segments with NIVEN costing Plaintiffs $10,000.

412.    CORNELL created several documents, which she tried—unsuccessfully—to get LEWIS to sign. One document was e-mailed to LEWIS on May 23rd 2012 @ 5:28:55 PM where it shows that CORNELL wanted LEWIS to call Twitter as stating that LEWIS was her attorney and that she (CORNELL) was a bona fide celebrity so CORNELL could get a "check mark" next to her name (falsely elevating her status on Twitter). LEWIS understood that CORNELL was attempting to use him in order to scam Twitter and Twitter users; LEWIS refused to comply with CORNELL'S scheme as he was NOT going to be induced to commit fraud. **See EXHIBIT 49-E.**

413.    CORNELL created a form letter and sent it LEWIS to on May 29th 2012 @ 1:39:52: P.M. The letter was a solicitation about a fraudulent business, GODSHOTS, that CORNELL claimed to own. CORNELL'S salutation was a fraudulent business called LC MEDIA ENTERPRISES. CORNELL wanted LEWIS to send it to his contact list, which he did not do. LEWIS went on to the

California Sec. of State website and checked out LC MEDIA ENTERPRISES and found there was no such business.

414.     CORNELL also demanded—to no avail—that LEWIS and others sign fraudulent paperwork. See example, **EXHIBIT 49-D-1 and 2.**

## **TWELFTH CAUSE OF ACTION**

**CONVERSION asserted by Plaintiffs LEWIS, TBCS, PAEGELS, and DOE Plaintiffs 1-300 against Defendants VARONOS, KING, MILLER, FLEMING, TORO, JUNCO, and Defendants 1-300 Inclusive.**

### **(The ACTS; CIVIL RICO; T.C.A. § 39-14-101)**

415.     By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-414 inclusive of this Complaint as if the same were hereat set forth in full.

416.     Said Defendants stole said Plaintiffs money and property for their own personal use.

417.     PAEGELS paid NIVEN to do advertising videotapes of the PAEGELS which she filmed at her studio. Without the PAEGEL'S permission, NIVEN gave those tapes to MILLER instead of the PAEGELS; MILLER has refused to give them to the PAEGELS.

418.     While still under contract with TBCS (PAEGELS), on December 4, 2010, Defendants KING and MILLER, with the help of CORNELL who told NELLE that MILLER had shown her his handgun and said he would "take care of them [PAEGELS] if we did not turn over the tapes, STOLE the videotapes PAEGELS made of the EVENT that evening.

419.     KING put the tapes in her purse and walked out of the EVENT with MILLER after promising to digitize them and return them the following Wednesday. PAEGELS never saw their property again, which was the "plan" from the outset.

420.     VARONOS appeared at the EVENT to promise PAEGELS that he would "upload" their material after MILLER and KING finished with the digitizing. VARONOS said this was necessary in order to put the material on their TODHD "channel." In fact, this was VARONOS'S part in the conspiracy to steal the videotapes from the PAEGELS.

421.     Prior to the event, VARONOS negotiated with a company, Pure Chemistry, to reward their contribution to TODHD at the EVENT with copies of TBCS'S videotapes.

## THIRTEENTH CAUSE OF ACTION

**GRAND LARCENY THEFT of PERSONAL PROPERTY asserted by Plaintiffs LEWIS, TBCS, PAEGELS, and DOE Plaintiffs 1-300 against Defendants MILLER, KING, NIVEN, CORNELL, VARONOS, FLEMING and DOE Defendants 1-300 Inclusive.**

### (The ACTS; CIVIL RICO; TN Common Law)

422.     By this reference. LEWIS herein incorporates each and every allegation of the foregoing paragraphs1-421 inclusive of this Complaint as if the same were hereat set forth in full.

423.     MILLER, KING and VARONOS stole videotapes belonging to said Plaintiffs and distributed the material to others.

424.     Plaintiff LEWIS through his investigation as the PAG has been   informed and believes, and thereon alleges, that at all times mentioned herein Defendant CORNELL is engaging in copyright infringement and theft by marketing. via the internet, the shows known as **"Too Close For Comfort,"** which are owned by <u>D.L.T., LTD. of 124 E. 55th St., New York, NY 10019</u>. According to legal counsel for D.L.T., CORNELL is marketing and selling their products without permission.

425.     Plaintiff's PAEGELS and TBCS own the exclusive rights to the material that was videotaped by the PAEGELS, using their own cameras, tapes, and equipment at CarStar/Nuke the Fridge, Frank & Sons, Extreme Green, Interviews of Stephanie King, Randy Sotile, John Carter, and Walter Coulter and at the EVENT. All celebrities had waived their right to copyright ownership of any of this material, which was stolen by MILLER, and KING.

426.     Plaintiff PAEGELS and TBCS were given express and/or implied permission by Variety EVENT organizers to videotape the red carpet, the rehearsals, the show itself, and the backstage interviews and were freely given their own EVENT badges and access to all areas of the venue.

427.     All content on all of the PAEGELS videotapes was/is original and unique.

428.     LEWIS alleges and believes that Defendants KING and MILLER and their agents, digitized said copyrighted material videotaped at the Variety EVENT on December 4, 2010 as well as other copyrighted material videotaped on or about September 1, 2010 through December 4, 2010 at NIVEN'S studio, CarStar/Nuke the Fridge, Frank and Sons, Extreme Green, and Interviews of Stephanie King, Randy Sotile, John Carter, and Walter Coulter and disseminated it for their benefit.

429.     CORNELL, MILLER, KING, NIVEN, VARONOS, FLEMING and CORNELL all conspired to commit theft via individual, group, and interrelated means.

## FOURTEENTH CAUSE OF ACTION

**GRAND THEFT OF MATERIAL 18 U.S.C. § 2314 asserted by Plaintiffs LEWIS, TBCS, PAEGELS, and DOE Plaintiffs 1-300 against Defendants MILLER, KING, NIVEN, VARONOS, CORNELL and DOE Defendants 1-300 Inclusive.**

**(The ACTS; CIVIL RICO; National Stolen Property Act 18 U.S.C. § 2314, TN TITLE 39 statutory and/or common law)**

430.     By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-429 inclusive of this Complaint as if the same were hereat set forth in full.

431.     LEWIS alleges and believes that Defendants NIVEN, KING and MILLER and their agents, digitized said material videotaped at the Variety EVENT on December 4, 2010 as well as other material videotaped on or about September 1, 2010 through December 4, 2010 at NIVEN'S studio, CarStar/Nuke the Fridge, Frank and Sons, Extreme Green, and Interviews of Stephanie King, Randy Sotile, John Carter, and Walter Coulter and used it for their own purpose(s), including, but not limited to, placing it on the internet to reach 5,000 sites including to "pktube.onePakistan.com, Prismotube, tube.7s-b.com, mahaythi.com, bluesplayer.co.uk., ISPs, Youtube and Facebook. All of these HD videos were stolen by through the collusive and conspiratorial efforts of MILLER, KING, NIVEN, VARONOS, and CORNELL. **EXHIBITS 17 A-C.**

///

///

///

## FIFTEENTH CAUSE OF ACTION

**UNFAIR COMPETITION BY TORTIOUS INTERFERENCE WITH EXISTING BUSINESS RELATIONSHIP; PROCUREMENT OF BREACH OF CONTRACT asserted by Plaintiffs LEWIS, TBCS, PAEGELS, and DOE Plaintiffs 1-300 against Defendants VARONOS, KING, MILLER, FLEMING, TORO, JUNCO, GRAMMER, BLEU, CORNELL and DOE Defendants 1-300 Inclusive.**

### (The ACTS; CIVIL RICO; Tenn. Code Ann. § 47-50-109)

432.     By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-431 inclusive of this Complaint as if the same were hereat set forth in full.

433.     On the strength of GRAMMER, CORNELL, and BLEU'S endorsements of TODHD, Plaintiff TBCS and the PAEGELS shifted from their original business plan to having their TODHD channel become the avenue by which they would present their programs to the public at large with their third-party affiliates.

434.     When TODHD turned out to be a fraud and owing to the abuse all had suffered from KING and MILLER, said third-party relationships of TBCS were destroyed.

435.     TBCS'S third-party agreements were INTENTIONALLY destroyed by VARONOS, FLEMING, MILLER, KING, TODHD, TSOFTNET, VIEWPARTNER, JUNCO, and TORO; but for the advertising averments made by GRAMMER and BLEU, TBCS/PAEGEL'S would never have considered TODHD as an alternative to their original plans.

436.     Material belonging solely to TBCS/PAEGEL was distributed by MILLER and his con-conspirators on the internet constituting unfair competition.

437.     MILLER and KING deliberately spoiled relationships with all of TBCS/PAEGEL'S business affiliates, partners and prospective clients by deliberately being abusive and insulting to and about them.

438.     VARONOS, KING, MILLER, FLEMING, TORO, JUNCO, GRAMMER, BLEU, CORNELL concealed that TODHD was a Ponzi scheme their GANG devised to commit fraud.

///

///

///

## SIXTEENTH CAUSE OF ACTION

**UNAUTHORIZED PRACTICE OF LAW asserted by Plaintiffs LEWIS, TBCS, PAEGELS, and DOE Plaintiffs 1-300 against Defendants WILEMAN, YAO, KELETI, MILLER, JUNCO, TORO, ROBINSON, WORMLEY, ROBERTS, VARGAS, PLUIM, THOMAS, WALSH, CORNELL and DOE Defendants 1-300 Inclusive.**

### (The ACTS; CIVIL RICO; CANONS of JUDICIAL CONDUCT; RULE 5.5, CHAPTER 5 RULES OF PROFESSIONAL CONDUCT)

439.     By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-438 inclusive of this Complaint as if the same were hereat set forth in full.

440.     Said Defendants committed illegal acts during the course and scope of their duties as attorneys, judge, and clerk; such acts included perjury, obstruction of justice, conspiracy, collusion, denial of due process, life endangerment, issuing an unlawful warrant for arrest, corruption, submitting false documents to a federal court, soliciting perjured testimony, defamation, computer hacking, internet fraud, internet hacking, ex parte communications and conspiracies, collusion to defraud, prevarication as to the law, prevarication as to facts, creating false identities and practicing law without a license.

441.     PLUIM, THOMAS, WILEMAN, KELETI, VARGAS, ROBERTS and YAO all committed perjury and bribery by making and/or adopting false statements made at various times in hearings for case no. GC047909 and 11-cv-08810-GW, which are ALL on the record.

442.     MILLER, TORO, and JUNCO acting in *propria persona* committed perjury by making false statements in pleadings and to the courts on the record at hearings.

443.     Said Defendants conspired with each other to perpetuate their corrupt GANG activities.

444.     LEWIS has investigated and has found that WALSH, WILEMAN, and ROBINSON HAVE ALL practiced law in California without a license. There is no public record supporting WILEMAN'S claim to be an attorney; the schools WILEMAN lists on the State Bar of California website do not support his claims. **EXHIBITS 7-A through D.** WALSH is only licensed to practice law in the state of Colorado, yet he gave on-going legal advice to CORNELL. Robinson has been disbarred for committing numerous instances of fraud on clients in the same manner as he committed on Plaintiffs PAEGELS/TBCS.

445. Said Defendants conspired to hack into Plaintiffs' computers and databases to create false legal documents and identities.

446. WILEMAN and YAO submitted a corrupted copy of Plaintiffs' complaint in case no. GC047909 to J. Wu. at the time they removed it to federal court as case no. 11-cv-08810-GW.

447. In a "ruse," PLUIM ordered NELLE to hand MILLER a copy of WILEMAN'S corrupted version of the complaint ostensibly for the purpose of "serving" MILLER. When NELLE refused to distribute the corrupted complaint, PLUIM ordered WILEMAN to hand it to MILLER. The entire "charade" was for an illegal purpose as MILLER had already been served by the sheriff; (this fact is on the record in PLUIM'S court on October 14, 2011). No judge or attorney is licensed to commit fraud upon the court, not even the judge.

448. MILLER, as a *pro per* Defendant, perjured himself by defaming LEWIS and/or The PAEGELS in pleadings, meetings, and in court on the record.

449. WILEMAN, KELETI and YAO repeatedly lied about facts and law in pleadings in both federal and state courts.

450. YAO refused to report for a subpoenaed deposition or submit her subpoenaed working copy of the complaint to Plaintiffs.

451. ROBINSON was suspended from the practice of law at the time he took a $5,000 retainer for his services. WORMLEY conspired with ROBINSON as his business partner and as the recipient of ROBINSON'S letters to Plaintiffs. WORMLEY also scheduled appointments for ROBINSON AFTER ROBINSON'S disbarment.

452. WILEMAN conspired with ROBINSON by colluding with him at the Defendant's table in federal court on December 8, 2011, in 11-cv-08810-GW.

///

///

///

///

///

///

## SEVENTEENTH CAUSE OF ACTION

**BREACH OF CONTRACT asserted by Plaintiffs LEWIS, TBCS, PAEGELS, and DOE Plaintiffs 1-300 against Defendants CORNELL, MILLER, KING, JUNCO, TORO, VARONOS, FLEMING, ROBINSON, WORMLEY, BEATY, FIN. INST., INS. and DOE Defendants 1-300 Inclusive.**

### (The ACTS; CIVIL RICO; Restatement (Second) of Contracts; U.C.C.; Tenn. Code Ann. § 47-50-109; U.S. and TN common law)

453.    By this reference LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-452 inclusive of this Complaint as if the same were hereat set forth in full.

454.    As members of the GANG, GRAMMER, CORNELL and BLEU induced the public at large to engage in the other GANG member's fraudulent schemes.

455.    FIN. INST. breached their duty to self-report that they had been sued in case no. GC047909 to the federal and state banking authorities, as required by law.

456.    As members of the GANG, Defendants FIN. INST. breached their express and/or implied duty to ensure Plaintiffs that the charges being made on their credit/debit cards and at their banks was for a legal and legitimate purpose. They all breached their duty by allowing charges and accounts benefitting a Ponzi Scheme and other fraudulent agreements by members of the GANG.

457.    INS. breached their duty to the Plaintiffs and the public trust by engaging ALMEIDA, WILEMAN, KELETI and YAO to fraudulently represent KING.

458.    INS. committed "bad faith" insurance fraud by refusing to pay KING'S claim instead of conspiring with ALMEIDA, WILEMAN, KELETI, NEWELL and YAO to "represent" KING against Plaintiffs in case nos. 047909 and 11-cv-08810-GW.

459.    Plaintiffs LEWIS, PAEGELS and TBCS entered into various contracts with CORNELL, NIVEN, VARONOS, FLEMING, KING, MILLER, JUNCO, TORO and respective businesses. All of the contracts were breached by said Defendants who made materially fraudulent representations at formation and/or subsequently by failing to comply with the contract's terms. CORNELL breached her agreement with NELLE for legal services in connection with case nos. GC047909 and 11-cv-08810-GW. The foregoing paragraphs include the rather numerous contracts

entered into by these parties; breach occurred as a result of said Defendants fraudulent representations made at formation. No defendant ever intended to perform as agreed.

460.    Said Plaintiffs fully performed as agreed until breach by defendants became self-evident.

461.    Defendant INS. committed bad faith insurance in fraudulently litigating KING'S claim for business fraud as described herein instead of paying her claim as it was filed.

## EIGHTEENTH CAUSE OF ACTION

**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING asserted by Plaintiffs LEWIS, TBCS, PAEGELS, and DOE Plaintiffs 1-300 against Defendants CORNELL, MILLER, KING, JUNCO, TORO, VARONOS, VIEWPARTNER, FLEMING, MILNER, ROBINSON, WORMLEY, BEATY, FIN. INST., INS. and DOE Defendants 1-300 Inclusive.**

**(The ACTS; CIVIL RICO; Restatement (Second) of Contracts; U.C.C.; Tenn. Code Ann. § 47-50-109; U.S. and TN common law)**

462.    By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-461 inclusive of this Complaint as if the same were hereat set forth in full.

463.    Defendants FIN. INST. breached the implied covenant of good faith and fair dealing by failing to properly investigate the use of bank accounts and credit/debit card processing in agreements with VARONOS, FLEMING, JUNCO, TORO, ROBINSON, WORMLEY, MILLER, KING, VIEWPARTNER, MILNER, BEATY, and CORNELL.

464.    FIN. INST. are members of the GANG as otherwise they should have realized the sort of "businesses" they enabled to operate by giving Defendants access to banks and credit/debit card processing. The Plaintiffs and the public at large has a legitimate expectation that FIN. INST. will protect their private information, NOT disclose it to racketeers, as here.

465.    Plaintiffs LEWIS, PAEGELS and TBCS have an expectation—along with the rest of the United States and world—that FIN. INST. has a duty to conduct "due diligence" to protect their card members before partnering in Ponzi schemes and fraudulent businesses as members of the GANG. There is no question that TODHD was not a company organized by any secretary of state.

1 | Similarly, STAROPOLY was nothing more than a pyramid scam to gather personal and credit card
2 | information from Plaintiffs and other victims.

3 | 466.  Once the FIN. INST. became aware that their services had been used for illegal
4 | purposes they had a further duty to rectify their mistake; instead FIN. INST. have ignored same and
5 | taken no action to offer restitution or apprise Plaintiffs, named and unnamed, of the fraud.

6 | 467.  On or about March, 2010 Defendant CORNELL became an associate of Defendant
7 | STAROPOLY and began "recruiting" others, including LEWIS who thought he was becoming
8 | affiliated with a legitimate multilevel marketing" firm.

9 | 468.  Defendants GRAMMER, BLEU and CORNELL were the promoters of
10 | STAROPOLY and TODHD.

11 | 469.  GRAMMER promotes ESTARHD.

12 | 470.  Advertisements of STAROPOLY were placed on the TODHD network and
13 | enrollment opportunities were available from that site as well; it was designed to "scoop up" visitors
14 | to TODHD.

15 | 471.  Defendants FIN. INST., FLEMING, and/or VARONOS failed to disclose and actively
16 | withheld all but the most basic terms of the contract that associates entered at the time of enrollment.

17 | 472.  Defendants GRAMMER'S, BLEU'S and CORNELL'S names and likeness continued
18 | to be used on the TODHD and STAROPOLY sites until on or about July 1, 2011. Currently,
19 | GRAMMER is seen posing on the ESTARHD.TV site that has taken the place of STAROPOLY in
20 | Defendant's on-going and continuing Ponzi scheme(s).

21 | 473.  At the time MILLER, KING, VARONOS, and CORNELL conspired to steal the
22 | EVENT videotapes with false promises, they knew they had no intention of returning them.

23 | 474.  Defendants KING and MILLER spontaneously offered to take the videos for
24 | digitizing and promised to return them to the PAEGELS. They took the tapes on the basis of that
25 | promise. This "scheme" was in furtherance of the purpose(s) of the GANG as neither of said
26 | Defendants had any intention of keeping their promise.

27
28

475.     Neither ROBINSON nor WORMLEY have made no attempt to give Plaintiff's their money or their case file back to them. They had no intention of doing any legal work; it was a ruse to cheat them out of $5,000.00.

476.     ROBINSON and WORMLEY are members of the GANG. VARONOS referred the PAEGELS to ROBINSON to pursue JUNCO and TORO knowing that PAEGELS would pay money for "legal services" that he knew the PAEGEL'S would not receive.

477.     ROBINSON has been disbarred for fraud.

478.     Plaintiff TBCS entered into the Agreement with Defendants JUNCO and TORO and paid a total of $77,546.62 in TORO'S fraudulent business venture, GREEN.   JUNCO and TORO knew at the outset that GREEN was a fake business.

479.     Defendant CORNELL tried to induce LEWIS to sign a contract with her to invest in and represent GODSHOTS for the purpose of defrauding the public at large by soliciting donations.

480.     Defendant CORNELL advertises GODSHOTS as a charity to supposedly help children and families.   In fact, there is no such charity and all of the money donated goes to CORNELL personally.

481.     Defendant CORNELL collected $3,666.00 from LEWIS under false pretenses the money was to a "loan" between the months of February – July, 2012.  CORNELL not only has refused to repay the debt, but has actively defiled LEWIS and endangered his family, LEWIS III, LORRAINE, and MINORS.  CORNELL WAS INTEGRAL IN CAUSING THE DISMISSAL OF CASE NO. GC047909 (WHERE UNTIL THAT TIME, SHE WAS A NAMED PLAINTIFF) BY CONSPIRING AND COLLUDING WITH THE DEFENDANTS AND PLUIM.

482.     This method of misrepresentation and subsequent punishment is a standard *modus operandi* of this GANG.

///
///
///
///
///

## NINETEENTH CAUSE OF ACTION

**INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS** asserted by
**Plaintiffs LEWIS, TBCS, PAEGELS and DOE Plaintiffs 1-300 against MILLER, KING,
VARONOS, FLEMING, WILEMAN, CORNELL and DOE Defendants 1-300.**

**(U.S. Common law;Tenn. Code Ann. § 47-50-109)**

483.        By this reference, LEWIS herein incorporates each and every allegation of the

foregoing paragraphs 1-482 inclusive of this Complaint as if the same were hereat set forth in full.

484.        At the time TBCS and the PAEGELS met MILLER and KING, TBCS had entered

into contracts for services ("PARTNERS") with four individuals and/or business entities necessary to

advance their business interests.

485.        The ONLY purpose that TBCS entered into its agreement for "services" with

MILLER was to advance these enterprises and PARTNER'S agreements as quickly as possible.

Meetings with PARTNERS were held for that express purpose.

486.        At these meetings, KING and MILLER were openly rude and abusive toward those

PARTNERS.

487.        As a direct result of said Defendant's acts toward PARTNERS, the relationship

between TBCS and the PAEGELS with the PARTNERS was permanently damaged so that they all

ceased to exist.

488.        Defendants VARONOS and FLEMING were fully aware that TBCS'S purposes for

contracting with them was to have a forum for programming for the PARTNERS, namely on

TODHD. The fact that TODHD was a "sham" further directly damaged the TBCS and PARTNER

agreements.

489.        VARONOS and FLEMING intended that all of TBCS'S/PAEGEL'S contracts would

be harmed to some degree in order to stall discovery of the fraud as long as possible.

490.        Knowing that TODHD could not really accommodate the types of programming needs

expressed and planned for by Plaintiff TBCS, said Defendants MILLER and KING—of necessity

sabotaged all of the PARTNER Agreements already in place, suggesting instead other third parties that "would be great." Of necessity, said Defendants saw to it that no third party relationship came to fruition. It became an endless cycle.

491.        KING was an integral part of this plan because she was the only one with any credibility duty-bound by a license (chiropractic) not to participate in any illegal activity.

492.        CORNELL, WILEMAN and GRAMMER interfered with NELLE'S contractual relationship for legal services with BRIAN WILLIAMS.

## TWENTIETH CAUSE OF ACTION

**FRAUD VIA INTERNET asserted by all Plaintiffs and DOE Plaintiffs 1-300 against all Defendants and DOE Defendants 1-300.**

**(The ACTS; U.S. Common Law; Tennessee Civil RICO Act; Money laundering T.C.A. § 39-14-903 et seq.)**

493.        By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-492 inclusive of this Complaint as if the same were hereat set forth in full.

494.        All Plaintiffs allege and believe that All Defendants conspired with each other to devise a scheme or plan to extort, embezzle, defame, bribe, blackmail, defraud, endanger, infringe, and commit other illegal acts via the internet.

495.        PLUIM, WILEMAN, THOMAS, and VARGAS conspired and colluded to enumerate illegal activities via the internet in case no. GC047909.

496.        PLUIM, WILEMAN, THOMAS, and VARGAS conspired to issue and post via the internet a NO-BAIL-WARRANT against LEWIS based SOLELY on a false and fraudulent "internet profile" of LEWIS.

497.        Said warrant endangered LEWIS'S life, health, and welfare and violated his civil rights as a plaintiff *ex rel* (private attorney general) in case no. GC047909.

498.        Said false and fraudulent profile of LEWIS was created and posted on the internet by CORNELL, WILEMAN, MILLER, COX and KEHOE.

499. Said false and fraudulent profile of LEWIS was created in part from the information CORNELL obtained as a direct result of CORNELL'S theft of LEWIS'S social security and veterans administration hospital medical card.

500. CORNELL stole LEWIS'S social security and veteran's administration hospital medical card while he was an invited guest in CORNELL'S home. LEWIS asserts that the sole purpose for CORNELL'S invitation to be her guest was the premeditated plan to steal his private and personal identification information in furtherance of the GANG'S conspiracies. By taking LEWIS'S information CORNELL placed his personal and private information on the internet.

501. While LEWIS was staying at CORNELL'S home two of LEWIS'S cell phones were stolen. The phones contained huge amounts of personal information such as telephone numbers and text messages. When LEWIS confronted CORNELL about the theft, CORNELL blamed her roommates. This was another lie and part of CORNELL'S plan to distribute false information about LEWIS.

502. CORNELL admitted to creating false accounts via the internet on her Facebook page.

503. FIN. INST. enabled money to be taken from Plaintiffs by providing illegal financial wire transfers, money laundering transactions and credit card processing services.

504. INS. used the internet to receive complaints with no intent to act on those complaints.

505. INS. actively concealed proof of the date when it hired WILEMAN in case no. GC047909. As a result, Plaintiffs TBCS, PAEGELS, and LEWIS allege that WILEMAN was hired subsequent to removal of case no. GC047909 to federal court.

506. WILEMAN persisted in harassing LEWIS and NELLE through e-mail and by fax after he was told to correspond through the mail.

507. MILLER committed numerous fraudulent activities via the internet, including, but not limited to harassment, stalking, computer hacking, computer fraud, false advertisement, hate mail, e-mailed correspondence, extortion, blackmail, threats, infringement of copyrights, defamation, false identities, character assassination, endangerment of the health and welfare of MINORS, and more.

508. KING advertised illegal businesses via the internet.

509.     KING advertised and participated in MILLER'S illegal activities via the internet, including, but not limited to harassment, stalking, computer hacking, computer fraud, false advertisement, hate mail, e-mailed correspondence, extortion, blackmail, threats, infringement of copyrights, defamation, false identities, character assassination, endangerment of the health and welfare of MINORS, and more.

510.     GRAMMER, BLEU, and CORNELL used their celebrity in order to defraud investors via the internet on a large scale by promoting and participating in TODHD and STAROPOLY.

511.     GRAMMER continued to lend his celebrity to ESTARHD.TV after claiming to have been victimized already by VARONES and FLEMING.

512.     CORNELL, COX, MILLER, HADDOCK and KEHOE colluded and conspired to damage and cause bodily harm to Plaintiffs LEWIS, LEWIS III, LORRAINE and MINORS via the internet.

513.     CORNELL and MILLER colluded to damage and cause personal harm to Plaintiffs TBCS and PAEGELS via the internet.

514.     GRAMMER used his kelseylive.com site to lend credibility to the Ponzi schemes TODHD, STAROPOLY, and ESTARHD.TV.

515.     CORNELL used myriad internet sites including, but not limited to, lydialive.com, Linked-in, Facebook, and Wikipedia to defraud via GODSHOTS, TODHD and STAROPOLY.

516.     HAYELAND uses the internet to conduct illegal business practices for the benefit of himself and SIMMONS.

517.     AXE and SIE are illegal businesses used by HAYELAND and SIMMONS via the internet.

518.     WELSH threatened bodily harm against LEWIS via the internet.

519.     FORD defamed LEWIS via the internet, including, but not limited to the following sites: Twitter, Facebook, the Huffington Post (on-line newspaper) and U-stream.

///

///

///

# TWENTY-FIRST CAUSE OF ACTION

**INTERNET PIRACY, PHISHING asserted by Plaintiffs LEWIS, TBCS, PAEGELS and DOE Plaintiffs 1-300 against CORNELL, COX, KEHOE, MILLER, KING and DOE Defendants 1-300.**

**(FEDERAL Civil RICO Act, U.S. Common Law; Gangs Act; Money laundering)**

520.     By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-519 inclusive of this Complaint as if the same were hereat set forth in full.

521.     CORNELL, COX, and KEHOE pirated LEWIS'S personal property from his Facebook and posted it on the internet without his EXPRESS permission, as stated on his site.

522.     CORNELL, COX, and KEHOE intentionally pirated LEWIS'S property and posted it on numerous internet sites. Once LEWIS discovered the infringement and demanded that it be immediately removed, he was blocked from their sites.

523.     CORNELL hacked into LEWIS'S sites via the laptop computer LEWIS had loaned to CORNELL. CORNELL hacked into LEWIS'S Facebook, reopened a closed twitter account, hacked into LEWIS'S AT&T e-mail account, and attempted to access LEWIS'S secure bank account and records without his permission. These activities were discovered by LEWIS upon retrieving his laptop computer.

524.     MILLER and KING pirated TBCS and PAEGELS personal property.

# TWENTY-SECOND CAUSE OF ACTION

**NEGLIGENCE/ GROSS NEGLIGENCE asserted by LEWIS, TBCS, PAEGELS, LEWIS III, LORRAINE, MINORS and DOE Plaintiffs 1-300 against FIN. INST., INS., WILEMAN, YAO, KELETI, PLUIM, THOMAS, VARGAS, NEWELL, KING, CORNELL, MILLER, KEHOE, JUNCO, HADDOCK, WALSH, FORD, VARONOS, FLEMING, COX, SIMMONS, GRAMMER, ICON, AXE, HAYELAND and DOE Defendants 1-300.**

**(18 U.S.C. 1961-1968 Civil RICO Act; 12 U.S.C. § 2605(e)(2)(A) and (e)(3); U.S. Common Law; TN Civil RICO Act 1968; The TN Gangs Act; TN Uniform Act §§ 29-11-101 *et seq*; Money laundering T.C.A. §39-14-903 et seq.)**

525.     By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-524 inclusive of this Complaint as if the same were hereat set forth in full.

526.     Said Plaintiffs were each harmed by the negligent acts or omissions to act by said Defendants. **See EXHIBITS 1-50.**

527.     FIN. INST. violated 12 U.S.C. § 2605(e)(2)(A) and (e)(3), and failed to properly supervise the use of their institutions for which they had a duty to the public and the banking regulators.

528.     INS. failed to properly supervise WILEMAN, YAO, KELETI, NEWELL, and KING in regards to their collective in-court fraudulent pleadings in case no. GC047909.

529.     NEWELL failed to comply with California regulations regarding attorney-client representation and privilege in case no. GC047909.

530.     WILEMAN, INS, KING, MILLER, and JUNCO, conspired to cause one or more Plaintiffs SEVERE EMOTIONAL AND/OR PHYSICAL HARM under the doctrine of *res ipsa loquitur* as a direct and proximate result of their actions during a "meet and confer" on January 16, 2012 at NELLE'S law office. See **EXHIBIT No. 9**, a true and correct transcription of said meeting.

531.     WILEMAN, INS., NEWELL, YAO and KING intentionally/negligently corrupted the original complaint in case no. GC047909 by changing information on no fewer than 206 pages in order to get KING'S default overturned.  Said corrupted complaint was filed by said Defendants when they removed the state case to federal jurisdiction.  WILEMAN perjured himself by signing an affidavit stating that he was filing a "true and correct copy" of the complaint.

532.     YAO drafted and filed numerous false and defamatory pleadings based upon a corrupted copy of the original complaint that contained no fewer than 206 pages of alterations in case GC047909/11-CV--08810-GW (state and federal jurisdiction respectively).

533.     CORNELL, COX, KEHOE, MILLER, and HADDOCK conspired to cause one or more Plaintiffs physical harm under the doctrine of *res ipsa loquitur* as a direct and proximate result of their actions of placing private and privileged information about MINORS, LEWIS, LEWIS III and LORRAINE over the internet.

534.     CORNELL, COX, KEHOE, MILLER, and HADDOCK conspired to create financial distress to LEWIS III by falsifying reports about LEWIS III to FEMA (federal emergency management agency), a department of Homeland Security, stating that LEWIS III was a "felon."  As

a direct result of said Defendant's acts, LEWIS III was terminated by his employer for a period of time until such reports were proven to be false. Negligence per se is asserted under the doctrine of *res ipsa loquitur*.

535.      KEHOE, COX, KEITH, VARONOS, FLEMING, MILLER and CORNELL own and operate fraudulent businesses in order to defraud the public at large.

536.      VARONES, FLEMING, MILLER, KING, GRAMMER, CORNELL, BLEU, and COX conspired to cause personal financial hardship to Plaintiffs LEWIS, TBCS, and the PAEGELS.

537.      PLUIM, WILEMAN, VARGAS and THOMAS conspired to falsify court records causing dismissal of case no. GC047909 in its entirety, including, but not limited to LEWIS'S Supplement filed under the Civil RICO Act naming PLUIM, WILEMAN and THOMAS as co-defendants.

538.      PLUIM, WILEMAN, VARGAS, THOMAS, MILLER, GRAMMER, INS., FIN. INST., VARONES, FLEMING, KING, JUNCO, TORO, and CORNELL conspired to thwart collections by defaulted Defendants through their use of false and defective legal and personal information in case no. GC047909.

539.      PLUIM, WILEMAN, VARGAS, THOMAS, MILLER, GRAMMER, INS., FIN. INST., VARONES, FLEMING, KING, JUNCO, TORO, NEWELL, and CORNELL conspired to ignore California State laws in order to dismiss case no. GC047909 in its entirety.

540.      HAYELAND, SIMMONS, AXE, SIE negligently defrauded the public at large by misrepresenting themselves as legitimate businesses via the internet.

541.      NIVEN intentionally/negligently conspired with MILLER and KING to defraud TBCS and the PAEGELS by infringing copyrighted materials and embezzlement of funds.

542.      NIVEN was an integral party to MILLER and KING'S fraudulent business transactions.

///

///

///

///

# TWENTY-THIRD CAUSE OF ACTION

**GRAND THEFT BY EMBEZZLEMENT asserted by ALL Plaintiffs and DOE Plaintiffs 1-300 against ALL Defendants, and DOE Defendants 1-300 Inclusive)**

**(The ACTS; CIVIL RICO; U.S. Common Law; T.C.A. § 39-14-101; T.C.A. § 39-14-103; T.C.A. § 39-14-112; T.C.A. § 39-14-114 T.C.A. § 39-14-118; T.C.A. § 39-14-127; T.C.A. § 39-14-136; Section 39-14-903)**

543.       By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-542 inclusive of this Complaint as if the same were hereat set forth in full.

544.       Said Defendants have conspired to embezzle money and/or property from Plaintiffs LEWIS, LEWIS III, LORRAINE, MINORS TBCS, and PAEGELS, directly and/or indirectly.  **See EXHIBITS 1-50.**

545.       Defendants CORNELL, MILLER, KING, VARONOS, FLEMING, ROBINSON, WORMLEY, TORO, and JUNCO entered into Agreements as set forth in the above paragraphs and engaged in other activities with the intent of permanently depriving Plaintiffs, LEWIS, TBCS, and PAEGELS of, *inter alia*, property, money, time, reputations, future earnings, and privacy.

546.       Defendants PLUIM, WILEMAN, CORNELL, THOMAS, ALMEIDA, MILLER, KING, VARONOS, ROBERTS intentionally made false and defamatory statements to/about Plaintiff LEWI, and PAEGEL.

547.       Defendants PLUIM and THOMAS used their taxpayer-paid positions as employees of the LASC to engage in on-going illegal activities, including but not limited to those involving this GANG.

548.       Said Defendants intended to permanently deprive said Plaintiffs LEWIS, TBCS, and PAEGELS of their property, money, reputations, and likenesses.

549.       By their actions and acting in concert with each other Defendants CORNELL, VARONOS and FLEMING embezzled money from LEWIS, TBCS and the PAEGELS in exchange for a business opportunity that did not exist.

///

///

550.        CORNELL "borrowed" more than $3,666 from LEWIS, which she claimed she needed to pay her overdue water bill, pool supplies, food, entertainment, and rent, with no intent to ever pay LEWIS back. CORNELL assured LEWIS that this money was "just a loan." When LEWIS declined to give CORNELL any additional funds, CORNELL embarked upon the above described hate and discrediting campaign against LEWIS, his family—including the MINORS—and took action to destroy the lawsuit that she had initiated. **See EXHIBIT 27.**

551.        GRAMMER, BLEU and CORNELL'S widespread and lengthy endorsements were the only reasons why Plaintiffs LEWIS, TBCS, and the PAEGELS invested in TODHD and/or STAROPOLY and why Variety agreed to the sponsorship of their charity EVENT.

552.        Defendants CORNELL, BLEU, FLEMING, VARONOS, and GRAMMER conspired to embezzle money, property, credit cards, time, wages, and businesses via TODHD, STAROPOLY and now ESTARHD.

553.        FIN. INST. embezzled funds by automatically debiting credit/debit cards for the monthly fee.

554.        FIN. INST. failed to supervise the use of their services by the GANG, thereby being an integral factor in the GANG'S financial success.

555.        ALL said Defendants participated in PHISHING Plaintiffs and many others.

556.        Upon discovery and realization of said Defendant's fraudulent schemes, LEWIS began his investigations, which lead him to become a party and PAG in the LASC case.    Due to his inquiries, Plaintiff LEWIS was, even while being charged on his Debit card as a STAROPOLY associate, surreptitiously "locked" out of both TODHD and STAROPOLY.   This sort of "hit-and-run" methodology pervades all aspects of said Defendants activities.

557.        FIN. INST. and BEATY repeated tried to charge LEWIS'S debit card forcing LEWIS to cancel the card.

558.        FIN. INST. and BEATY failed to properly supervise the processing of the credit cards.

559.        FIN. INST. and BEATY, EXP and BANK failed to properly investigate the companies using the processing to ensure that they were being used for legitimate, business purposes.   In fact,

1 TODHD was not a business at all and the structure of STAROPOLY was obviously that of a Ponzi
2 scheme. FIN. INST'S. failed to comply with state and federal BANKING REGULATIONS.

3 560. Consumers regularly and justifiably rely on banking regulations for protection.

4 561. Numerous other accounts of similar inducements to defraud third parties will be
5 exposed at trial.

6 562. All Defendants attempted to cause Plaintiffs LEWIS, TBCS and the PAEGELS to
7 engage in some kind of illegal activity as a way of insuring against legal action against them; the fear
8 of being in some way liable for doing something illegal that had been arranged by defendants was
9 itself a scheme. This clever plan did not work this time, since LEWIS and PAEGEL knew the law.
10 MILLER tried to engage TBCS and PAEGELS in several of his plans that would have been illegal in
11 some way. Their unwillingness to follow these directions and insistence that MILLER return their
12 property led to MILLER'S resignation. CORNELL also tried to engage LEWIS in illegal activities,
13 which LEWIS refused to do.

14 563. KING garnered the trust of Plaintiffs by advertising that she is a chiropractor; because
15 the California State Chiropractic Board specifically proscribes chiropractors from committing ANY
16 dishonest acts, Plaintiffs reasonably relied on her chiropractic status to give credibility to her.

17 564. MILLER was accorded the same credibility based upon his so-called status as a
18 chiropractor and owing to his partnership with KING. MILLER, however, has refused to provide any
19 proof of his license.

20 565. KING knew and expected that Plaintiffs would rely upon her status as a chiropractor
21 as she made her videotapes available for private viewing to the Plaintiffs.

22 566. KING, MILLER and VARONOS agreed that Plaintiffs' goal was to use the videotapes
23 of the EVENT for their own benefit, however she knew that once in her possession Plaintiffs would
24 never see their videotapes again and/or ever receive a benefit from them.

25 567. KING, MILLER and VARONOS have retained the videotapes for more than 2 years.
26 Such prolonged time has greatly diminished the value of the material on the tapes in the marketplace.

27 568. KING and MILLER actively operate the public relations scheme at her chiropractic
28 office using the equipment there.

569.     MERITUS was the credit card processor that charged the debit card and failed to disclose the full agreement prior to their signing up for STAROPOLY.

570.     BEATY was informed that STAROPOLY was continuing to make charges on credit cards after the associate LEWIS dropped out of the program.

571.     FIN. INST. and BEATY intentionally participated in the Ponzi Scheme by processing credit cards of those who were victimized in the scheme.

572.     FIN. INST. failed to employ measures to protect their credit card clients from fraudulent use by the GANG.

573.     GRAMMER and CORNELL directly endorsed STAROPOLY and encouraged LEWIS to invest his money in STAROPOLY.

574.     VARONOS and FLEMING intended to defraud all investors in TODHD, ESTARHD, and STAROPOLY.

575.     FIN. INST. enabled the Ponzi scheme to embezzle from others by receiving stolen funds and laundering it.

576.     ROBINSON and WORMLEY fraudulently pretended to sue TORO and JUNCO in exchange for a $5,000.00 retainer.

577.     NIVEN conspired with MILLER to create material they know was unusable in order to be paid $10,000.00. NIVEN and MILLER have retained possession of PAEGEL'S materials.

578.     PLUIM awarded sanctions fees to Defendants including but not limited to KING and WILEMAN, in the GC047909 against NELLE personally WITHOUT LEGAL JUSTIFICATION in furtherance of the Ponzi Scheme and the GANG'S illegal objectives.

## TWENTY-FOURTH CAUSE OF ACTION

**INVASION OF PRIVACY, PHISHING asserted by LEWIS, LEWIS III, LORRAINE, MINORS, NELLE and DOE Plaintiffs 1-300 against CORNELL, COX, KEHOE, MILLER, HADDOCK, WILEMAN, KING, THOMAS, PLUIM, VARGAS and DOE Defendants 1-300 Inclusive.**

**(U.S. CONST. art 14; The ACTS; U.S. Common Law; T.C.A. § 39-13-101 *et seq.* ; TENN. CONST. art. I§ 8; Fed. Privacy Act of 1974; T.C.A § 39-13-601 *et seq.*; 18 U.S.C. § 2511)**

1 | 579. By this reference, LEWIS herein incorporates each and every allegation of the
2 | foregoing paragraphs 1-578 inclusive of this Complaint as if the same were hereat set forth in full.

3 | 580. CORNELL invaded LEWIS'S privacy by posting his private and personal information
4 | on CORNELL'S Facebook, Twitter, Huffington Post, The Rip-Off Report, Lydiacornell.com, Linked
5 | In, and Wikipedia.

6 | 581. CORNELL, MILLER, KEHOE, COX and others invaded the privacy of LEWIS,
7 | LEWIS III, LORRAINE and MINORS by posting on numerous of their web sites said Plaintiff's
8 | names, addresses, and map locations to their homes and work.

9 | 582. CORNELL invaded the privacy of LEWIS, NELLE, THOMAS W.V. PAEGEL, Steve
10 | Daubenspeck, and the F.B.I. by taping conversations with them without their permission.

11 | 583. WALSH invaded LEWIS'S privacy by posting threatening messages to LEWIS over
12 | the internet. He stated, "You can run, but you cannot hide" as though LEWIS would have reason to
13 | hide.

14 | 584. MILLER, PLUIM, NIVEN and KING invaded NELLE'S privacy by conspiring to
15 | disparage NELLE'S professional and private image on 5,000 websites.

16 | 585. FORD invaded LEWIS'S privacy by publicly and falsely disparaging LEWIS on the
17 | Huffington Post internet site, his Facebook page, and on his Blog, www.jameshillisford.com.

18 | 586. COX invaded LEWIS'S privacy by placing LEWIS'S private information on her
19 | Facebook and on The Rip-Off Report, an internet site from which information cannot be removed.

20 | 587. WILEMAN invaded LEWIS'S privacy by harassing, stalking and threatening LEWIS
21 | in court and in pleadings and further by sending documents to and phoning LEWIS'S home in
22 | connection with case no. GC047909, speaking with LEWIS'S disabled brother.

23 | 588. PLUIM conspired to invade LEWIS'S privacy by denying LEWIS'S motion ordering
24 | WILEMAN to "cease and desist" the aforementioned activities in connection with case GC047909.

25 | 589. HADDOCK invaded the privacy of Plaintiffs LEWIS, LORRAINE, LEWIS III and
26 | MINORS by supplying their personal information to his co-conspirators in ¶581 exposing all of them
27 | to internet predators.

28 |

590.     THOMAS, PLUIM, VARGAS invaded LEWIS'S privacy by failing to seal LEWIS'S private medical records, as requested by LEWIS.

591.     CORNELL invaded NELLE'S privacy by pretending to be a client in case no. GC047909 when she was a co-conspirator of the GANG collecting private and business information about NELLE and her family and sharing it with the GANG.

592.     PLUIM and MILLER invaded NELLE'S privacy by making disparaging remarks about NELLE without any opportunity to hear from NELLE that were distributed to 5,000 web sites over the internet.

## TWENTY-FIFTH CAUSE OF ACTION

**COMPUTER FRAUD AND ABUSE, INTERNET HACKING, PHISHING, AND CYBER-CRIMES asserted by LEWIS, PAEGELS, LEWIS III, LORRAINE, MINORS, and DOE Plaintiffs 1-300 against CORNELL, MILLER, NIVEN, KING, COX, WILEMAN, FORD, WALSH, KEITH, VARONES, FLEMING, GRAMMER and DOE Defendants 1-300.**

**(18 USC 1961-1968 Tennessee Computer Hacking or Cyber Crimes Act, Computer Fraud and Abuse Act (18 USC 1030); U.S. Common Law; T.C.A. § 39-14-601 and § 39-14-602)**

593.     By this reference, Plaintiffs herein incorporates each and every allegation of the foregoing paragraphs inclusive of this Complaint as if the same were hereat set forth in full.

594.     Said Defendants all participated directly or indirectly in cyber-crimes against all Plaintiffs. **See EXHIBITS 1-50.**

595.     CORNELL hacked into LEWIS'S computer, Facebook, LEWIS'S AT&T e-mail account, re-activated LEWIS'S closed Twitter account and attempted to hack into LEWIS'S bank records to obtain and distribute information.

596.     CORNELL sent messages to others during her access to LEWIS'S accounts portending to have been sent by him. LEWIS received threats of violence directed towards him personally as a direct result of CORNELL'S hacking.

597.     CORNELL created an e-mail account in NELLE'S name using a pseudonym without NELLE'S permission.

598.        MILLER, NIVEN and KING conspired to hack into the e-mail accounts of LEWIS and PAEGELS and LEWIS'S Facebook account.

599.        ROBINSON and WORMLEY claimed to offer legal services to TBCS and PAEGELS via the internet.

600.        ROBINSON and WORMLEY advertised their legal services over the internet.

601.        COX and KEITH sell computer services via the internet through an illegal business. LEWIS is informed and believed that they conspired with other Defendants to hack into various Plaintiffs computers.

602.        WILEMAN filed fraudulent court pleadings via computer in case no. 11-CV-08810-GW obtainable to the public at large via the internet.

603.        WILEMAN, MILLER, VARONES, and FLEMING hacked into government criminal databases to create a FALSE criminal "record" about LEWIS. The "record" contained a photograph that was not LEWIS and a description with distinctly different physical features to LEWIS (eye and hair color; height).

604.        PLUIM, THOMAS and VARGAS placed fraudulent court pleadings in case no. GC047909 on the internet.

605.        FORD placed private, false and/or defamatory statements about LEWIS, LEWIS III, LORRAINE and MINORS on the internet on FORD'S Facebook page, FORD'S blog, The Huffington Post, and on CORNELL'S Facebook page.

606.        WALSH impeded an investigation by LEWIS in case no. GC047909 via the internet through threats of violence and interference.

607.        VARONES, FLEMING, CORNELL, BLEU and GRAMMER committed numerous cyber-crimes by defrauding the public at large, including LEWIS, PAEGELS and TBCS.

///

///

///

///

///

# TWENTY-SIXTH CAUSE OF ACTION

**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT asserted by LEWIS, THOMAS W. PAEGEL and DOE Plaintiffs 1-300 against WILEMAN, PLUIM, MILLER, THOMAS, VARGAS, VARONES, FLEMING, CORNELL and DOE Defendants 1-300.**

608.    By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-607 inclusive of this Complaint as if the same were hereat set forth in full.

609.    Plaintiffs LEWIS AND THOMAS W. PAEGEL ARE DISABLED AMERICANS. LEWIS IS A DISABLED AMERICAN VETERAN. AS SUCH, ALL ACTS BY DEFENDANTS ARE SUBJECT TO VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACTS AS APPROPRIATE.

# TWENTY-SEVENTH CAUSE OF ACTION

**HARASSMENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS asserted by ALL PLAINTIFFS and DOE Plaintiffs 1-300 against ALL DEFENDANTS and DOE Defendants 1-300.**

**(CIVIL RICO ACT 18 USC 1961-1968; U.S. Common Law; T.C.A. § 39-17-315; T.C.A. § 39-17-309; Restatement (second) of Torts § 46(l) (1965); See *Bain v. Wells*, 936 S.W.2d 618 (1997))**

610.    By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs inclusive of this Complaint as if the same were hereat set forth in full.

611.    All Defendants, DIRECTLY OR INDIRECTLY, conspired to and did in fact harass and intentionally inflict severe emotional distress upon all Plaintiffs. **See EXHIBITS 1-50.**

612.    WILEMAN harassed LEWIS by sending numerous—more than 30—legal documents to LEWIS'S home instead of LEWIS'S work address. Furthermore, WILEMAN harassed LEWIS by phoning LEWIS'S home at a time when he knew LEWIS was not at home, upsetting LEWIS'S disabled brother. WILEMAN admitted on October 19, 2012 to having made that call.

613.    WILEMAN harassed LEWIS by refusing to properly address mail to LEWIS then complained in court that LEWIS refused to accept the mail (case no. GC047909).

614.    WILEMAN, MILLER and PLUIM conspired to and did harass LEWIS in pleadings and hearings by accusing him of having a felony record and by creating a false arrest record in order

to get LEWIS off the case no. GC047909. PLUIM denied LEWIS his rights of due process by refusing to allow LEWIS to present information, witnesses, documents or proof of any type in his defense. PLUIM dismissed LEWIS'S Civil RICO Supplement wherein he, MILLER and WILEMAN were all named Defendants. PLUIM also dismissed LEWIS as a Plaintiff.

615.        PLUIM harassed and inflicted extreme emotional distress by issuing an "order to show cause" against LEWIS based upon false information from WILEMAN. Such order ultimately lead to a NO-BAIL WARRANT for LEWIS'S arrest issued by PLUIM at WILEMAN'S expense causing extreme emotional distress that exacerbated LEWIS'S medical conditions.

616.        WILEMAN, KELETI, INS. and KING conspired to create said false accusations and warrant.

617.        WILEMAN harassed Plaintiffs LEWIS and The PAEGELS through his court pleadings in case nos. GC047909 and 11-cv-08810-GW by clogging court dockets, misstating laws and facts, unwarranted name-calling, false accusations, and corrupting documents in such a way as to confuse the judges into granting his motions without any legal basis.

618.        WILEMAN altered 206 pages of the original complaint in GC047909 filed by NELLE and then removed the case to federal court. WILEMAN expected Judge Wu to grant WILEMAN'S motion to dismiss for being unable to properly read the complaint, which Judge Wu did not do. Ultimately the case was remanded for lack of jurisdiction, incurring more than $500,000.00 in attorney fees and costs. This activity coupled with WILEMAN'S discovery violations during the meet and confer on JANUARY 16, 2012 CAUSED severe emotional distress to the PAEGELS. The corrupted document was not discovered by them until just prior to the remand, but Judge Wu had been very critical of the condition of the complaint during his time of jurisdiction. Because WILEMAN was shocked at J. Wu's remand and denying his motion, LEWIS believes that WILEMAN has employed that "trick" in other cases where this "strategy" has worked. LEWIS will be investigating WILEMAN'S other cases for evidence of this type of corruption and malfeasance going back 10 years, which is a felony and grounds for disbarment and could vitiate other court decisions.

619.     WILEMAN further filed a false cause of action against NELLE and THOMAS W.V. PAEGEL for the purpose of harassing them and in anticipation of this suit as a pre-emptive "strike."

620.     CORNELL hacked into computers belonging to LEWIS in order to send messages to her "friends" that appeared to be from LEWIS; such messages were statements that disparaged CORNELL in such a way as to incite attacks against LEWIS by her friends. A few of those attacks resulted in CORNELL'S "friends" being also named Defendants herein.

621.     CORNELL harassed LEWIS by filing false police and F.B.I. reports against LEWIS. CORNELL lied to the Santa Monica, CA judge in order to get a restraining order against LEWIS, which was issued against CORNELL as well. Since then, CORNELL has repeatedly continued to harass LEWIS by violating that order.

622.     CORNELL harassed LEWIS and The PAEGEL'S by making false statements about LEWIS in court; such statements contributed to LEWIS having a no-bail warrant issued for his arrest and that case being dismissed by PLUIM, who was CORNELL'S co-conspirator in the deception.

623.     CORNEL, knowing that LEWIS was extremely ill, harassed LEWIS by bombarding him with phone calls at all hours of the day and night and refused to cease and desist this disruptiveness when LEWIS demanded that she do so.

624.     CORNELL'S phone calls, Facebook postings, e-mail messages and twitter statements were so upsetting to LEWIS that they triggered two heart attacks in July, 2012.

625.     CORNELL, KEHOE, MILLER and COX made statements about LEWIS, MINORS, LORRAINE, NELLE and LEWIS III on COX'S blogs, avcomputerdoctor and lyrixenterprises (**EXHIBIT 5**); on their Facebook pages; on the Facebook page of their fictitious devise, Jason Meadows; on lydiacornell.com; on lydiacornelllive.com; in a video recording by CORNELL on U-stream; on MILLER'S Facebook hitmanpr and on MILLER'S blog at hitmanpr.com; and on Marty-k-hello. Amongst the statements made by CORNELL, KEHOE, MILLER and COX were the names, addresses and a map to the residences of MINORS. LEWIS, LORRAINE and LEWIS III each demanded that said Defendants cease and desist their harassment and remove the personal information about them and MINORS from all of their sites. LEWIS got a restraining order against

KEHOE, however CORNELL and COX have evaded service of process. E-mails are still being sent to LEWIS III, ignoring his demands to cease and desist.

626.        HADDOCK caused LORRAINE extreme emotional distress by conspiring with KEHOE, CORNELL and COX by giving the information to them that they posted on numerous internet sites as to LORRAINE'S work location and home address of MINORS, with maps. HADDOCK participated in said action in order to gain greater access to the MINORS who are the children of HADDOCK and LORRAINE.

627.        CORNELL, KEHOE and COX harassed LEWIS and caused LORRAINE **EXTREME EMOTIONAL DISTRESS** by causing LORRAINE and two of the MINORS to be deprived of each other's company and enjoyment. The MINORS were only 5 and 7 years old. Despite HADDOCK'S motives, LORRAINE had to relinquish her court-ordered entitlement to said MINOR'S company in order to protect their safety and health from predators stemming from the foregoing internet statements made by CORNELL, KEHOE and COX. CORNELL falsely advertises on her web sites that she is a child "advocate."

628.        Owing to HADDOCK'S actions as outlined in ¶626 and CORNELL, KEHOE and COX'S harassment of LEWIS and LEWIS III, caused EXTREME EMOTIONAL DISTRESS for LEWIS III who was forced to move to a different home and relocate in order to protect the other two MINORS from predators.

629.        CORNELL, KEHOE and COX placed LEWIS'S home address with a Google map on the foregoing sites in order to deprive him of the company and enjoyment of MINORS, who are his grandchildren. Such information also endangered LEWIS'S health and well-being by causing undue stress from fear of assault by predators and friends of CORNELL, KEHOE and COX.

630.        CORNELL, KEHOE and COX made untrue statements that LEWIS III had been arrested.

631.        CORNELL, KEHOE and COX placed a map of LORRAINE'S work address on their internet sites.

632.        KEHOE sent LEWIS a copy of her e-mail messages to three friends disparaging LEWIS.

633.    MILLER harassed NELLE by making numerous offensive and vile statements and accusations during the January 16, 2012 meet and confer. Most of MILLER'S remarks were of a sexual nature.

634.    MILLER further harassed NELLE by filing the aforementioned false Bar, Sheriff and Police reports against her.

635.    MILLER further harassed NELLE by making false internet comments and listings—some that were in her name as though she had made the postings—over the internet to which he freely admitted were spread to at least 5,000 sites.

636.    MILLER further harassed NELLE by making "gestures" involving his middle finger directed at NELLE while in PLUIM'S courtroom on January 18, 2013.

637.    MILLER further harassed NELLE by making "unseemly" verbally offensive noises directed at NELLE in PLUIM'S courtroom at all GC047909 hearings.

638.    VARGAS harassed Plaintiff THOMAS W.V. PAEGEL by forcing him to leave the courtroom for no reason, violating his civil rights to be heard and/or participate in the case no. GC047909 as a Plaintiff.

639.    PLUIM harassed NELLE, TOMMY and LEWIS by threatening to have them removed from court hearings for trying to correct lies being told by WILEMAN, MILLER, VARONOS, CORNELL and KELETI.

640.    VARGAS harassed Plaintiffs by singling them out during court for making too much noise in the courtroom—ORDERING TOMMY TO LEAVE—while IGNORING that Defendants MILLER, JUNCO and WILEMAN and ROBERTS freely and loudly spoke, had phone alarms go off, and in general conducted themselves in a disruptive manner by laughing and loud talking.

641.    VARGAS, THOMAS and PLUIM—on WILEMAN'S "orders"—harassed LEWIS and NELLE on October 19, 2012 by having three sheriffs stand behind them and ordering them not to speak in their own defense as Defendants made numerous, unsubstantiated and false statements about them in case no. GC047909.

642.    VARONES harassed LEWIS by making an in-court death threat against LEWIS: "LEWIS is a DEAD MAN."

643. **LEWIS knows that the aforementioned harassment and infliction of extreme emotional distress are commensurate with techniques employed by organized crime to pressure others into complying with their goals. This sort of "pattern" of activities is one reason why Congress empowered individuals with the Civil RICO Act. Attacking and endangering children is commonly used by GANGS to bring about their desired results.**

## TWENTY-EIGHTH CAUSE OF ACTION

**FILING FALSE REPORTS WITH GOVERNMENT AGENCIES asserted by LEWIS, LEWIS III, NELLE and DOE Plaintiffs 1-300 against WILEMAN, MILLER, VARONOS, PLUIM, THOMAS, VARGAS, KING, INS., CORNELL, and DOE Defendants 1-300.**

**(False Claims Act (FCA), 31 U.S.C. §§ 3729 – 3733; U.S. common Law; T.C.A. 39-16-502)**

644. By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-643 inclusive of this Complaint as if the same were hereat set forth in full.

645. WILEMAN made false statements about LEWIS to the court in GC047909 accusing LEWIS of having two felony convictions and a two-year jail sentence for internet fraud.

646. WILEMAN paid for a NO BAIL WARRANT for LEWIS'S arrest, which PLUIM issued for allegedly LEWIS was practicing law in California without a license.

647. MILLER, KING, PLUIM, CORNELL, THOMAS, VARGAS, VARONOS, and INS. conspired with WILEMAN to commit the aforementioned acts outlined in ¶¶1-643.

648. CORNELL filed false reports against LEWIS with the Santa Monica Superior Court, the Beverly Hills Police Department, the Los Angeles Sheriff's Dept., and the F.B.I.

649. CORNELL made false in-court statements to the Santa Monica and Pasadena Superior Courts and to the FBI wherein she stated that LEWIS was a felon, that LEWIS "has many guns in his home," that he was never in the military. CORNELL has never been to LEWIS'S home and she has no knowledge of LEWIS'S gun ownership. CORNELL has stolen LEWIS'S Purple Heart, and knows full well that LEWIS is a veteran who was disabled in multiple wars while defending his the United States of America. LEWIS has received two Purple Hearts, one in a gift box with his name

engraved on it. LEWIS has worn items from the set to PLUIM'S court yet PLUIM ascribed credibility to CORNELL'S blatantly false statements.

650. MILLER, COX and FORD repeated said information on their blogs and Facebook pages. None of them has ever been to LEWIS'S home nor do they have any knowledge of his ownership of firearms. Conspiring with CORNELL, FORD also filed a false report with the Arlington, Massachusetts Police Department against LEWIS.

651. CORNELL made false in-court statements that NELLE "lied," but gave no other details as to those alleged "lies" and PLUIM made no inquiries of CORNELL.

652. MILLER and JUNCO filed a false report against NELLE with the Walnut, CA Sheriff's department. MILLER also filed false reports against NELLE with the Glendora Police dept.; and twice with the California State Bar Association. None of those agencies took any action against NELLE.

653. WILEMAN filed a summons and complaint with false information against NELLE and THOMAS W. V. PAEGEL based upon the meet and confer discussed *infra*. WILEMAN'S case no. BC495150, wherein he included a photocopy of MILLER'S redacted and unsigned Glendora Police Department report, is further evidence of harassment and collusion between MILLER and WILEMAN and constitutes filing false reports with a court.

## TWENTY-NINTH CAUSE OF ACTION

**INSURANCE BAD FAITH asserted by LEWIS, PAEGELS, TBCS and DOE Plaintiffs 1-300 against INS., WILEMAN, NEWELL, KING, and DOE Defendants 1-300.**

**(15 U.S.C. §§ 1011-15; U.S. Common Law)**

654. By this reference, LEWIS herein incorporates each and every allegation of the foregoing paragraphs 1-653 inclusive of this Complaint as if the same were hereat set forth in full.

655. Acting as members of the GANG, INS., WILEMAN, NEWELL, and KING conspired to avoid the payment of KING'S claim by INS. that stemmed from her "default" in GC047909.

656.     Many of the herein causes of action and activities by most of the Defendants in this case are a direct result of said ORGANIZED GANG activities paid for by INS.

657.     PLUIM and WILEMAN stated that they were both paid a "flat fee" for their respective services on the record on December 14, 2012.

658.     PLUIM, THOMAS, VARGAS, WILEMAN, ROBERTS, MILLER, JUNCO and VARONOS participated in ex parte communications on December 14, 2012 when WILEMAN requested that they "go off the record." See **EXHIBIT 1-VV**.

## THIRTIETH CAUSE OF ACTION

**BUSINESS INTERFERENCE asserted by LEWIS, LEWIS III, LORRAINE, TBCS, The PAEGELS and DOE Plaintiffs 1-300 against CORNELL, KEHOE, COX, KEITH, MILLER, WILEMAN, YAO, KELETI, NEWELL, HADDOCK, KING, PLUIM, and DOE Defendants 1-300.**

**(The ACTS; *Tenn. Code Ann.* § 47-50-109; *Lumley v. Gye*, 2 El. & Bl. 216, 118 Eng. Rep. 749 (Q.B. 1853); *Hutton v. Waters*, 132 Tenn. (5 Thompson) 527, 179 S.W. 134 (1915)).**

659.     By this reference, Plaintiffs herein incorporates each and every allegation of the foregoing 1-658 paragraphs inclusive of this Complaint as if the same were hereat set forth in full.

660.     CORNELL, COX, MILLER, FORD, HADDOCK and KEHOE conspired and contacted FEMA making false accusations against LEWIS III directly resulting in the employment termination of LEWIS III. Similarly, after posting a map to LORRAINE'S workplace, LORRAINE was forced to seek employment elsewhere.

661.     CORNELL, COX, MILLER, FORD, HADDOCK and KEHOE conspired and made three separate contacts with Angelo's Pizza in Englewood, Florida stating that they were from the Los Angeles Times wanting LEWIS III'S contact information and work information. LEWIS III had worked there on a part-time basis. Because of these contacts, LEWIS III was unable to continue working at Angelo's Pizza.

662.     MILLER created a blog in the name of NELLE without her permission and wrote defamatory material against NELLE as a visitor to the blog. In so doing, MILLER was able to spread defamatory and untrue statements about NELLE throughout the internet without her knowing it.

663.     MILLER and PLUIM conspired to get defamatory information about NELLE on the record at hearing on October 14, 2011, which MILLER then spread to 5,000 web sites. PLUIM refused to allow NELLE to correct MILLER'S false in-court statements at the time they were made. PLUIM threatened THOMAS W.V. PAEGEL with "contempt of court" when he also tried to correct the record on that date. PLUIM further refused to take appropriate action against MILLER when same was brought to his attention in pleadings and in court.

664.     PLUIM and MILLER conspired to and did in fact destroy NELLE'S reputation and law practice as a result of their aforementioned actions.

665.     KING, MILLER, VARONOS, FLEMING and CORNELL interfered with TBCS and The PAEGELS by conspiring to and stealing their videotapes.

## THIRTY-FIRST CAUSE OF ACTION

**DEFAMATION (LIBEL, SLANDER, & FALSE LIGHT INVASION OF PRIVACY)** asserted by LEWIS, LEWIS III, LORRAINE, MINORS, TBCS, NELLE, THOMAS W. V. PAEGEL, and DOE Plaintiffs 1-300 against CORNELL, COX, KEITH, INS., WALSH, FORD, NEWELL, PLUIM, MILLER, YAO, WILEMAN, KING and DOE Defendants 1-300.

(The ACTS; Restatement (2D) of Torts §§ 652E, 558, 578 (1977); U.S. Common Law; *Daniel B. Eisenstein v. WTVF-TV, News Channel 5 Network, LLC*, M2011-02208-COA-R3-CV, 2012 WL 3090307 (Tenn. Ct. App. July 30, 2012); *Ali v. Moore*, 984 S.W.2d 224, 227 (Tenn. Ct. App. 1998); *Hibdon v. Grabowski*, 195 S.W. 3d 48, 58 (Tenn. Ct. App. 2005))

666.     By this reference, Plaintiffs herein incorporates each and every allegation of the foregoing paragraphs 1-665 and **EXHIBITS 1-50** inclusive of this Complaint as if the same were hereat set forth in full.

667.     CORNELL intentionally distributed false and defamatory information about LEWIS orally in court—reflected in transcripts—as well as in the following written forms: in e-mail

messages to third persons, on her Facebook page(s), on Twitter, on her blog, lydiacornell.com, on Wikipedia, on LEWIS'S Facebook, on the Huffington Post, on TMZ.com and on Rip-Off Report.com

668.     CORNELL made bald, false statements about NELLE in court on September 13, 2012 when she said "Nelle Paegel lied."

669.     MILLER, COX, WALSH, FORD, and KEHOE repeated CORNELL'S defamatory material on their respective web sites.

670.     CORNELL intentionally distributed knowingly false and defamatory information about LEWIS and NELLE—ON THE RECORD—in hearings, in person, and over the telephone.

671.     CORNELL, PLUIM, WILEMAN, VARONOS, KING, JUNCO, TORO, YAO, MILLER, ROBERTS, INS., and NEWELL conspired to defame NELLE via the internet, in court pleadings, during hearings, and at the meet and confer on January 16, 2012.

672.     MILLER repeatedly made defamatory statements about The PAEGELS, and LEWIS to others in person, in court, in written complaints, at the meet and confer, in sworn Declarations and to 5,000 websites [by his own admission] causing severe emotional distress and PERMANENT physical harm.

## THIRTY-SECOND CAUSE OF ACTION

### VIOLATIONS OF THE FEDERAL RULES OF DISCOVERY asserted by LEWIS, THE PAEGELS, TBCS and DOES 1-300 against WILEMAN, MILLER, JUNCO, TORO and DOES 1-300 INCLUSIVE.

### (The ACTS; FRCP 26, 34, and 37 *et seq*)

673     By this reference, Plaintiffs herein incorporates each and every allegation of the foregoing paragraphs 1-672 inclusive of this Complaint as if the same were hereat set forth in full.

674.     On January 16, 2012, Defendants WILEMAN, MILLER, JUNCO, and TORO were all supposed to meet and confer with Plaintiffs' counsel, NELLE S. PAEGEL, in case 11-cv-0810-GW in good faith. **EXHIBIT 9** is a complete and true transcription of that meeting. WILEMAN, MILLER and JUNCO met with Plaintiffs' counsel NELLE and a witness of her choice, Steve

Daubenspeck, but as the transcription clearly shows WILEMAN, MILLER and JUNCO exhibited no "good faith" at the meeting.

675.     TORO failed to attend or notify NELLE that she wished to re-schedule. According to JUNCO, TORO had no intention of meeting with Plaintiffs, as required by the rules.

676.     WILEMAN refused any and all of Plaintiffs' requests for discovery. The initial disclosures (5) WILEMAN distributed at the meeting were misleading and/or defective. Two of the disclosures were affidavits containing forged signatures; one document contained redactions to make it intentionally deceptive; and an insurance policy that was not true and correct despite it being represented as such. The fifth disclosure was identical to one of Plaintiffs original exhibits. Essentially, WILEMAN failed completely to comply with the rules despite contrary assertions.

677.     MILLER, TORO and JUNCO failed to make ANY initial disclosures or ANY OTHER DISCLOSURES as requested and/or agreed to by them at the meeting.

678.     No additional discoverable information was requested of Plaintiffs, who had already disclosed some 325 pages of documentation attached as exhibits to their original complaint.

679.     WILEMAN offered and all accepted his offer to draft a Discovery Plan, which he also failed to do.

680.     Sanctions are therefore appropriate against WILEMAN, MILLER, JUNCO and TORO for their violations of Discovery rules in case 11-cv-08810-GW.

## THIRTY-THIRD CAUSE OF ACTION

**FEDERAL AND STATE INCOME TAX EVASION AND FRAUD asserted by Plaintiffs LEWIS, The PAEGELS, TBCS and DOE Plaintiffs 1-300 against ALL Defendants and DOE Defendants 1-300 Inclusive.**

**(The ACTS; IRC §7201)**

681.     By this reference. Plaintiffs herein incorporates each and every allegation of the foregoing paragraphs 1-680 inclusive of this Complaint as if the same were hereat set forth in full.

682.     LEWIS alleges and believes that in addition to cheating the public of funds another goal of the GANG is to defraud the federal Internal Revenue Service by evading taxes. As the PAG

1  and acting under the authority of the Civil RICO Act Defendant's tax and bank records for the past
2  10 years will be investigated.

3  683.  MILLER responded to NELLE'S query for his tax identification number by stating that "[he]
4  was a corp. . . . and didn't get 1099'd." **EXHIBIT 8A-a.**  MILLER insisted that The PAEGELS
5  make his checks payable to him personally or the MILLER FAMILY TRUST—located in Nevada.
6  Owing to his attitude toward being 1099'd LEWIS believes that the money stolen from The
7  PAEGELS was not reported as income.  MILLER took money from others that he likely did not also
8  report.

9  684.  MILLER colluded with VARONOS and implicated VARONOS for tax fraud in
10  **EXHIBIT 8A-a.**

11  685.  MILLER has already been investigated for tax fraud by the California State Franchise
12  Tax Board. **EXHIBIT 8A-b**.

13  586.  In addition to CORNELL'S wrongful taking of "donations" made to her fraudulent
14  "company" GODSHOTS, CORNELL sub-rents rooms for $1000.00 per month.  At times CORNELL
15  has been known to house 2 such roommates.  LEWIS has a reasonable belief that CORNELL has not
16  reported this rental income to the taxing authorities.

17  587.  **The tax and bank records for said Defendants will show the extent of each of**
18  **their liability for tax fraud.  Clearly, any Defendant who either enabled, conspired with or**
19  **wrongfully received money did not report same on their tax returns.  LEWIS will begin his**
20  **investigations with said Defendants tax and bank records.**

21

22  **DATED:**     **SUBMITTED BY:**
        RICHARD LEWIS, in *propria persona* and *ex rel*

23

24

25

26

27

28

1    # VERIFICATION OF NELLE S. PAEGEL

2    I, Nelle S. Paegel, an individual and as President of The Body Company Sports, Inc. have

3    read the herein complaint and verify under oath that to the best of my knowledge and belief that the

4    allegations are true and accurate.

5    DATED*2-17-2013*          By: _____

6                                        NELLE S. PAEGEL

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS CIVIL RICO COMPLAINT                                          Page 113

# VERIFICATION OF THOMAS W. PAEGEL

I, Thomas William Paegel, an individual and as Treasurer of The Body Company Sports, Inc. have read the herein complaint and verify under oath that to the best of my knowledge and belief that the allegations are true and accurate.

DATED: 02-17-13          By: _____
                             THOMAS W. PAEGEL

## VERIFICATION OF THOMAS W. V. PAEGEL

I, Thomas Wolfgang Von Paegel, an individual and as Secretary of The Body Company Sports, Inc. have read the herein complaint and verify under oath that to the best of my knowledge and belief that the allegations are true and accurate.

DATED: 2/17/2013        By: _Thomas V.V. Paul_
                              THOMAS W.V.PAEGEL

**VERIFICATION OF LORRAINE LEWIS**

I, Lorraine Lewis have read the herein complaint and verify under oath that to the best of my knowledge and belief that the allegations are true and accurate.

DATED: 1- 11-2013 Submitted By: _Lorraine Bresidert Lewis_
LORRAINE LEWIS

LEWIS CIVIL RICO COMPLAINT

## VERIFICATION OF RICHARD LEWIS, III

I, Richard Lewis, III have read the herein complaint and verify under oath that to the best of my knowledge and belief that the allegations are true and accurate.

DATED: 2-15-13        Submitted By: _Richard Lewis III_
                                   RICHARD LEWIS, III

**DAMAGES**

**LEWIS and ALL OTHER PLAINTIFFS pray for the following damages to be awarded:**

**1. GENERAL DAMAGES**

**A. General Damages**:  to the PAEGELS, against all defendants for the theft of HD video tapes of the EVENT. The HD video tapes stolen by CORNELL, MILLER, KING, FLEMING and VARONES in the amount **of $500,000,000.00** for loss of endorsements, sales, promotions and reproduction of said HD video tapes. LEWIS claim against Defendants CORNELL, COX VERONOS, MILLER, WILEMAN, PLUIM THOMAS KEHOE., HADDOCK INS., FIN and FLEMING For loss of enjoyment with the MINORS 1,2,3,4 in the amount of **$2,000,000.00** each Defendant

**B. CHILD ENDANGERMENT**: of the Plaintiffs MINORS 1,2,3,4 all defendants, pay Special Damages in the amounts of **$10,000,000.00** to each of MINOR 1,2,3,4 from each and every defendant JOINTLY AND SEVERALLY or an amount to be determined at trial.

**C. RESTITUTION OF MONIES PAID**. MONIES PAYABLE TO THE PAEGELS AND TBCS: **$43,080** CHARGED TO MILLER. **$23,000 CHARGED** TO VARONOS AND FLEMING, **$78,000** CHARGED TO JUNCO AND TORO, AND THE VALUE OF LITIGATION FEES AND COSTS IN CASES GC047909 AND 11-CV-08810-GW TO BE CHARGED TO CORNELL, MILLER, VARONOS, FLEMING, WILEMAN, YAO, PLUIM, KING, THOMAS, VARGAS, GRAMMER, ROBINSON, WORMLEY, FARMER'S INS., ZURICH INS., WELLS FARGO, BEATY, MERITUS, VIEWPARTNER, AND TSOFTNET TO BE DETERMINED AT TRIAL.

To LEWIS against **CORNELL** for the amount of **$3,666.00** and against **VERONOS, STAROPOLY, TODHDTV, CORNELL, COX, KEHOE, HADDOCK  FLEMING, FORD, KING,** and **MILLER** for **$129.00. Additionally, for the v**alue of litigation fees, travel, and costs associated with GC047909 and 11-cv08810-GW TO BE DETERMINED AT TRIAL.

To LEWIS III against **COX, KEHOE, HADDOCK, CORNELL, AND MILLER,** for lost wages, moving expenses, and added security for the two **MINORS, 3,4** in the amount of **$20,000,00**.

To LORRAINE for lost wages, moving expenses, added security, and loss of association and enjoyment of **MINORS 1 & 2** in the amount of **$50,000.00** per month for each and every month the children have been missing from the custody of LORRAINE. Charges to be against **CORNELL, COX, KEHOE, HADDOCK, FORD, and MILLER.**

**D.** To TBCS, and PAEGELS, **$150,000,000.00** for 41 video HD tapes from MLLER, KING, and NIVEN as compensation for lost future earnings or an amount to be determined at trial.

**E. To LEWIS III FOR BUSINESS INTERRUPTION** from CORNELL, COX, KEHOE, MILLER, AND FORD in the amount of $10,000.00 for disrupting his work with FEMA.

**D. DEFAMATION**: of PAEGELS, LEWIS, LEWIS III, LORRAINE and the MINORS 1,2,3,4 joint and severally from all defendants in the amount **$400,000,000.00**

**E. PHYSICAL DISTRESS, EMOTIONAL DISTRESS, HARASSMENT, STALKING, JUDICAL CORRUPTION, COLLUSION, INTERNET FRAUDS, INTERNET STALKING, INTERNET HARASSMENT and HACKING, FRAUD, AND ASSAULT CAUSED BY THE ALL DEFENDANT GANG MEMBERS** upon all Plaintiffs LEWIS, LEWIS III, PAEGELS, LORRAINE and the MINORS 1,2,3,4, against ALL DEFENDANTS JOINTLY AND SEVERALLY in the amount of **$100,000,000.00** to each Plaintiff and **$250,000,000.00 EACH for permanent physical harm and irreversible pain and suffering caused to LEWIS and THOMAS W. PAEGEL.**

**F. BUSINESS and DOE PLAINTIFF Damages**:

**1. For TBCS and PAEGELS** lost profits, revenue and marketing for the next 10 years in the amount of **$200,000,000.00** a year for business interruption stemming from prior business assets namely exercise teams and other assets destroyed by Defendants MILLER, KING, VARONOS, FLEMING for a **total of $2Billion**.

AND

**2**. **Such other individuals and entities to be determined at trial.**

**G. Sanctions for Discovery violations** AND for injuries suffered at the January 16, 2012 meet and confer to be determined at trial against MILLER, KING, WILEMAN, TORO, and JUNCO and any others according to discovery at time of trial.

**H. Incidental Damages** : A. Incidental damages are appropriate to be determined at trial.

**I. Damage to NELLE'S REPUTATION AND CAREER** to be determined at trial.

**2. Special Damages** : To be determined at trial.

**3. Punitive/Exemplary Damages:** Punitive damages are appropriate to punish the Defendants according to JOINT AND SEVERAL liability in an amount of $100,000,000.00 from each Defendant, or an amount to be determined at trial.

**4. Attorney Fees:** Treble fees in the amount to be determined at trial.

**5. Costs:** Treble Out of Pocket costs in the amount to be determined at trial.

**6. Unknown Plaintiffs' Damages to be determined at trial.**

7.  **TREBLE DAMAGES** ARE APPROPRIATE FOR BUSINESS AND RICO/CIVIL RICO VIOLATIONS UNDER 15 U.S.C.A. §§ 1 *et seq.,* **15 U.S.C.A.§§ 12,** *et seq.* **and The ACTS.**

8. **INTEREST FROM THE DATE OF DAMAGE AT THE LEGAL LIMIT.**

9. **Such other damages as the Court and/or Jury sees fit to award.**

Whereas; for all the foregoing reasons PLAINTIFFS pray for the following;

    **1.) Damages as prayed,**

    **2.) All charges affirmed, and**

    **3.) Such other relief as the court deems proper**

Date. February 19th 2013

RICHARD LEWIS, in PROPRIA PERSONA
and EX REL as a Private Attorney General